Electronically filed

**UNITED AUTOMOBILE, AEROSPACE AND**
**AGRICULTURAL IMPLEMENT WORKERS OF**
**AMERICA LOCAL 3047, et al**.                                                              PLAINTIFFS

v.

**HARDIN COUNTY, KENTUCKY**, et al.                                                     DEFENDANTS

\*         \*         \*         \*         \*         \*         \*

## MEMORANDUM IN SUPPORT
## OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................................1
STATEMENT OF FACTS ....................................................................................................................1
ARGUMENT..........................................................................................................................................4
   I.  ORDINANCE 300 IS NOT A "STATE LAW" AND DOES NOT APPLY THROUGHOUT "ANY STATE OR TERRITORY" WITHIN THE MEANING OF NLRA § 14(b). ............................5
      A.  The Terms of NLRA § 14(b). ..................................................................................................5
      B.  The Legislative Context of NLRA § 14(b)...............................................................................7
      C.  Applying the § 14(b) Exception to Allow Local Right-to-Work Laws Would Impede Federal Labor Policy..........................................................................................9
   II.  CHECK-OFF AND HIRING HALL AGREEMENTS ARE NOT "AGREEMENTS REQUIRING MEMBERSHIP IN A LABOR ORGANIZATION AS A CONDITION OF EMPLOYMENT" WITHIN THE MEANING OF NLRA 14(b). ..................................................11
      A.  Check-off. ...............................................................................................................................12
      B.  Hiring Halls. ............................................................................................................................13
CONCLUSION....................................................................................................................................15

List of Exhibits:

1. Affidavit of Renard Duvall, President of UAW Local 3047 [unsigned at time of filing this Motion].

2. Affidavit of Michael Elick, International Representative for UFCW Local 970C.

3. Affidavit of Bob Blair, President of UFCW Local 227.

3-A. Excerpt from CBA between Local 227 and Kroger.

4. Affidavit of Fred Zuckerman, President/Principal Officer of General Drivers, Warehousemen & Helpers, Local 89.

4-A. Excerpts from CBA between Local 89 and E&B Paving.

5. Affidavit of Charlie Essex, Business Manager and Financial Secretary of IBEW Local 369.

5-A. Excerpts from CBA between IBEW Local 369 and NECA, Louisville Chapter.

6. Affidavit of Mark Morgan, President of IUE-CWA Local 83766.

7. Printout from web page of Jefferson County League of Cities, http://jeffersoncountyleagueofcities.com/?page_id=55.

8. Copy of Hardin County Ordinance No. 300, Series 2014.

**INTRODUCTION**

This is a facial challenge to Sections 4 and 5 of Hardin County Ordinance No. 300, Series 2014 on the ground that these provisions are preempted by the National Labor Relations Act, as amended. There is no factual dispute concerning the terms of the Ordinance. The plaintiffs are entitled to judgment as a matter of law, since the challenged provisions are clearly preempted by the NLRA. Accordingly, the court should enter summary judgment in favor of the plaintiffs. Rule 56(a), Fed.R.Civ.P.

**STATEMENT OF FACTS**

Ordinance No. 300, Series 2014, was enacted by the Fiscal Court of Hardin County on January 13, 2015. (Copy provided as Exhibit 8.) Hardin County is a unit of local government and a political subdivision of the Commonwealth of Kentucky. *See* KRS 67.083(1); Ord. 300 § 1. The Fiscal Court of Hardin County is authorized to enact ordinances that apply within the area of the County. KRS 67.083(7). Ordinance 300 applies only to "'employee[s].' 'employer[s],' 'labor organization[s],' and 'person[s]' . . . as defined by the National Labor Relations Act." Ord. 300, § 3. *See* 29 U.S.C. § 152(1), (2), (3) & (5). The ordinance applies to all contracts between employers and labor organizations covering employees within Hardin County that are entered into or renewed after January 13, 2015. Ord. 300 § 11.

> Section 4 of Ordinance 300 makes it unlawful for any
>
> person covered by the National Labor Relations Act [to] be required as a condition of employment or continuation of employment . . . to become or remain a member of a labor organization[,] to pay any dues, fees, assessments, or other charges of any kind or amount to a labor organization[, or] to pay to any charity or other third party, in lieu of such payments, any amount equivalent to or a pro-rata portion of dues, fees, assessments, or other charges regularly required of members of a labor organization.

Ord. 300 § 4 (B), (C), & (D). This provision of the ordinance makes it unlawful for employers and labor organizations to apply to employees within Hardin County the sort of "union security" agreements requiring either union membership or the payment of union fees that are authorized and regulated by the NLRA.[1] Section 6 of the ordinance declares all such union security agreements to be unlawful, null and void, even where the agreements meet the requirements of the NLRA.

Each plaintiff labor organization is a party to a separate collective bargaining agreement that applies to one or more workplaces located within Hardin County. Each agreement contains a union security clause that is lawful under the NLRA. (Exhibits 1-6.[2]) Each plaintiff expects to include an identical union security clause in future agreements, but Ordinance 300 would make it unlawful to agree to or apply such a union security clause within Hardin County. (Exhibits 1-6.)

Section 5 of Ordinance 300 requires written authorization for an employer to deduct union dues or fees from an employee's wages and requires that such authorization be revocable at any time. Ord. 300 § 5. Payroll deduction of union dues or fees ("check-off") is authorized and regulated by both the NLRA and § 302(c)(4) of the Labor Management Relations Act. LMRA § 302(c)(4) specifically authorizes check-off authorizations that are "irrevocable for a period of [no] more than one year." 29 U.S.C. § 186(c)(4). Section 5 of the Ordinance would

---

[1] Agreements that make union membership or the payment of union fees a condition of employment are referred generally to as "union security" agreements. **NLRB v. General Motors Corp.**, 373 U.S. 734, 740 (1963). Union security agreements that speak in terms of requiring union membership are referred to as "union shop agreements," and those that speak in terms of paying union fees are referred to as "agency shop agreements." *Id.* at 743-44. Regardless of their different wording, union shop and agency shop agreements both require nothing more of covered employees than the payment of a fee to their union representative. *Id*. at 743.

[2] Exhibit 1, the Affidavit of Renard Duvall, is an unsigned copy; however, Counsel anticipate receipt of the signed Affidavit shortly, and it will be submitted promptly.

thus make unlawful payroll deductions of union dues or fees that are lawful under the NLRA and the LMRA. Further, Section 6 of the ordinance provides that "[a]ny agreement, understanding, or practice . . . that violates the rights of employees as guaranteed by provisions of this Ordinance is hereby declared to be unlawful, null and void, and of no legal effect." Ord. 300 § 6. Section 6 could be read to invalidate check-off authorizations that are lawful under federal law, even where the employee intends for the authorization to continue in effect.

Each of the plaintiff labor organizations receives dues and fees that have been deducted from the wages of employees working in Hardin County pursuant to written authorizations that are irrevocable for one year. Section 5 of Ordinance 300 would make it unlawful to treat these written authorizations as irrevocable for one year. And, for that reason, Section 6 would seem to invalidate these authorizations even if no employee attempted to revoke.

Section 4 of Ordinance 300 also makes it unlawful for any "person covered by the National Labor Relations Act [to] be required as a condition of employment or continuation of employment . . . to be recommended, approved, referred, or cleared by or through a labor organization." Ord. 300 § 4 (B), (C), & (D). This provision of the ordinance makes it unlawful for employers and labor organizations to apply exclusive union hiring hall agreements that are authorized and regulated by the NLRA to employees within Hardin County. Section 6 of the ordinance declares all such agreements to be unlawful, null and void, even where the agreements meet the requirements of the NLRA.

Plaintiff Local 369 of the International Brotherhood of Electrical Workers is a party to a separate collective bargaining agreement that applies to one or more workplaces located within Hardin County. The agreement contains an exclusive union hiring hall clause that gives Local 369 the right to refer job applicants, without regard to their union membership status, to covered

employers. (Exhibit 5.) Local 369's hiring hall agreement is lawful under the NLRA. Local 369 expects to include an identical union security clause in future agreements, but Ordinance 300 would make it unlawful to agree to or apply such a union hiring hall clause within Hardin County. (Exhibit 5.)

**ARGUMENT**

Hardin County Ordinance 300 seeks to regulate several aspects of the relationships among "employee[s]," "employer[s]" and "labor organization[s]" that "are covered by the National Labor Relations Act." Ord. 300, §§ 3 & 4. In particular, Ordinance 300 seeks to regulate the negotiation and application of collectively bargained contracts clauses that: make union membership or the payment of union fees a condition of employment ("union security agreements"); provide for authorized payroll deduction of an employee's union dues or fees ("check-off agreements"); and provide that a union shall refer job applicants for employment on a nondiscriminatory basis ("hiring hall agreements"). These are all matters that are regulated by the NLRA.

"It is by now a commonplace that in passing the NLRA Congress largely displaced state regulation of industrial relations." **Wisconsin Dep't of Labor & Human Relations v. Gould**, 475 U.S. 282, 286 (1986). "[T]he comprehensive amalgam of substantive law and regulatory arrangements that Congress set up in the NLRA," **Local 926, International Union of Operating Engineers v. Jones**, 460 U.S. 669, 675-76 (1983), has "occupied the field" of labor relations "creat[ing] rights in labor and management both against one another and against the State," **Golden State Transit Corp. v. City of Los Angeles**, 493 U.S. 103, 109 (1989). *See* **Chamber of Commerce v. Brown**, 554 U.S. 60, 65 (2008).

Section 14(b) of the NLRA creates an exception to federal preemption for the narrow class of "right-to-work" laws delineated in that provision. *See* **Local 514, Transport Workers**

***v. Keating,*** 212 F.Supp.2d 1319, 1322 (E.D. Okla. 2002) (applying § 14(b) to an Oklahoma right-to-work law containing provisions similar to those in Ordinance 300). The Supreme Court has held that "right-to-work laws which are not encompassed by § 14(b) . . . are no[t] permissible" because such laws are preempted by the NLRA. ***Oil, Chemical & Atomic Workers v. Mobil Oil Corp.***, 426 U.S. 407, 413 n. 7 (1976). *See id*. at 412-13 ("the central inquiry . . . is whether § 14(b) permits the application of [the state] right-to-work laws").

Ordinance 300 is "not encompassed by § 14(b)," ***Mobil Oil***, 426 U.S. at 413 n. 7, for two distinct reasons. First, and most fundamentally, Ordinance 300 is not a "State . . . law" and does not apply throughout "any State or Territory" within the meaning of § 14(b) and thus is not encompassed by the exception at all. Second, the particular provisions in Ordinance 300 regulating dues check-off and union hiring halls would not come within § 14(b), even if they had been included in a state law, because check-off and hiring hall agreements are not "agreements requiring membership in a labor organization as a condition of employment" within the meaning of § 14(b). We take up each of these points in turn.

## I. ORDINANCE 300 IS NOT A "STATE LAW" AND DOES NOT APPLY THROUGHOUT "ANY STATE OR TERRITORY" WITHIN THE MEANING OF NLRA 14(b).

### A. The Terms of NLRA § 14(b).

Section 14(b) of the National Labor Relations Act, as amended in 1947, provides:

> Nothing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.

29 U.S.C. § 164(b).

By its terms, NLRA § 14(b) creates a carefully delimited exception to the federal policy of authorizing union security agreements. That exception applies in "any State or Territory"

5

where "State or Territorial law" prohibits such agreements. By providing that the exception applies throughout "any State or Territory" where "State or Territorial law" prohibits union security agreements, the terms of § 14(b) make it particularly clear that the law triggering the exception is that of the highest law-making authority in the State or Territory.

Hardin County does not have authority to enact laws that apply throughout the State of Kentucky. "Hardin County [i]s a political subdivision of the Commonwealth [of Kentucky]." Ord. 300 § 1. The County is thus a "unit[] of general purpose local government." KRS 67.083(1). "County ordinances" are "enforce[able] throughout the entire area of the county" but not beyond that area. KRS 67.083(7). Ordinance 300 is a local law that applies only within the boundaries of the County. *See* Ord. 300 § 11.

If § 14(b) had been intended to authorize local laws having limited application to a particular political subdivision, the exception to federal labor policy stated there would have applied "in any State[*or political subdivision thereof*] or Territory in which such execution or application is prohibited by [*local*] or Territorial law." It is particularly telling in this regard, that the subsection immediately preceding § 14(b) (added by the same 1947 amendments) *does* refer to "local" law making it clear that subsection 14(b)'s reference to "State" law refers to laws applying at the state-level. *Compare* 29 U.S.C. § 164(a) *with id*. § 164(b). *See also* 29 U.S.C. § 152(2) (referring to "any State or political subdivision thereof").

Given the particularly clear statutory language, every court to have ruled on the matter has held that local laws adopted by a political subdivision of a state or territory do not constitute "State or Territorial law" within the meaning of § 14(b). **Kentucky State AFL-CIO v. Puckett**, 391 S.W.2d 360, 362 (1965); **New Mexico Federation of Labor v. City of Clovis**, 735 F.Supp. 999, 1004 (D.N.M. 1990). *See* **Mobil Oil Corp.**, 426 U.S. at 413 n. 7 (citing *Puckett* with

approval); **NLRB v. Pueblo of San Juan**, 276 F.3d 1186, 1197 (10th Cir. 2002) (relying on **City of Clovis** for the proposition that NLRA § 14(b) "embraces diversity of legal regimes respecting union security agreements" only "at the level of 'major policy-making units'"). As the Attorney General of Kentucky recently concluded, after carefully reviewing the statutory language and the precedents interpreting it, "local governments have no power to enact right-to-work ordinances, as they are preempted by the NLRA." "Whether a Local Government May Enact a Right-to-Work Ordinance," Ky. O.A.G. 14-007, p. 5 (Dec. 18, 2014).

### B. The Legislative Context of NLRA § 14(b).

The legislative context of § 14(b) reinforces the plain meaning of the statutory terms. Congress added § 14(b) to the NLRA in 1947 in order to counteract, in a carefully limited way, the preemptive effect of the 1947 amendments to § 8(a)(3). As a result of the 1947 amendments, "agreement[s] requiring membership in a labor organization as a condition of employment [are] authorized in section 8(a)(3)." 29 U.S.C. § 157. *See* 29 U.S.C. § 159(e)(1) (providing that "such authorization [may] be rescinded" by a majority vote of covered employees). At the same time, the federal law began to closely regulate the wording and the application of the authorized agreements. The 1947 amendments to § 8(a)(3)'s first proviso require that union security agreements specify that membership is not required until "the thirtieth day following the beginning of . . . employment." 29 U.S.C. § 158(a)(3). And, the new second proviso added in 1947 regulates how such agreements may be applied.[3] "Section 14(b) simply mirrors . . . § 8(a)(3)" and, "[a]s its language reflects was designed to make clear that § 8(a)(3) left the States

---

[3] "Provided further, That no employer shall justify any discrimination against an employee for non-membership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership." *Id.*

7

free to pursue their own more restrictive policies in the matter of union-security agreements." **Mobil Oil**, 426 U.S. at 417 (quotation marks and citation omitted).

"While § 8(a)(3) articulates a national policy that certain union-security agreements are valid as a matter of federal law, § 14(b) reflects Congress' decision that any State or Territory that wishes to may exempt itself from that policy." **Mobil Oil**, 426 U.S. at 416-17. In other words, "[f]ederal policy favors permitting such agreements unless a State or Territory with a sufficient interest in the relationship expresses a contrary policy via right-to-work laws." *Id*. at 420. Thus, "with respect to those state laws which § 14(b) permits to be exempted from § 8(a)(3)'s national policy there is conflict between state and federal law; but it is a conflict sanctioned by Congress with directions to give the right of way to state laws." *Id*. at 417 (quotation marks, ellipses and citation omitted).

"By the time § 14(b) was written into the Act, twelve States had statutes or constitutional provisions outlawing or restricting the closed shop and related devices . . . ." **Retail Clerks v. Schermerhorn**, 375 U.S. 96, 100 (1963). "Congress [was] . . . well informed [about these state laws] during the 1947 debates." *Id*. Congress resolved the "conflict between state and federal law" by enacting "§ 14(b) giv[ing] the States power to outlaw even a union-security agreement that passes muster by federal standards." *Id*. at 103.

The wording of § 14(b) reflects Congress's intent to allow states to continue to adopt and apply the same sort of state-wide "statutes or constitutional provisions" that had coexisted with collective bargaining under the NLRA from 1935 to 1947. **Schermerhorn**, 375 U.S. at 100. Section 14(b) provides that the authorization of union security agreements contained in § 8(a)(3) should not "be construed as authorizing the execution or application" of such agreements "in any State or Territory in which such execution or application is prohibited by State or Territorial

law." In other words, § 14(b) states an exception to the federal policy regarding union security agreements "in any State" where "State . . . law" prohibits such agreements. That exception clearly applies only to the sort of state-wide laws that had coexisted with collective bargaining under the NLRA during the 1935-47 period.

### C. Applying the § 14(b) Exception to Allow Local Right-to-Work Laws Would Impede Federal Labor Policy.

"Congress was willing to permit varying policies [regarding the authorization of union security agreements] at the state level, but could not have intended to allow as many local policies as there are local political subdivisions in the nation." *Puckett*, 391 S.W.2d at 362. The example of local government in Kentucky shows why. There are 120 counties within the Commonwealth of Kentucky. In addition, Kentucky has 418 city governments. (Exhibit 7.) What is more, both counties and cities are authorized to "adopt[] [overlapping] ordinance[s] pertaining to the same subject matter." KRS 67.083(7)(b). Thus, reading § 14(b) to allow local laws prohibiting the execution or application of union security agreements would subject such agreements to over five hundred different legal regimes within Kentucky alone.

Applying a patchwork of local right-to-work laws would make it difficult for parties to administer union security agreements. As the example of Kentucky demonstrates, the number of local governmental authorities within a single state can be quite large, and the geographical area within which they each exercise authority will be correspondingly limited. Given the limited geographical reach of many local governmental authorities, many employers will have facilities located within several different political subdivisions of a single state. It is not uncommon for collective bargaining agreements to cover units comprised of a number of facilities and for employees within such units to transfer among the facilities. For example, UFCW Local 227's collective bargaining agreement with Kroger covers grocery stores located throughout Kentucky,

9

and covered employees have the right to transfer among the stores. (Exhibit 3.) In that situation, were local right-to-work laws like Ordinance 300 authorized by § 14(b), the validity of the union security clause contained in the collective bargaining agreement could easily vary as an employee moved from one store to another within Kentucky.

Determining the existence and correct application of local right-to-work laws would be much more difficult than determining the requirements of state laws. In the first place, city and county governments have overlapping jurisdiction, so it would be necessary to determine not only whether a particular local government has enacted a right-to-work law but whether that law has been preempted or supplemented by the laws of other local governments. In addition, local laws are subject to greater flux than state laws. For instance, it was only a matter of weeks between the time Ordinance 300 first came before the Hardin County Fiscal Court and when it was finally enacted into law. The ordinance could be just as quickly repealed. The legislative process for enacting state laws is generally much more measured, ensuring a greater stability in state law. Finally, local ordinances are not published in easily available, well indexed forms. Unlike the Kentucky Revised Statutes, which are compiled in one central place, county and city ordinances appear only in whatever form the local jurisdiction determines.

NLRA § 14(b) was intended to accommodate the new federal policy regarding the regulation of union security agreements to the type of pre-existing state right-to-work laws that the 1947 Congress determined should not be preempted by the amended federal labor law. To achieve that end, § 14(b) was drafted so that "parties entering into a collective bargaining agreement will easily be able to determine in virtually all situations whether a union- or agency-shop provision is valid." **Mobil Oil**, 426 U.S. at 419. Reading §14(b) to allow a patchwork of overlapping local right-to-work laws would make it extremely difficult to determine where a

10

union security agreement may lawfully be applied.[4] The exception to federal preemption created by § 14(b) preserves a role for those state laws. But it does not invite a chaotic welter of piecemeal local regulation.

\* \* \*

Section 14(b) of the NLRA, as amended, provides an exception to the federal authorization of the execution and application of union security agreements that applies "in any State or Territory in which such execution or application is prohibited by State or Territorial law." Ordinance 300 is not a "State or Territorial law" and does not apply throughout "any State or Territory" within the meaning of § 14(b) and is thus "not encompassed by § 14(b)." **Mobil Oil Corp.**, 426 U.S. at 413 n. 7. Ordinance 300 is, therefore, preempted by the NLRA. *Id*.

## II. CHECK-OFF AND HIRING HALL AGREEMENTS ARE NOT "AGREEMENTS REQUIRING MEMBERSHIP IN A LABOR ORGANIZATION AS A CONDITION OF EMPLOYMENT" WITHIN THE MEANING OF NLRA 14(b).

In the preceding section, we demonstrated that Ordinance 300 is preempted by the NLRA insofar as it attempts to regulate the negotiation and application of union security, check-off and hiring hall agreements because the ordinance is not a "state law" within the meaning of NLRA § 14(b). In this section, we briefly show that even if Ordinance 300 were a "state law" under NLRA § 14(b), the provisions regulating dues check-off and union hiring halls are preempted for

---

[4] Congress's concern with the disruptive effect of applying inconsistent right-to-work laws to a single collective bargaining agreement is demonstrated by the 1950 amendments to the Railway Labor Act authorizing union security agreements under that statute. RLA bargaining units are nationwide in scope and typically cover workplaces in a number of states. The 1950 RLA amendments authorizing union security agreements in railroad and airline industries did not create an exception allowing state right-to-work laws, because Congress determined that application of inconsistent state laws to a single bargaining unit would be unduly disruptive. In this regard, the House Report on the 1950 RLA amendments explained that "it would be wholly impracticable and unworkable for the various States to regulate such [union security] agreements," because the "agreements are uniformly negotiated for an entire railroad system and regulate the rates of pay, rules of working conditions of employees in many States." H. Rep. No. 2811, 81st Cong., 2d Sess., p. 5 (1950).

11

the additional reason that check-off and hiring hall agreements are not "agreements requiring membership in a labor organization as a condition of employment" within the meaning of NLRA § 14(b). Again, the precedents interpreting § 14(b) are unanimous on these points.

**A. Check-off.**

Section 5 of Ordinance 300 makes it "unlawful to deduct from the wages, earnings, or compensation of an employee any union dues, fees, assessments, or other charges . . . unless the employee has first presented . . . a signed written authorization of such deductions, which authorization *may be revoked by the employee at any time by giving written notice of such revocation to the employer.*" Ord. 300 § 5 (emphasis added).

Section 302 of the Labor Management Relations Act makes it unlawful for an employer "to pay, lend or deliver, any money . . . to any labor organization . . . which represents . . . any of the employees of such employer," but states an exception "with respect to money deducted from the wages of employees in payment of membership dues in a labor organization" where "the employer has received from each employee, on whose account such deductions are made, a written assignment *which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner.*" 29 U.S.C. §§ 186(a)(2) & (c)(4).

Ordinance 300 and LMRA § 302(c)(4) not only overlap in their regulation of check-off authorizations, they contradict one another. While Ordinance 300 provides that check-off authorizations may be "revoked by the employee at any time," LMRA § 302(c)(4) provides that check-off authorizations "shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner." And, while Ordinance 300 specifies that an employee must "giv[e] written notice of such revocation to the employer," LMRA § 302(c)(4) says nothing about how the revocation must be given.

12

Deduction of union dues or fees from an employee's pay after the employee has revoked his or her authorization at one of the times specified by LMRA § 302(c)(4) is an unfair labor practice subject to the jurisdiction of the NLRB. *See* **NLRB v. Atlanta Printing Specialties & Paper Product Union 527**, 523 F.2d 783 (5th Cir. 1975). An employer's refusal to deduct union dues or fees in accordance with the terms of its collective bargaining agreement and pursuant to an employee authorization meeting the requirements of LMRA § 302(c)(4) is also an unfair labor practice subject to the jurisdiction of the NLRB. *See* **NLRB v. Shen-Mar Food Products, Inc.**, 557 F.2d 396 (4th Cir. 1977). Finally, an employer's transmission to a labor organization of union dues or fees that have been deducted from an employee's pay without the authorization required by § 302(c)(4) is subject to both criminal and civil enforcement actions in federal court. *See* 29 U.S.C. §§ 186 (d) & (c).

The negotiation and application of check-off agreements is a matter that is carefully regulated by the NLRA and the LMRA. Ordinance 300's overlapping and inconsistent regulation of check-off agreements is, therefore, clearly preempted unless the ordinance comes within NLRA § 14(b)'s exception from federal preemption. However, "dues checkoff provisions are not union security devices but are intended to be an area of voluntary choice for the employee." **Atlanta Printing Specialties**, 523 F.2d at 787. For that reason, **SeaPAK v. Industrial Technical and Professional Employees**, 300 F.Supp. 1197, 1200-01 (S.D. Ga. 1969), *aff'd* 423 F.2d 1229 (5th Cir. 1970), *aff'd*, 400 U.S. 985 (1971), squarely holds that state laws regulating check-off do not come within NLRA § 14(b). The Supreme Court's affirmance of **SeaPAK** makes that decision a binding precedent. *See, e.g.,* **Local 514, Transport Workers**, 212 F.Supp.2d at 1327 (following **SeaPAK**).

### B. Hiring Halls.

Section 4(E) of Ordinance 300 provides that "[n]o person covered by the National Labor

Relations Act shall be required as a condition of employment . . . to be recommended, approved, referred, or cleared by or through a labor organization." An identical provision in an Oklahoma statute was found to be preempted in **Local 514, Transport Workers**, 212 F.Supp.2d at 1326-27. The **Local 514** decision follows a unanimous line of circuit court precedents holding the state regulation of hiring hall agreements is preempted by the NLRA. *Id.*

It is not uncommon for collective bargaining agreements in the construction industry to contain clauses giving a union the exclusive right to refer applicants for employment. IBEW Local 369's agreement with the National Electrical Contractors Association contains such a provision. (Exhibit 5.) These contract clauses are referred to as "hiring hall agreements." Like the clause in the Local 369 agreement, hiring hall agreements typically give the employer the right to turn down referred applicants. And, as does the Local 369 clause, they typically require the union to make referrals without regard to the applicant's union membership.

The NLRA regulates the negotiation and application of hiring hall agreements to ensure that referrals are made in a fair and nondiscriminatory manner. *See* **Breininger v. Sheet Metal Workers**, 493 U.S. 67, 73-84 (1989) (describing the federal regulation of hiring halls). Provided that the referrals are made in a manner that does not discriminate on the basis of union membership, "the hiring hall, under the [federal] law as it stands, is a matter of negotiation between the parties." **Local 357, Teamsters v. NLRB**, 365 U.S. 667, 676 (1961).

The **Local 514** opinion succinctly explains why even state laws regulating the operation of union hiring halls are preempted by the NLRA:

> [S]ection 158(a)(3) of the LMRA permits exclusive union hiring halls provided such halls do not discriminate between members and non-members. **International Brotherhood, T. C. W. & H. v. NLRB**, 365 U.S. 667 (1961). As a result, courts which have interpreted section 164(b) of the LMRA in this context have held that

14

it does not grant the States the authority to prohibit non-discriminatory exclusive hiring halls. **Laborers Int'l Union Local 107 v. Kunco, Inc.**, 472 F.2d 456, 458-59 (8th Cir. 1973); **NLRB v. Tom Joyce Floors, Inc.**, 353 F.2d 768, 770-71 (9th Cir. 1965); **NLRB v. Houston Chapter Ass'd Gen'l Contractors,** 349 F.2d 449, 451 (5th Cir. 1965), *cert. denied*, 382 U.S. 1026 (1966). Oklahoma has clearly attempted to prohibit the use of exclusive hiring halls by enacting subsection (B)(5), which provides that "no person shall be required, as a condition of employment or continuation of employment, to: . . . be recommended, approved, referred, or cleared by or through a labor organization." Consequently, the court declares subsection (B)(5) to be preempted by federal law as it is outside the grant of authority contained in section 164(b) of the LMRA. *See* **Oil, Chem. & Atomic Workers Int'l Union v. Mobil Oil Corp.**, 426 U.S. 407, 417 (1976) (the laws section 164(b) allows states to enact do not relate to the hiring process, but rather, are related to the "post-hiring employer-employee-union relationship").

212 F.Supp.2d at 1326-27.

## CONCLUSION

Section 4 and 5 of Ordinance 300 are invalid on the ground that they are preempted by the NLRA. The Court should, therefore, enter judgment in favor of the plaintiffs declaring those provisions void, enjoining their enforcement and granting such other relief as the Court deems appropriate.

RESPECTFULLY SUBMITTED,

/s/ Irwin H. Cutler, Jr._____
Irwin H. Cutler, Jr.
David Leightty
Benjamin S. Basil
Priddy, Cutler, Naake & Meade, PLLC
800 Republic Building
429 West Muhammad Ali
Louisville, Kentucky 40202
Phone: (502) 587-8600
Fax: (502) 632-5271

/s/ Robert M. Colone *(with permission)*
Robert M. Colone
General Counsel
IBT Local 89
3813 Taylor Blvd.
Louisville, KY 40215
Phone: (502) 368-5885
Fax: (502) 366-2009
rmcolone@teamsers89.com
COUNSEL FOR PLAINTIFF TEAMSTERS LOCAL 89

00625003

E-mail: cutler@pcnmlaw.com
COUNSEL FOR PLAINTIFFS EXCEPT
TEAMSTERS LOCAL 89

CERTIFICATE OF SERVICE

      It is hereby certified that a copy of the foregoing has this 6th day of March, 2015, been served through this Court's CM/ECF system on the following persons:

Jason M. Nemes, Esq.
E-mail: jnemes@fmhd.com

John T. Lovett, Esq.
E-mail: jlovett@fbtlaw.com

      It is further certified that a copy of the foregoing was this 6th day of March 2015, emailed to:

Jennifer B. Oldham, Esq.
jennyo.hcao@hcky.org

                                          /s/ Irwin H. Cutler, Jr._____