# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# LOUISVILLE DIVISION

| | | |
|---|---|---|
| **UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA LOCAL 3047,** et al., | ) ) ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) ) | CASE No. 3:15-cv-66 (DJH) *Electronically filed* |
| **HARDIN COUNTY, KENTUCKY,** et al. | ) ) | |
| Defendants | ) | |

## BRIEF OF THE COMMONWEALTH OF KENTUCKY AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS

Respectfully submitted,

/s/ Sean J. Riley            /s/ Matt James
Sean J. Riley               Matt James
Deputy Attorney General     Assistant Attorney General
700 Capitol Avenue, Ste. 118
Frankfort, KY 40601
Phone: (502) 696-5600
Fax:    (502) 564-2894

The Commonwealth of Kentucky ("Commonwealth"), by its Attorney General, Jack Conway, submits its brief addressing the issue of whether local governments are preempted by the National Labor Relations Act from enacting right-to-work ordinances.

### Identity Of The Movant, Interest In The Case, And Source Of Authority to File

The Kentucky Attorney General is a constitutional office of the Commonwealth created by KY. CONST. § 91. KY. REV. STAT. ANN. § 15.020 provides that "the Attorney General is the chief law officer of the Commonwealth of Kentucky" and "shall . . . attend to all litigation and legal business . . . in which the Commonwealth has an interest."

> KRS 15.020 provides, in the role as "chief law officer of the Commonwealth of Kentucky[,]" the Attorney General "shall exercise all common law duties and authority pertaining to the office of the Attorney General under the common law, except when modified by statutory enactment." It is unquestioned that "[a]t common law, [the Attorney General] had the power to institute, conduct[,] and maintain suits and proceedings for the enforcement of the laws of the state, the preservation of order, and the protection of public rights." Or, in other words, "[u]nder the common law, the attorney general has the power to bring any action which he or she thinks necessary to protect the public interest . . . ."

*Commonwealth ex rel. Conway v. Thompson*, 300 S.W.3d 152, 172-73 (Ky. 2009). The Attorney General is the chief law officer of the Commonwealth, with broad authority to bring proceedings for the protection of the laws of the state and the general public interest in the name of the Commonwealth. The issue addressed in this case, whether a local government may enact a right-to-work ordinance, is one of obvious statewide importance, as argued below. The Commonwealth takes no position on the merits of right-to-work laws, and concedes that if a right-to-work law were enacted by the Kentucky General Assembly and signed into law by the Governor of Kentucky, it would be the law of the Commonwealth. The Commonwealth merely seeks to protect its interests in ensuring uniform application of any right-to-work laws throughout the Commonwealth for the general welfare of its citizens.

As the chief law officers of states, federal courts have regularly considered or expressly requested the opinions of state attorneys general in matters of statewide importance. "In addressing the constitutionality of a statute with statewide application we consider highly relevant the views of the State's chief law enforcement official." *New York v. Uplinger,* 467 U.S. 246, 248 n.1 (1984). District courts regularly grant petitions by state attorneys general to file briefs as *amicus curiae* on issues of statewide importance, and even invite state attorneys general to submit them. *See, e.g., Coyne v. Am. Tobacco Co.,* 183 F.3d 488, 492 (6th Cir. 1999) ("After briefing by the parties, and submission of an amicus curiae brief on behalf of the Ohio Attorney General, the district court issued a Memorandum Opinion and Order . . . ."); *Norton v. Parke*, 892 F.2d 476, 479 (6th Cir. 1989) ("To ensure that the State of Ohio would be adequately represented . . . the district court invited the Ohio Attorney General to intervene as a party or as amicus."); *Sovereign News Co. v. Falke*, 448 F. Supp. 306, 314 n. 13 (N.D. Ohio 1977) ("The district court retains discretion to invite the Ohio Attorney General to intervene as an Amicus Curiae, and this court exercised that discretion in this case."). The views of the Commonwealth in cases of statewide importance, as expressed through its Attorney General, are highly relevant to determinations of federal district courts. Accordingly, this court should allow the Commonwealth to participate as *amicus curiae* to speak on behalf of the interests of its citizens.

## **ARGUMENT**

The Commonwealth argues that Section 14(b) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 164(b), as amended by the Taft-Hartley Act, Pub. L. No. 80–101, 61 Stat. 136 (1947), only authorizes a state or territory to enact legislation banning union or agency shops. Section 14(b) of the NLRA preempts local governments from enacting ordinances banning union or agency shops. Hardin County, Ky., Ordinance 300 (Jan. 13, 2015) ("Ordinance 300") is therefore preempted by the NLRA.

I. **The NLRA Preempts Local Governments From Enacting Right-To-Work Laws.**

Ordinance 300 § 4, attached as Ex. 1, provides:

No person covered by the National Labor Relations Act shall be required as a condition of employment or continuation of employment:
- (A) to resign or refrain from voluntary membership in, voluntary affiliation with, or voluntary financial support of a labor organization;
- (B) to become or remain a member of a labor organization;
- (C) to pay any dues, fees, assessments, or other charges of any kind or amount to a labor organization;
- (D) to pay to any charity or other third party, in lieu of such payments, any amount equivalent to or a pro-rata portion of dues, fees, assessments, or other charges regularly required of members of a labor organization; or
- (E) to be recommended, approved, referred, or cleared by or through a labor organization.

Ordinance 300 thus provides that no employee under the NLRA is required to join a union or pay dues to a union as a condition of employment or employment continuation.

Section 8(a) of the NLRA, 29 U.S.C. § 158(a), provides:

It shall be an unfair labor practice for an employer . . . (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later . . . .

4

Therefore, 29 U.S.C. § 158(a)(3) forbids an employer from discriminating in employment based on whether that person is a member of a union, forbidding "closed shops" that only consider union members for employment, although an employee may be required to join a union upon commencing employment, in what is known as a "union shop," or required to make payments equivalent to union dues, in what is known as an "agency shop."[1]

Section 14(b) of the NLRA, as amended, 29 U.S.C. § 164(b), provides that "nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law." Although 29 U.S.C. § 158(a)(3) allows union and agency shops, 29 U.S.C. § 164(b) creates the provision that states may enact so-called "right-to-work" laws forbidding union and agency shops. Twenty-five states have enacted such right-to-work laws. Kentucky has not.

In *Kentucky State AFL-CIO v. Puckett*, 391 S.W.2d 360 (Ky. 1965), the City of Shelbyville enacted a right-to-work ordinance providing that "the right of persons to work shall not be denied or abridged on account of membership or nonmembership in, or conditioned upon payments to, any labor union, or labor organization." *Id.* at 361. The court considered the question of "whether Congress has pre-empted the field of regulation of such union-security agreements to the extent that local political subdivisions of a state have no power to legislate in the field." *Id.* at 361-62. The *Puckett* court considered *Retail Clerks Int'l Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96 (1963), which stated that "even if the union-security

---

[1] *See Oil, Chem. and Atomic Workers, Int'l. Union, AFL-CIO v. Mobil Oil Corp.*, 426 U.S. 407, 410 n.1 (1976):

> A "union shop" agreement provides that no one will be employed who does not join the union within a short time after being hired. An "agency shop" agreement generally provides that while employees do not have to join the union, they are required usually after 30 days to pay the union a sum equal to the union initiation fee and are obligated as well to make periodic payments to the union equal to the union dues.

agreement clears all federal hurdles, the States by reason of s [§] 14(b) have the final say and may outlaw it. . . . It is a conflict sanctioned by Congress with directions to give the right of way to state laws . . . ." *Id.* at 102-03. Based on *Schermerhorn*, the *Puckett* court reasoned that:

> Section 14(b) makes an exception out of the otherwise full pre-emption by the Act. The exception should be strictly and narrowly construed because it represents a departure from the overall spirit and purpose of the Act. . . . We think it is not reasonable to believe that Congress could have intended to waive other than to major policy-making units such as states and territories, the determination of policy in such a controversial area as that of union-security agreements.

*Id.* at 362. The *Puckett* court construed the exemption for states and territories narrowly to refer only to states and territories, reasoning that Congress did not want to leave the important field of union security agreements to local regulation. The court then concluded that "Congress has pre-empted from cities the field undertaken to be entered by the Shelbyville ordinance." *Id.*

Although *Puckett* expressly deals only with cities, the court articulated that the intent of Congress in enacting 29 U.S.C. § 164(b) was not "to allow as many local policies as there are political subdivisions in the nation." *Id.* "Counties are unincorporated political subdivisions of the state . . . ." *Lexington-Fayette Urban Cnty. Gov't v. Smolcic*, 142 S.W.3d 128, 133 (Ky. 2004). As *Puckett* makes clear, 29 U.S.C. § 164(b) preempts all political subdivisions of a state, including counties and cities, from enacting right-to-work laws.

Other courts, following *Puckett*, have come to the same conclusion as the court in *Puckett*.[2] For example, in *United Food and Commercial Workers Union Local 1564 v. City of Clovis, N.M.*, 735 F. Supp. 999 (D.N.M. 1990), following *Puckett,* the court held that "Congress preempted the field of regulation of union security agreements, except to the extent specifically permitted in § 14(b)." *Id.* at 1003. The court found that:

---

[2] *Puckett* was cited with approval in *Oil, Chem. and Atomic Workers, Int'l Union, AFL-CIO v. Mobil Oil Corp.*, 426 U.S. 407, 413 n. 7 (1976).

6

> The Congressional regulation of union security agreements is comprehensive and pervasive. . . . Section 8(a)(3) of the NLRA provides for specific conditions which must be met in order for an agreement to be valid. Congress intended to prohibit non-federal laws which would allow agreements impermissible under the Act. . . . This indicates to me that Congress intended an exclusive regulatory system and that § 8(a)(3) so thoroughly regulates the subject of union security agreements so as to preempt the matter from state legislation except to the extent specifically permitted under § 14(b) of the Act.

*Id.* at 1002. The court found a comprehensive scheme of legislation in the NLRA with a clear intent to preempt other legislation except as expressly permitted.

The *City of Clovis* court also based its reasoning on the plain language of the statute. "Looking to the language of the statute, § 14(b) permits union security agreements to be prohibited by 'State or Territorial law.' No mention is made of local ordinances or other means. . . . *Id.* at 1004. The court further noted that "courts have held that as a matter of plain language, reference to a 'state' does not include reference to subdivisions of the state." *Id.* (citing *Consol. Rail Corp. v. Smith*, 664 F. Supp. 1228, 1237 (N.D. Ind. 1987) (citing cases)). Similarly, in *Grimes & Hauer, Inc. v. Pollock*, 127 N.E.2d 203 (Ohio 1955), the court considered whether "decisions of this court . . . have established the 'right to work' law in Ohio." *Id.* at 207. The court concluded that "Section 164(b) has reference to a constitutional provision or a legislative enactment." *Id*. The courts that have considered the question have concluded that right-to-work laws can only be enacted by state or territorial legislatures.

The legislative history of the Taft-Hartley Act creating § 14(b) further supports the position that Congress had no intent of authorizing local governments to enact right-to-work ordinances:

> The legislative history of section 14(b) contains nothing to indicate that Congress intended a broad interpretation of "state." No one ever proposed that regulatory power should be localized to this extent. Even the opponents of the Taft-Hartley Act, who could have been expected to propound all possible arguments, did not contend that one of the evils of the Act was that it left labor to

> the mercy of city councils and such. Moreover, there is reason to believe that had Congress intended to include cities and counties within the exception created by section 14(b), it would have expressly so provided. Thus in section 2(2) of the Taft-Hartley Act, in which Congress did wish to cover local governmental bodies, the language "State or political subdivision thereof" is used.

Ted Finman, *Local "Right To Work" Ordinances: A Reply*, 10 STAN. L. REV. 53, 70 (1957). Congress never considered extending the power to enact right-to-work ordinances to local governments in the Taft-Hartley Act, and used different language within § 2(2) of the same act, 29 U.S.C. § 152(2), "state or political subdivision thereof," when it wanted to indicate local governments. "Where a statute with respect to one subject contains a given provision, the omission of such provision from a similar statute is significant to show a different intention existed." *Richerson v. Jones*, 551 F.2d 918, 928 (3d Cir. 1977). The history and language of the Taft-Hartley Act indicates that Congress never intended to grant local governments the power to enact right-to-work ordinances.

In a situation similar to this case, in *CSX Transp., Inc. v. City of Plymouth, Mich.* 86 F.3d 626 (6th Cir.1996), the court considered whether a municipal regulation concerning trains was preempted by the Federal Railway Safety Act ("FRSA"). *Id.* at 627. Like the NLRA, the FRSA contains an exception to preemption where "a State may adopt or continue in force an additional or more stringent law, regulations, or order related to railroad safety or security" when certain conditions are met. 49 U.S.C. § 20106(2)(A). The court found that "Congress expressly intended that the FRSA preempt all railroad safety legislation except *state law* governing an area in which the Secretary of Transportation has not issued a regulation or order and *state law* more strict than federal regulations when necessary to address local problems." *CSX Transp.* 86 F.3d at 628. The court held that "these exceptions apply only to a 'State ... law, regulation, or order . . . .' . . . As Plymouth is not a 'State,' the challenged Plymouth ordinance is not within the FRSA's

preemption clause exceptions." *Id.* The *CSX Transp.* court held that although federal law carved out an express exception from preemption for certain "state" laws, the term "state" did not include municipal ordinances. The same reasoning should apply to the exemption from preemption for state law in the NLRA.

Kentucky's highest court and other courts have found that the plain language and the intent of § 14(b) of the NLRA preempts local governments from enacting right-to-work laws. This Court should follow the reasoning of the other courts and similarly conclude that local governments are preempted by the NLRA from enacting right-to-work laws.

## II.     Home-Rule Powers Do Not Override Federal Preemption.

Although it may be argued that *Puckett* was superseded by the grant of "home rule" powers to counties and cities,³ once federal preemption is found, the powers of a local government are irrelevant. U.S. CONST. Art. VI, cl. 2 provides that "the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." "The Supremacy Clause invalidates all state laws that conflict or interfere with an Act of

---

³ By way of background, *Puckett* was decided in 1965. Subsequent to *Puckett,* in 1972 the Kentucky General Assembly passed what was called the Home Rule Act, which created what was subsequently codified as KY. REV. STAT. ANN. § 67.083. The Home Rule Act provided that "the fiscal court of any county is hereby authorized and empowered to exercise all rights, powers, franchises, and privileges including the power to levy all taxes not in conflict with the constitution and statutes of this state." 1972 Ky. Acts 1652. In *Fiscal Court of Jefferson Cnty. v. City of Louisville*, 559 S.W.2d 478 (Ky. 1977) the Home Rule Act was challenged as an unconstitutional delegation of legislative powers to counties in violation of KY. CONST. § 29, and as a violation of KY. CONST. § 181 which limits the kinds of taxes that counties may levy. *Id.* at 481-82. The court found the Home Rule Act unconstitutional, with the memorable phrase that "while the General Assembly may grant governmental powers to counties it must do so with the precision of a rifle shot and not with the casualness of a shotgun blast." *Id.* at 482. Subsequently, the General Assembly amended KY. REV. STAT. ANN. § 67.083 to expressly enumerate the powers of counties, rather than delegating them full home rule. 1978 Ky. Acts 277-78. Although cases still refer to KY. REV. STAT. ANN. § 67.083 as the Home Rule Act, *see, e.g., C & H Entm't, Inc. v. Jefferson Cnty. Fiscal Court,* 169 F.3d 1023, 1025 (6th Cir. 1999); *Russell Cnty. Fiscal Court v. Kelley,* 823 S.W.2d 941, 942 (Ky. Ct. App. 1991), counties do not actually have full home rule powers.
     Cities, in contrast, were granted full home rule in 1980. 1980 Ky. Acts 729. *Compare* KY. REV. STAT. ANN. § 67.083, *with* KY. REV. STAT. ANN. § 82.082. The distinction is not relevant, however, as federal preemption would apply to both cities and counties regardless of whether they have home rule powers or not.

Congress." *Rose v. Arkansas State Police*, 479 U.S. 1, 3 (1986). "Where a municipal ordinance conflicts with a constitutional provision or statute, the ordinance 'is preempt[ed]' . . . in other words, the municipality is 'without authority' to enact that ordinance, and the ordinance must be struck down as 'invalid[ ].'" *Sheffield v. City of Fort Thomas, Ky.*, 620 F.3d 596, 604 (6th Cir. 2010). "The courts presume that federal legislative or regulatory action intends to preempt parallel state and local legislation." *Interstate Towing Ass'n, Inc. v. City of Cincinnati, Ohio*, 6 F.3d 1154, 1157 (6th Cir. 1993). A county or municipal ordinance that conflicts with a federal statute is void, and there is a presumption that federal action in an area intends to preempt parallel local action.

Both *Puckett* and *City of Clovis*, upon finding that the NLRA preempted local regulation of union security agreements, ended the inquiry and did not see the need to address whether the local governments had the power in the first place. The *Puckett* court found it "unnecessary to discuss the questions of whether the ordinance in issue is within the scope of the policy power of a Kentucky city." *Puckett*, 391 S.W.2d at 363. The *City of Clovis* court concurred. "Based on these findings and conclusions, I find it unnecessary to address the question of whether under New Mexico law the City of Clovis has the authority to enact the Ordinance at issue." *City of Clovis*, 735 F. Supp. at 1004. If a local government is preempted by federal law, it has no authority to regulate in that area, and cannot give itself any such authority, nor have any such authority given to it by a state. Once federal preemption is found, the conversation is simply over.

**III.     Preemption Of Local Right-To-Work Ordinances Is Sound Public Policy.**

The policy expressed in *Puckett* and other cases is sound, as the Commonwealth has an obvious and significant public interest in determining uniformity of working terms and

10

conditions throughout the state regarding union and agency shops. A patchwork of right-to-work laws varying between the 120 Kentucky counties and the over 400 Kentucky cities would create an impossibly uncertain legal framework in the area of union security agreements.

In line with such reasoning, the *Puckett* court stated:

> . . . it is not reasonable to believe that Congress could have intended to waive other than to major policy-making units such as states and territories, the determination of policy in such a controversial area as that of union-security agreements. We believe Congress was willing to permit varying policies at the state level, but could not have intended to allow as many local policies as there are local political subdivisions in the nation.

*Puckett,* 391 S.W.2d at 362. The *Puckett* court saw the confusion that would be created by variances in right-to-work laws between local governments, and did not believe that Congress intended such wild variance in such a controversial area as union security agreements. The court in *City of Clovis* concurred:

> It is true that by enacting § 14(b), Congress contemplated diversity of regulation throughout the country on the subject of union security agreements. . . . However, the diversity that arises from different regulations among various of the 50 states and the federal enclaves within the 21 right-to-work states is qualitatively different from the diversity that would arise if cities, counties, and other local governmental entities throughout the country were free to enact their own regulations. A consequence of such diversity for both employers and unions would be to subject a single collective bargaining relationship to numerous regulatory schemes thereby creating an administrative burden and an incentive to abandon union security agreements. This result would effectively undermine Congress' determination in § 8(a)(3) of the Act that union security agreements are consistent with federal labor policy and would similarly undermine the NLRA's purpose by discouraging rather than encouraging bargaining on "conditions of employment."

*City of Clovis,* 735 F. Supp. at 1002-03.

The *City of Clovis* court reasoned that the intent of Congress in enacting § 14(b) was to permit diversity of regulation regarding union security agreements, but not the level and kind of diversity that would arise if each local government entity were to have the authority to enact

11

right-to-work laws. "The result would be a crazy-quilt of regulations within the various states." *Id.* at 1002. Both the *Puckett* and *City of Clovis* courts contemplated and rejected as unreasonable that Congress intended a "crazy quilt of regulations" within states regarding right-to-work laws.[4]

Courts have consistently recognized that allowing each individual local government to enact right-to-work ordinances could create an untenable "crazy quilt" of hundreds of different union security frameworks within a single state. Accordingly, this Court should follow the *Puckett* courts and other courts in finding that limiting the ability to pass right-to-work laws to states only, and not to political subdivisions, is sound public policy.

## CONCLUSION

For the reasons argued above, this Court should find that local governments are preempted by the National Labor Relations Act from enacting right-to-work ordinances.

## CERTIFICATE OF SERVICE AND NOTICE OF ELECTRONIC FILING

It is hereby certified that a true copy of the foregoing Motion was filed on this the 13th day of March, 2015 via the CM/ECF system.

/s/ Sean J. Riley
Sean J. Riley

---

[4] *See also* Ted Finman, *Local "Right To Work" Ordinances: A Reply*, 10 STAN. L. REV. 53, 71 (1957):

> If one stops to consider the possible consequences of city and county regulation, it seems inconceivable that Congress could have intended the words "State ... law" to have any but their literal meaning. Where an appropriate bargaining unit extends into two or more states, differing state laws on union-shop agreements can create highly complex problems. Imagine the situation if tens or hundreds of varying union-shop laws must be considered in negotiating a collective bargaining agreement! Yet if "state" means "city and county," the way is left open for just such chaos.