UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED AUTOMOBILE, AEROSPACE      )
AND AGRICULTURAL IMPLEMENT        )
WORKERS OF AMERICA LOCAL 3047, et )
al.,                              )
                                  )
                Plaintiffs,       )          **Electronically Filed**
                                  )
        v.                        )          CASE NO. 3:15-cv-00066-DJH
                                  )
HARDIN COUNTY, KENTUCKY, et al.,  )
                                  )
                Defendants.       )

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants, Hardin County, Kentucky and its elected officials, sued in their official capacities, respectfully submit this Memorandum in Support of their Motion for Summary Judgment.

### INTRODUCTION

On January 13, 2015, Defendant, Hardin County, Kentucky, adopted Ordinance 300, Series 2014 ("Ordinance 300"). Ordinance 300 prohibits collective bargaining agreements ("union contracts"), within Hardin County, that require employees to join or pay money to a labor union in order to keep their jobs. The ordinance also includes attendant measures intended to insure the benefits to workers of this protection. A copy of Ordinance 300 is attached to Defendant's Answer as well as to this Brief, as Exhibit "A."

**Terms.** Congress and the courts frequently refer to requirements that employees join or pay money to unions as a condition of employment as "compulsory unionism." *See, e.g., Retail Clerks Intern. Ass'n., Local 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96, 102 (1963). Laws forbidding compulsory unionism are frequently called "right to work" ("RTW") laws. *Id.* at 98.

Provisions in union contracts imposing "compulsory unionism" are often called "union security" agreements.  *Id.* at 101.  Workplaces where workers are subject to a "union security agreement" are frequently referred to as "union shops."

   ***Legal Issues.***  Whether Hardin County, or any political subdivision of state government, may lawfully adopt a "right to work" ordinance turns on two basic legal questions.  These are:

   1.   Does the National Labor Relations Act ("NLRA") preempt the field of regulating compulsory unionism?  The United States Supreme Court answered this question in *Retail Clerks Intern. Ass'n., Local 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96, 100-101 (1963):

> "It was never the intention of the National Labor Relations Act . . . to preempt the field in this regard so as to deprive the States of their powers to prevent compulsory unionism."

The NLRA does not preempt the field of regulating compulsory unionism.

   2.   Does the NLRA's protection of States' rights to outlaw compulsory unionism include the right of the States' political subdivisions, like counties, to prohibit compulsory unionism?  The United States Supreme Court answered this question in *City of Columbus v. Ours Garage and Wrecker Service, Inc.,* 536 U.S. 424, 433 (2002):

> "The exclusion of political subdivisions cannot be inferred from the express authorization to the States because political subdivisions are components of the very entity the statute empowers."  *See also, Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 607-608 (1991) (quoted in *City of Columbus).*

Section 14(b) of the NLRA expressly authorizes the States to prohibit compulsory unionism.  As a political subdivision of the Commonwealth of Kentucky, Hardin County is empowered to prohibit compulsory unionism within its borders.

   At bottom, Defendants are entitled to Summary Judgment because Plaintiffs' challenge to Ordinance 300 asks this Court to rule contrary to the United States Supreme Court on the two fundamental principles set out above: (a) the NLRA does not preempt the regulation of "right to

work" laws, and (2) the NLRA's protection of State rights to adopt RTW laws includes the right of the political subdivisions of the States to adopt RTW laws.

## STATEMENT OF FACTS

Hardin County, Kentucky, is a political subdivision of the Commonwealth of Kentucky. Legislative power for the county is lodged in the Hardin County Fiscal Court.   Pursuant to Kentucky Revised Statute (KRS) 67.083, the Fiscal Court is empowered and charged to "enact ordinances" in the performance of "public functions," that include "(r)egulation of commerce for the protection and convenience of the public" and "(p)romotion of economic development of the County. . . ."

In order to fulfill these responsibilities, the Hardin County Fiscal Court passed Ordinance 300 on January 13, 2015.  The primary provisions of Ordinance 300 are found at Section 4, titled "Freedom of Choice Guaranteed, Discrimination Prohibited."  This provision states:

> No person covered by the National Labor Relations Act shall be required as a condition of employment or continuation of employment:
>
> (A) to resign or refrain from voluntary membership in, voluntary affiliation with, or voluntary financial support of a labor organization;
>
> (B) to become or remain a member of a labor organization;
>
> (C) to pay any dues, fees, assessment, or other charges of any kind or amount to a labor organization;
>
> (D) to pay to any charity or other third party, in lieu of such payments, any amount equivalent to or a pro-rata portion of dues, fees, assessments, or other charges regularly required of members of a labor organization; or
>
> (E) to be recommended, approved, referred, or cleared by or through a labor organization.

Other sections of Ordinance 300 address collateral aspects of compulsory unionism. Section 5 authorizes wage deductions to pay union dues, fees, assessments, and other charges, but provides that such wage deductions must be revocable at any time by the employee.  Other sections provide for enforcement of the Ordinance by declaring contrary agreements invalid, preventing coercion and intimidation, and setting forth penalties and civil remedies.  The Hardin County Fiscal Court adopted Ordinance 300 by a vote of eight Magistrates to one.

Ordinance 300 identified its twin purposes as regulating commerce within the County and promoting economic development within the County.  Both purposes are authorized by KRS 67.083.  *See* Ordinance 300, p. 1.  Section 2 of the Ordinance identifies the County's public policies furthered by the Ordinance as the regulation of commerce through promoting freedom for the County's citizens in their choice of employment and how they spend their paychecks.

Another public policy identified in Section 2 of Ordinance 300 is to "encourage an employment climate conducive to the economic development of Hardin County." Ordinance 300, Section 2, page 2.  Hardin County is located on the U.S. Interstate 65 ("I-65") Corridor and must compete for jobs and other economic development opportunities with communities along the I-65 Corridor in Indiana to the north and Tennessee to the South. Def. Answer ¶ 15.   Both Indiana and Tennessee have enacted right-to-work laws. *Id*.   The construction of new bridges across the Ohio River between Indiana and Kentucky only increases the competition for economic development opportunities between Hardin County and communities located across the border in Indiana. *Id*.

Kentucky counties vary widely in both their geography and their primary contributors to the local economy.  Rural counties with economies fueled by agricultural and small business may care little about "right to work."  Similarly, Kentucky counties located neither adjacent to

nor closely connected via Interstate highways with "right to work" jurisdictions may feel little competition for jobs due to the absence of "right to work" protections for their citizens. Ordinance 300 explains, however, that "Hardin County and its residents compete for the expansion of employment opportunities with other cities, counties and states whose citizens benefit from the protections under similar right to work legislation." Ordinance 300, p. 1.

ARGUMENT

A.    THE NATIONAL LABOR RELATIONS ACT LEAVES STATE AND LOCAL GOVERNMENTS FREE TO REGULATE COMPULSORY UNIONISM.

*Relationship Between State Law and Local Law for Preemption Purposes.* Local laws, like Ordinance 300, are treated the same as State laws for preemption purposes. The Supremacy Clause of the United States Constitution gives Congress the authority to preempt State law.  U.S. CONST. art. VI, cl. 2[1]; *Wardair Canada, Inc. v. Florida Dept. of Revenue*, 477 U.S. 1, 6 (1986); *Maryland v. Louisiana,* 541 U.S. 725, 746 (1981) ("consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace State law."). The Supremacy Clause makes no mention of local laws.  This is because local governments are simply political subdivisions of the States that created them. *Lexington-Fayette urban Cnty. Gov't v. Smolcic*, 142 S.W.3d 128, 133 (Ky. 2004) (counties are unincorporated political subdivisions of the State. . . ."). For this reason, local ordinances are "analyzed in the same way as that of state-wide laws" under the Supremacy Clause.  *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 605 (1991). Local governments, such as Hardin County, are "agencies" of their States. *Mortier*, 501 U.S. at 607-8.

---

[1] The Supremacy Clause states:  "Clause 2. This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby; any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

The U.S. Supreme Court explains the relationship between States and the local governments they create as follows: "The principle is well settled that local 'governmental units are created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them . . . .'"  *Mortier*, 501 U.S. at 607-8 (internal citations omitted).  Where federal law preempts State law, the laws of the State's political subdivisions are likewise preempted.  Where federal law does not preempt State law, the State's political subdivisions are likewise free to act.

The Supreme Court affirmed this interrelationship between States and local governments, for preemption purposes, with inescapable language in *City of Columbus v. Ours Garage and Wrecker Service, Inc.*, 536 U.S. 424, 429 (2002):

> "A locality . . . is a 'political *subdivision'* of the State.  Ordinarily, a political subdivision may exercise whatever portion of state power the State, under its own constitution and laws, chooses to delegate to the subdivision. Absent a clear statement to the contrary, Congress' reference to the 'regulatory authority of the State' (the statutory language at issue) should be read to preserve, not preempt, the traditional prerogative of the States to delegate their authority to their constituent parts." (Emphasis in original; parenthetical explanation added).

Congress can choose to preempt local authority while leaving intact state authority to legislate in the same field, but courts are forbidden to find such a separation unless Congress expresses "a clear and manifest purpose to preempt local authority."  *Id.* at 432.  "Mere silence," the Supreme Court importantly holds, "cannot suffice to establish a clear and manifest purpose to preempt local authority."  *Id.*; *Mortier*, 501 U.S. at 607.  Accordingly, if States are free from federal preemption to adopt RTW laws, their local governments are free to adopt RTW laws, absent Congress stating a "clear and manifest purpose to preempt local authority."  *Id.*  Courts are never to assume that Congress wants local laws preempted if State laws on the subjects would not be preempted.  *Id.*  If Congress wants local laws treated differently than States laws,

Congress will clearly say so.  *Id.*  "Mere silence" in a federal statute will not justify treating local laws differently than State law for purposes of preemption.

The impact of this relationship between States and their political subdivisions for preemption purposes is addressed more fully below in the discussion on the specific protection for "State" RTW laws set out in Section 14(b) of the NLRA.  An understanding of this basic principle of local-law preemption is also essential, however, to a correct reading of most of the legal authorities on "right to work" preemption.  Historically most "right to work" laws have been State laws.  Accordingly, most Congressional and judicial pronouncements about whether the NLRA preempts "right to work" laws have addressed State laws. If federal law does not preempt State "right to work" laws, what does this mean for local "right to work" laws?

The United States Supreme Court has spoken:  When "States" are granted the authority to legislate without federal preemption, this "should be read to preserve, not preempt, the traditional prerogative of the States to delegate their authority to their constituent parts," like Hardin County.  *City of Columbus*, 536 U.S. at 429.  If States are free to pass RTW laws, counties are free to exercise their authority to pass RTW laws. *See, City of Columbus*, 536 U.S. at 433.

***Sources of Federal Preemption.***  Federal preemption of State and local laws can arise in one of three ways:

> (a)    An express preemption of State law embodied in the federal statute;
>
> (b)    An implied preemption through pervasive regulation of an entire field of law;
>
> (c)    An implied preemption arising from a conflict between federal law and State or local law.

*English v. General Electric Company*, 496 U.S. 72, 78-79 (1990).  "Conflict preemption" has two types: (i) A State or local law may create a conflict with a federal law by rendering it

impossible to comply with both the federal law and the State or local law simultaneously, and (ii) A State or local law may "stand as an obstacle" to achieving the objectives Congress intended when passing the federal law. *Gade v. National Solid Waste Management Ass'n,* 505 U.S. 88, 98 (1992).

   **(a)     *NLRA Contains No Express Preemption of RTW Laws.*** The plain language of the NLRA nowhere preempts state or local "right to work" laws. Plaintiffs' Complaint admits that Section 8(a)(3) of the NLRA (29 U.S.C. § 158(a)(3)) is the statutory authority for any "union security" agreement. *See,* Complaint ¶ 17. Generally, Section 8(a)(3) forbids "discrimination . . . to encourage or discourage membership in any labor organization." Thus, requiring an employee to be a union member or pay union dues would violate the NLRA but for the following additional language:

> "*Provided*, That nothing in this Act, or any other statute of the United States, shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later. . . ."

Section 8(a)(3) of the NLRA, (29 U.S.C. § 158(a)(3)); (emphasis in original). Section 8(a)(3) says **nothing** that prevents state or local laws from forbidding compulsory unionism. Section 8(a)(3) prevents only the NLRA and other federal laws from precluding compulsory union contracts. 29 U.S.C. § 158(a)(3)(". . . this Act, or any other statute of the United States, . . .").

   This is no accident. Throughout the history of the NLRA, various States have passed laws and constitutional provisions outlawing compulsory unionism. *See, e.g., Lincoln Federal Labor Union v. Northwestern Iron & Metal Company*, 335 U.S. 525, 530-37 (1949); *Retail Clerks International Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96, 100 (1963). Congress' omission of any reference to state and local law in Section 8(a)(3) makes clear that the

NLRA does not, by its language, place any limits on State or local regulation of compulsory unionism.  The United States Supreme confirmed that Section 8(a)(3) creates no preemption of "right to work" laws in *Algoma Plywood & Veneer Company v. Wisconsin Employment Relations Board,* 336 U.S. 301 (1948).  In *Algoma Plywood*, Justice Frankfurter refuted this suggestion that Section 8(a)(3)'s language established any preemption over regulation of "union-security" agreements.  He explained:

> "It is argued therefore, that a State cannot forbid what Section 8(3) affirmatively permits.  The short answer is that Section 8(3) merely disclaims a national policy hostile to the closed shop or other forms of union-security agreement. This is the obvious inference to be drawn from the choice of the words 'nothing in this Act . . . or in any other statute of the United States,' and it is confirmed by the legislative history."  *Id.* at 307.

Section 8(3) of the NLRA was renumbered Section 8(a)(3) after the Taft-Hartley amendments. *See also,   Retail Clerks International Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96, 102 (1963)("It was never the intention of the National Labor Relations Act to preempt the field . . . to prevent compulsory unionism.")

Since the NLRA contains no express preemption of State or local authority to prohibit compulsory unionism, any preemption of State or local "right to work" laws would have to be implied preemption.

      **(b)**     ***The NLRA Creates No "Implied" Preemption of RTW.***

Federal labor law does preempt regulation of many aspects of labor relations.  In *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 245 (1959), the United States Supreme Court held that the National Labor Relations Board had exclusive jurisdiction over activity that "is arguably subject to [Section] 7 or [Section] 8 of the [NLRA]."  Aspects of labor regulation that is "arguably" subject to Section 7 or 8 of the NLRA represents the broadest scope of federal "implied" labor law preemption, and is often referred to as *Garmon* preemption. The Supreme

Court has made equally clear, however, that the regulation of compulsory unionism is **not** one of the areas of labor law preempted by the *Garmon* preemption.

In *Retail Clerks International Association, Local 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96 (1963), the U.S. Supreme Court faced the question of whether the National Labor Relations Board possessed jurisdiction over Florida's State "right to work" law.  In short, the Court faced the question of whether *Garmon* preemption applied to "right to work" laws or similar regulation of "union security agreements."  *Id.* at 103-04.  The Court held that *Garmon* preemption has no application to "right to work laws".[2]  *Id.*

To reach this decision, the U.S. Supreme Court set out a detailed explanation of the origin and preservation of State rights to regulate compulsory unionism.  Adopting and quoting from various portions of the legislative history behind the National Labor Relations Act, the Court explained:

1. "Prior to enactment of the Wagner Act [NLRA] in 1935, the States had unquestioned power to regulate or prohibit the closed shop and other forms of union-security agreements."  *Id.* at 100.

2. "While § 8(3) of the Wagner Act [NLRA] said 'nothing in this Act, . . . or in any other statute of the United States, shall preclude' such agreements, it left open the power of a State to 'preclude' them."  *Id.*

The Court explained that Congress had acted in the Taft-Hartley amendments to the NLRA of 1947 to address abuses in union use of "closed shop."  "Closed shop" is a type of "union security" agreement under which an employer agrees to hire only persons who are already union members.  The Taft-Hartley amendments outlawed "closed shop" by amending Section 8(a)(3) of the NLRA to "require that there be a 30-day waiting period before any employee is forced into

---

[2] The U.S. Supreme Court observed:  "This result on its face may seem to be at war with *San Diego Building Trades Council v. Garmon* (cite omitted) . . . . The Court in *Algoma Plywood & Veneer Co. v. Wisconsin Emp. Relations Board,* 336 U.S. 301, 314 (cite omitted) stated that Section 14(b) was included to forestall the inference that federal policy was to be exclusive on this matter of union-security agreements."  *Retail Clerks Intern. Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96, 103 (1963).

a union." *Id.* "Union security" agreements that afforded this "30-day" waiting period before any employee is forced into a union" are termed "union shop" agreements.

Congress, however, wanted to make clear that its enactment of some regulation of union security agreements did ***not*** preempt the field so as to prevent "right to work" laws.

> "In other words, Congress undertook pervasive regulation of union-security agreements, raising in the minds of many whether it thereby preempted the field. . . .  That is one reason why a section, which later became § 14(b), appeared . . . as making clear and unambiguous the purpose of Congress not to preempt the field." *Id.* at 100-01.

The Court went on to state unequivocally:

> "It was never the intention of the National Labor Relations Act . . . to preempt the field in this regard so as to deprive the States of their powers to prevent compulsory unionism." *Id.* at 102.

**(c) *Section 14(b) of the NLRA.*** In *Schermerhorn*, the Supreme Court took pains to explain that the National Labor Relations Act "never" preempted State power "to prevent compulsory unionism." *Id.* at 102.  Congress added new language to the NLRA, which became incorporated into the law as Section 14(b), in order to protect state power to prevent compulsory unionism. Importantly, however, Section 14(b) did not create an exception of federal preemption. The sole purpose for Congress' addition of Section 14(b) to the NLRA was to "forestall the inference that federal policy was to be exclusive on this matter of union-security agreements." *Id.* at 104, *quoting Algoma Plywood & Veneer Co. v. Wisconsin Emp. Relations Board,* 336 U.S. 301, 314 (1948).  The language Congress added is found at Section 14(b) of the Act[3], and states as follows:

> "(b) Nothing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a

---

[3] The title of Section 14 is "Construction of Provisions."  The Section does not affect any positive law.  The purpose of the Section is to give instructions for the proper reading of the NLRA.  It instructs anyone reading the NLRA not to interpret any part as depriving the States of their power to regular union-security agreements.  29 U.S.C. § 164(b).

labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law." 29 U.S.C. § 164(b).

The inclusion of Section 14(b) made "clear and unambiguous the purpose of Congress not to preempt the field." *Schermerhorn,* 375 U.S. at 102. Section 14(b) of the NLRA added no new freedom from any federal preemption to pass "right to work" laws. Section 14(b) simply affirms that no federal preemption against "right to work" laws exists.

Finally, the express disclaimers of preemption evident in the NLRA's language and confirmed in the decisions of the U.S. Supreme Court, discussed above, foreclose any claim of "conflict preemption." Compliance with both the NLRA and RTW laws is certainly possible. The NLRA expressly authorizes RTW laws. Similarly, neither State nor local RTW laws can be said to "stand as an obstacle" to achieving the objectives of the NLRA. The availability of RTW laws in embedded within the NLRA, as long as the RTW law is not the product of either "this (the National Labor Relations) Act, or any other statute of the United States." Section 8(a)(3), (29 U.S.C. § 164(b). Accordingly, RTW laws are not an "obstacle" to achieving the NLRA's purpose. The NLRA creates no "implied" preemption of State or local RTW laws.

The Court of Appeals for the Tenth Circuit ruled that the NLRA creates no "implied" preemption over a local RTW law in *NLRB v. Pueblo of San Juan*, 276 F.3d 1186, 1197 (10th Cir. 2002). *Pueblo of San Juan* involved a "right to work" ordinance adopted by an Indian tribe. The National Labor Relations Board and a local union sued the tribe in the United States District Court of New Mexico. Plaintiffs claimed that the NLRA preempted the ordinance. The District Court granted summary judgment in favor of the tribe. The Court of Appeals upheld the District Court's decision rejecting the preemption challenge.

The Federal Court carefully explained that Section 8(a)(3) created no preemption of "right to work" laws. The Court stated:

> "What Congress has not taken away by Section 8(a)(3) it need not give back (by Section 14(b)) in order for the tribe to continue to have authority to pass a right-to-work law. Although the Supreme Court has characterized Section 8(a)(3) as 'articulat[ing] a national policy that certain union-security agreements are valid <u>as a matter of federal law</u>,' the Court has also made it clear that . . . Section 8(a)(3) left the States free to pursue their own more restrictive policies in the matter of union-security agreements."

*Id.* at 1197-8 (internal quotations omitted; underlining added).  The Tenth Circuit, then, quoted from *Schermerhorn*, 375 U.S. at 101.  The Court observed that Congress only enacted Section 14(b) of the NLRA "to 'mak[e] clear and unambiguous the purpose of Congress not to preempt the field."  *Id.*

*NLRB v. Pueblo of San Juan* utilizes some legal principles unique to Indian tribes.  The Court's application of NLRB preemption principles governing "right to work" laws, however, apply fully to Hardin County.   Again, the NLRA simply creates no express or "implied" preemption of State or local RTW laws.

### B.   THE AUTHORITY OF STATES TO ADOPT RTW LAWS INCLUDES THEIR POLITICAL SUBDIVISIONS.

The NLRA does not preempt Hardin County's Ordinance 300 because the NLRA does not preempt RTW laws.  The NLRA merely disclaims any ***federal*** prohibition of union shop. The addition of Section 14(b), however, which specifically protects "State" power to pass right to work laws, underscores Hardin County's right to adopt its "right to work" ordinance.

As explained above, authority belonging to the States includes the States' political subdivisions within the scope of that authority, in the absence of Congress setting forth a "clear and manifest purpose to preempt local authority."  *City of Columbus v. Ours Garage and Wrecker Service, Inc.*, 536 U.S. 424, 432 (2002).  Therefore, the NLRA's provision in Section 14(b) authorizing "any State" to forbid union shop authorizes a political subdivision, such as Hardin County, to forbid union shop within its geographical boundaries.

This principle merits close examination because of the light it sheds on whether federal preemption applies to Ordinance 300.[4] The U.S. Supreme Court carefully set out the legal principles for including political subdivisions within the authority granted to the States in *Wisconsin Public Intervenor v. Mortier,* 501 U.S. 597 (1991).  *Mortier* involved the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA).  FIFRA created an expansive regulatory scheme for pesticides.  The statute, however, authorized "States" to also "regulate the sale or use of pesticides so long as the state regulation does not permit a sale or use prohibited by the Act." *Id.* at 602.  The town of Casey, Wisconsin, adopted an ordinance regulating the use of pesticides within the town.  Mortier, who ran an aerial insecticide spraying service, challenged the town's ordinance on the grounds that it was preempted by FIFRA.  A State trial court found the county ordinance was preempted.  The Wisconsin Supreme Court affirmed.  The United States Supreme Court reversed the Wisconsin Supreme Court ruling that FIFRA did not preempt the local government ordinance.

In its opinion, the U.S. Supreme Court acknowledged that FIFRA grants only "States" the right to regulate pesticides, and fails to include political subdivisions within any definition of "State."  Nevertheless, the Supreme Court unanimously ruled that the absence of any reference to political subdivisions within the definition of "States" did not warrant the conclusion that the federal legislation preempted local government action.  The Court explained:

> "Section 136v [of FIFRA] plainly authorizes the 'States' to regulate pesticides and just as plainly is silent with reference to

---

[4] The relationship between federal, state and local governments is succinctly stated in the Executive Order on the "Fundamental Federalism Principles," issued by President Bill Clinton in 1999.  Section 2 of the Executive Order explains "[t]he people of the States created the national government and delegated to it enumerated governmental powers.  All other sovereign powers, save those expressly prohibited the States by the Constitution, are reserved to the States or to the people."  Under its Section on "Definitions," the Executive Order explains: "(b) 'State' or 'States' refer to the States of the United States of America, individually or collectively, and, where relevant, to State governments, **including units of local government and other political subdivisions established by the States**." Executive Order No. 13132, 64 FR 43255, Section 2(b)(1999),(Emphasis added)(Copy attached as Exhibit B).

> local governments. Mere silence, in this context, cannot suffice to establish a 'clear and manifest purpose' to pre-empt local authority." (citation omitted). *Id.* at 107.

The Court, then, explained why the statute's authorization for "State" regulation of pesticides included within its scope the authority for the local governments to regulate pesticide usage:

> "The principle is well settled that local 'governmental units are created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them . . . in [its] absolute discretion.'" (citations omitted)  The exclusion of political subdivisions cannot be inferred from the express authorization to the 'State[s]' because political subdivisions are components of the very entity the statute empowers." *Id.* at 607-08.

The fact that other parts of FIFRA referred to "any State or any political subdivision thereof," did not dissuade the Court from its conclusion that the authority granted the "States" to regulate pesticides included the State's political subdivisions. The Court reasoned:

> "The term 'State' is not self-limiting since political subdivisions are merely subordinate components of the whole.  The scattered mention of political subdivisions elsewhere in FIFRA does not require their exclusion here." *Wisconsin Public Intervenor v. Mortier,* 501 U.S. 597, 612 (1991).

Finally, the Court concluded that even if political subdivisions had not fallen within the definition of "States," "it would not follow that municipalities were left with no regulatory authority."  The Court concluded, "[a]t a minimum, localities would still be free to regulate subject to the usual principles of pre-emption." *Id.* at 607.

Applying this principle to Ordinance 300 confirms dual reasons why the Ordinance is not preempted.  Section 14(b) of the NLRA protects a "State's" right to enact RTW laws, and Hardin County enjoys the same right as a political subdivision of the Commonwealth of Kentucky.  Even if Hardin County did not fall within the scope of "States" in Section 14(b), however, it would "still be free to regulate (compulsory unionism) subject to the usual principles of pre-emption." *Id.*  As noted above, the NLRA excludes only "this Act, or any other statute <u>of the</u>

United States" from prohibiting "compulsory unionism."  Section 8(a)(3) of the Act (29 U.S.C. § 158(a)(3).  And, no "implied" preemption prevents local RTW laws. Ordinance 300 would be lawful even if Section 14(b0 had never been added to the NLRA.

The U.S. Supreme Court demonstrated the strength of the rule that State authority includes political subdivisions in *City of Columbus v. Ours Garage & Wrecker Service, Inc.,* 536 U.S. 424 (2002).  The *City of Columbus* involved the Interstate Commerce Act ("ICA").  This federal legislation expressly preempts provisions by "a State [or] political subdivision of a State . . . related to a price, route or service of any motor carrier . . . with respect to the transportation of property."  49 U.S.C. § 14501(c)(1).  *Id.* at 428.  The ICA carves out from this federal preemption, however, two relevant exceptions.  These are:

> "(2) MATTERS NOT COVERED.
>
> "(A) shall not restrict the safety regulatory authority of a State with respect to motor vehicles. . . ."
>
> . . . .
>
> (C) does not apply to the authority of a State or a political subdivision of a State to enact or enforce a law . . . relating to the price of for-hire motor vehicle transportation by a tow truck if such transportation is performed without the prior consent or authorization of the owner or operator of the motor vehicle."

The City of Columbus adopted extensive regulations governing the operation of tow trucks.  The regulations were not limited to tow trucks that transport vehicles without the owner's consent.  Plaintiff, Ours Garage and Wrecker Service, Inc., asserted that the Interstate Commerce Act preempted Columbus' local tow truck regulations.

Both the U.S. District Court and the Sixth Circuit Court of Appeals agreed with the Plaintiff that the ICA preempted Columbus' tow-truck regulations.  The Court of Appeals observed the distinction between the ICA's grant of authority to "States" to adopt safety

regulations, but ICA granted authority to "State or political subdivision of a State" only to regulate the price of tow trucks when towing vehicles without the owner's consent. The Court of Appeals reasoned that the statute's inclusion of "political subdivisions of the States" for one purpose, but only "State(s)" for the broader "safety" purpose meant that the ICA preempted political subdivisions from issuing safety regulations. *Id.* at 431-432.

The United States Supreme Court reversed. The Court ruled that the exclusion of "political subdivisions" from the grant of authority to States to regulate safety "does not provide the requisite 'clear and manifest indication that Congress sought to supplant local authority.'" *Id.* at 434. By ruling that the ICA use of "State" included its political subdivisions under these circumstance, the Supreme Court illustrated just how "clear" a statute must be to free the States from federal preemption but shackle political subdivisions with federal preemption.

Compare the ICA with the NLRA. The NLRA nowhere states an intention to preempt State or local "right to work" laws. Just the opposite. Section 8(a), by its plain language, excludes only the National Labor Relations Act and "other statutes of the United States" from prohibiting union shop. Unlike the ICA, the NLRA contains no parallel grant of a different type of exception to federal preemption for "State" versus "States and political subdivisions." If the Interstate Commerce Act provides no "clear and manifest indication that Congress sought to supplant local authority," the National Labor Relations Act certainly contains no such indication as to "right to work" laws.

The NLRA contains only a single reference to "political subdivisions" of the States. It is found at Section 2(2). 29 U.S.C. § 152(2). This provision specifies that for purposes of the NLRA, an "employer" does not encompass "any State or political subdivision thereof." This reference was necessary because a State and a political subdivision, when treated as employers,

are two distinct corporate entities.  Congress' determination that States and political subdivisions were not subject to the NLRA as "employers" does not lead to any implication that Congress preempted local right-to-work laws.

The FIFRA, at issue in *Mortier*, contains various references to "any State or political subdivision."  *Mortier*, 501 U.S. at 608.  Nevertheless, the Supreme Court had no difficulty unanimously concluding that the exemption permitting "States" (with no mention of political subdivisions) fully authorizes local ordinances on the subject that would otherwise be preempted by the federal statute.  The same is true for the NLRA.

### C.    KRS 67.083 DELEGATES TO HARDIN COUNTY SUFFICIENT AUTHORITY TO ADOPT RTW ORDINANCE.

States can delegate "authority to their political subdivisions either specifically or by leaving undisturbed their existing statutes that would otherwise provide local government with ample authority to regulate."  *Mortier*, 501 U.S. at 611.  Hardin County's authority to regulate commerce and promote economic development gives its Fiscal Court ample authority to adopt Ordinance 300.

KRS 67.083 specifically authorizes Kentucky counties to enact ordinances to fulfill, among other things, the following "public functions":

> "(m) Regulation of commerce for the protection and convenience of the public; and

> (x) Promotion of economic development of the county. . . ."

The regulation of compulsory union agreements plainly falls within the scope of the regulation of commerce.  This is certainly a central goal and purpose of the Hardin County Fiscal Court.  Ordinance 300 identifies among its purposes "to promote and encourage direct commerce for the protection and convenience of the public, by giving employees freedom to choose employment

without restrain or coercion regarding payment of mandatory dues, fees or other payments to a labor organization as a condition of that employment." Ordinance 300, p. 1.

The United States Court of Appeals for the Sixth Circuit addressed the scope of county authority to regulate commerce under KRS 67.083 in *C&H Entertainment, Inc. v. Jefferson County Fiscal Court*, 169 F.3d 1023 (1999). *C&H Entertainment*, *Inc.* involved an adult entertainment ordinance passed by the Jefferson County Fiscal Court. The owner of various adult entertainment venues challenged the County's authority to adopt an ordinance regulating adult entertainment establishments on the grounds that it fell outside the County's authority delegated by the Commonwealth.

Jefferson County relied upon KRS 67.083's grant of the authority to regulate commerce, as well as its authority to regulate the sale of alcoholic beverages, to support its authority to pass the adult entertainment ordinance. The U.S. District Court for the Western District of Kentucky found that the County's authority to regulate commerce was not broad enough to encompass adult entertainment. The Sixth Circuit reversed.

KRS 67.083 identifies among its purposes: "to provide necessary latitude and flexibility and finance various governmental services within the functional areas specified in subsection (3)…." The regulation of commerce is one of the "functional areas specified in subsection (3)." The Court of Appeals relied upon a decision of the Kentucky Supreme Court interpreting this aspect of the statute: *Casey County Fiscal Court v. Burke*, 743 S.W.2d 26 (1988). Guided by the *Burke* decision the Sixth Circuit concluded that KRS 67.083(3) must interpret the "regulation of commerce" with "latitude and flexibility."

The *C&H Entertainment* plaintiff argued that an earlier decision of the Kentucky Supreme Court, *Fiscal Court of Jefferson County v. City of Louisville,* 559 S.W.2d 478 (Ky.

1977), prevented Jefferson County from using its broad commerce powers to regulate an industry in the absence of a more "rifle shot" grant of authority.  The Sixth Circuit rejected this narrow interpretation.   The Court explained: "This interpretation thus requires a level of micro-management by the General Assembly that the Home Rule Act was designed to obviate."  *C&H Entertainment, Inc.*, 169 F.3d at 1027.

Ordinance 300 falls even more within the scope of "regulation of commerce" than adult entertainment laws. The National Labor Relations Act itself states among its purposes, "to eliminate the causes of certain obstructions to the free flow of commerce."  *See,* Section 1 of the NLRA (29 U.S.C. § 151).  It is hard to imagine any subject more central to commerce than jobs, wages, and an employee's control over his/her paycheck.

Furthermore, the experience of industrial recruiters and academic literature support the conclusion of the Hardin County Fiscal Court that a "right to work" ordinance will aid the County in attracting industry and other jobs and economic opportunities for the citizens of Hardin County. Plaintiffs and other proponents of compulsory unionism may dispute the economic development benefits of "right to work" laws.  Nevertheless, Hardin County's Fiscal Court is charged with the responsibility of making these policy judgments.  The Fiscal Court's policy judgment is set out in Section 2 of Ordinance 300.  It is not the role of Plaintiffs, or even the Courts, to regulate commerce or promote economic development within Hardin County. KRS 67.083 charges the Hardin County Fiscal Court with these responsibilities, and the NLRA does not preempt Hardin County from exercising them by adopting Ordinance 300.

KRS 67.083(1) reserves to the Kentucky General Assembly the authority to limit local government activities in any way it chooses.  The Sixth Circuit noted, however, that *Casey County Fiscal Court v. Burke*, holds that "(a)ny limitation cannot be implied and must be an

express restriction." *C&H Entertainment, Inc.*, 169 F.3d at 1026, *quoting Burke*, 743 S.W.2d at 27.  The Kentucky legislature has placed no limitation on a county's duty and power to regulate commerce or promote economic development that would prevent adoption of an RTW ordinance. Should the General Assembly, at any time in the future, decide to prevent or restrict County authority to adopt RTW ordinances, the General Assembly is free do so.  Should the Kentucky General Assembly decide that it does not want counties exercising their power to regulate commerce or promote economic development, the General Assembly (has) retain(ed) full authority to prescribe and limit by statute local government activities when it deems such action necessary." KRS 67.083(1).  Unless and until the General Assembly excludes RTW ordinances from a county's tools for regulating commerce and promoting economic development, the NLRA does not preempt Hardin County from exercising its delegated power to regulate commerce and promote economic development through an RTW ordinance.

### D.    KENTUCKY DECISION AGAINST LOCAL RTW ORDINANCE IN 1965.

In 1965, the Court of Appeals of Kentucky, then Kentucky's highest court, addressed a right to work ordinance passed by the City of Shelbyville.  The resulting decision is *Kentucky State AFL-CIO v. Puckett*, 391 S.W.2d 360 (1965).  The *Puckett* decision concluded that the NLRA preempted the City of Shelbyville's ordinance.  The Court relied entirely on federal grounds.  It interpreted no Kentucky statute or case law.  Accordingly, *Puckett* binds this Court in no way.

Furthermore, the *Puckett* Court rendered its decision before either the U.S. Supreme Court decided either *Wisconsin Public Intervenor v. Mortier* (1991) or *City of Columbus v. Ours Garage and Wrecker Service* (2002).  Therefore, the *Puckett* Court lacked the benefit of these U.S. Supreme Court decisions holding that local laws are analyzed like State laws for preemption purposes.  *City of Columbus,* 536 U.S. at 432; *Mortier,* 501 U.S. at 607-8.  As a result, *Puckett*

erroneously concluded that the protection of State power to adopt RTW laws protected by the NLRA's Section 14(b) excludes, ***when in fact it include***s, the right of localities to adopt RTW laws. *See, e.g., City of Columbus,* 536 U.S. at 429.[5]

Moreover, *Puckett* ***chose*** to read the NLRA as occupying the entire field of compulsory unionism, then construed Section 14(b) as creating a "narrow exception" to this non-existent federal preemption. This reasoning ignores the teaching of *Schermerhorn,* 375 U.S. at 100-05, *Algood Plywood,* and the legislative history of the NLRA. (Section 14(b) was added merely to preserve the existing right to regulate compulsory unionism free from federal preemption).

Finally, the *Puckett* court opined that it did not "believe" Congress would allow variation in policy at the local government level. It rested this conclusion on an assumption that Congress sought some level of uniformity in the enforcement of "union shop" agreements. *Puckett,* 391 S.W.2d at 360-61. This again ignores the express teaching of the U.S. Supreme Court in *Schermerhorn*:

> "Congress, in other words, chose to abandon any search for uniformity in dealing with the problems of state laws barring the execution and application of agreements authorized by Section 14(b) and decided to suffer a medley of attitudes and philosophies on the subject." *Schermerhorn,* 375 U.S. at 104-105.

It also ignores the reality of where, how, and what compulsory unionism is or is not allowed across the United States.

Congress has allowed wide variation in right-to-work policy at levels other than the States. Native American tribes may regulate compulsory union agreements. *See, NLRB v. Pueblo of San Juan,* 276 F.3d 1186 (10th Cir. 2002). Even where State law prohibits compulsory union agreements, the prohibition does not extend to federal enclaves within the State, such as

---

[5] "Congress' reference to the 'regulatory authority of the State' should be read to ***preserve, not preempt***, the traditional prerogative of the States to delegate their authority to their constituent parts." *City of Columbus,* 536 U.S. at 429 (Emphasis added).

military bases or similar federally-owned property.  *See, Lord v. Local Union No. 2088, International Brotherhood of Elec. Workers, AFL-CIO*, 646 F.2d 1057, 1062 (5th Cir. 1981).  In both situations, unions and employers are faced with asymmetrical policies within each State's geographic footprint.

Finally, any fantasy of uniformity on the subject of compulsory unionism rests on a misunderstanding of how "union shops" occur.  The presence of a union in any workplace where a union shop is lawful does ***not*** guarantee that the particular unionized workplace will be a "union shop."  "Union shop" agreements are the product of collective bargaining.  The union must propose and the employer must agree to include a "union shop" provision in the parties' union contract.

Collective bargaining is a "give and take" process.  Concessions in wages, benefits, or other contract terms sought by the employer, in exchange for the employer's agreement to include a "union shop" clause in the parties' union contract, may be too high for the union to accept.  The employer may have a principled objection to forcing its employees to pay money to the union. The employer may not want the benefit to its employees of its payroll costs to be diluted by mandatory union payments deducted from employees' paychecks and sent to the union, without their true consent.  In short, "union shop" is a workplace by workplace issue ***even in the absence of an RTW law.***  *See, e.g., Erie Brush & Mfg. Corp. v. N.L.R.B.*, 700 F.3d 17, 23-24 (2012)(Employer and union fail to reach a collective bargaining agreement due to an impasse over including a "union shop" clause in the contract).

Because *Kentucky State AFL-CIO v. Puckett* relies on no Kentucky case or statutory authority, and erroneously interprets federal law, it stands as no barrier to the approval of Ordinance 300 today.  Unfortunately, however, the erroneous logic of *Kentucky State AFL-CIO*

*v. Puckett*, has been contagious.  A U.S. District Court in New Mexico invalidated a municipal "right to work" ordinance largely due to a mistaken reliance on *Kentucky State AFL-CIO v. Puckett*.  *New Mexico Federation of Labor v. Clovis,* 735 F.Supp. 999 (D.N.M. 1990).  *Puckett* even shows up in *dicta* in a footnote of a U.S. Supreme Court decision addressing which States' laws on compulsory unionism govern seamen on ships in the North Atlantic Ocean.  *See, Oil, Chemical & Atomic Workers v. Mobile Oil Corp.*, 426 U.S. 407, 413, n.7 (1976).  The *Puckett* interpretation of federal law was erroneous when decided, but it is far more inaccurate now.  It needs to be corrected.

## E.    "HIRING HALL" AND "DUES CHECK OFF" PROVISIONS SUPPORTING RTW ORDINANCE.

The language of Ordinance 300 includes provisions addressing two issues ancillary to its core "right to work" language.  These provisions:

1.  Prevent persons in Hardin County from being denied employment because they are not "recommended, approved, referred, or cleared by or through a labor organization." Ordinance 300, Section 4(e).

2.  Prevent deductions from wages within Hardin County for payments to the union "unless the employee has first presented, and the employer has received, a signed written authorization of such deductions, which authorization may be revoked by the employee at any time by giving written notice of such revocation to the employer." Ordinance 300, Section 5.

The first issue listed above regulates what is frequently called a "Hiring Hall" agreement between a union and an employer.  The second issue listed above regulates what is frequently called a "Dues Check-off" agreement between a union and an employer.

Plaintiffs challenge these ancillary provisions as also preempted by the Act, although they are identical to ancillary provisions presently enforced in the State of Idaho.  *See* I.C. § 44-2003(5) (no requirement of hiring hall referral) and I.C. § 44-2004(1) (dues deduction

authorization may be revoked at any time by written notice) (copy attached as Exhibit C).  Other states, including Iowa and Wisconsin, have also adopted similar (albeit not identical) ancillary provisions that are currently enforced.  *See* Iowa Code Ann. § 731.5 (revocation of dues deduction on 30 days' written notice) (copy attached as Exhibit D); W.S.A. 111.06(1)(i) (revocation of dues deduction on 30 days' written notice) (copy attached as Exhibit E).

Neither the U.S. Supreme Court nor the U.S. Court of Appeals for the Sixth Circuit has directly spoken on the preemption issues raised by ancillary provisions contained in either a State or local "right to work" law.  In candor, a closer question of preemption arises with the "Hiring Hall" and "Dues Check-off" language of Ordinance 300 than with its core RTW language.  And, a few courts have found language like the "Hiring Hall" and "Dues Check-off" provisions of Ordinance 300 to be preempted.  *See, e.g., Local 514, Transport Workers of America v. Keating*, 212 F.Supp.2d 1319 (E.D. Ok. 2002) (finding hiring hall provisions and dues check-off provisions preempted); *SeaPak v. Indus., Technical & Prof'l Emp., Div. of Nat'l Mar. Union, AFL-CIO,* 300 F. Supp. 1197 (S.D. Ga. 1969), *aff'd sub nom.* 423 F.2d 1229 (5th Cir. 1970), *aff'd sub nom.* 400 U.S. 985 (1971) (finding dues check-off preempted).  One of these district court decisions is not binding on this Court whatsoever.  *See Local 514.*  The other district court decision was upheld by the U.S. Supreme Court without opinion, despite the fact that the district court did not analyze the same arguments made in this case, which arguably leaves room for further review.  *See SeaPak*, 300 F. Supp. 1197.  Defendants therefore respectfully ask the Court to dismiss Plaintiffs' entire preemption challenge to Ordinance 300.  Should any aspect of Ordinance 300 be determined to be preempted, the remainder of the Ordinance should remain in full force and effect pursuant to the Ordinance's Severability clause.  Ordinance 300, Section 13.

Nowhere does the Act expressly preempt either of these ancillary provisions. *Chamber of Commerce v. Brown*, 554 U.S 60, 65 (2008) (The NLRA contains no express preemption clause.) Furthermore, there is a presumption against preemption. *Maryland v. Louisiana* 451 U.S. 725, 746 (1981)("Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law"). In order for this Court to find that the Act preempts Ordinance 300's regulation of union referrals and wage assignments for union dues, the Court will have to find an implied preemption.

Defendants respectfully submit that no implied preemption – whether field or conflict – exists. As explained previously, field preemption is foreclosed by inclusion of Section 14(b) of the Act, which made "clear and unambiguous the purpose of Congress not to preempt the field." *Schermerhorn,* 375 U.S. at 102. Regarding conflict preemption, it only occurs in two circumstances. First, conflict preemption may be found if it would be impossible to comply with both the state law and the federal law. Second, conflict preemption may be found if a state law interferes with the goals of a federal law. *Gade v. National Solid Waste Management Ass'n.*, 505 U.S. 88, 98 (1992). Neither type of "conflict" preemption occurs here for either the "Hiring Hall" or the "Dues Check-off" provision because they may be read consistently with federal law and do not interfere with federal legislative intent.

1. **Dues Check Off Provision.**

Section 5 of Ordinance 300 addresses "dues check off." Section 5 states:

> "Section 5 <u>Voluntary Deductions Protected</u>. It shall be unlawful to deduct from the wages, earnings, or compensation of an employee any union dues, fines, assessments, or other charges to be held for, transferred to, or paid over to a labor union, unless the employee has first presented, and the employer has received, a signed written authorization of such deductions, which authorization may be revoked by the employee at any time by giving written notice of such revocation to the employer."

Ordinance 300, Section 5.

Since collection of union dues occurs post-employment and is directly related to whether an employee is compelled to pay union dues, regulations of "dues check off" fall within the "right to work" exception to NLRA preemption.  They fall within the authority given to "State law," and therefore the law of a State's political subdivisions, under Section 14(b) of the Act. The purpose of Section 14(b) was to make "clear and unambiguous the purpose of Congress not to preempt the field." *Schermerhorn*, 375 U.S. at 105.  Some decisions outside of the Sixth Circuit have failed to see a connection between "dues check off" and an employee's continued employment.  This viewpoint is like failing to see the connection between taxes and the Internal Revenue Service.  "Dues check off" is the means of enforcing compulsory unionism.  Where an employee cannot get free of dues check off, they are bound to compulsory unionism.  Therefore, neither the NLRA nor the LMRA preempt the field of regulating dues check off.

It is only when state and federal laws directly conflict (e.g., federal says that all widgets must be red, but state law says that all widgets must be green) that conflict preemption occurs. *See, e g., Foster v. Love*, 522 U.S. 67, 69 (1997) (finding preemption where state law set election date other than that required under federal law).  Here, it is entirely possible to comply with both Ordinance 300 and Labor-Management Relations Act ("LMRA") § 302(c)(4).  The LMRA provides that dues check-off authorizations "shall not be irrevocable <u>for a period of more than</u> one year, or beyond the termination date of the applicable collective bargaining agreement, <u>whichever occurs sooner</u>." 29 U.S.C. § 186(c)(4) (emphasis added).  In other words, restating this legislative mandate in the affirmative, Section 302(c)(4) requires that dues deduction authorization must be revocable at least once a year.  It is therefore clear that the LMRA provides only a maximum—and not a minimum—duration that a dues deduction authorization

may remain irrevocable.   Ordinance 300, Section 5 merely provides that a dues check-off authorization may be "revoked by the employee at any time," which establishes a "floor" for irrevocability to complement the LMRA's "ceiling."   The legislative harmony resulting from these "floor" and "ceiling" concepts were never addressed in the *SeaPak* decision, which demonstrates why the issue should be revisited.[6]

It is also clear that the "Dues Check-off" provision does not interfere with federal legislative intent.  Courts have long recognized that Section 302 of the LMRA was enacted in an attempt to prevent bribery of unions by management.  *Arroyo v. United States,* 359 U.S. 419, 425-26 (1959) (citing legislative history and confirming that Section 302 was "concerned with corruption of collective bargaining through bribery of employee representatives by employers, with extortion by employee representatives, and with the possible abuse by union officers of the power which they might achieve if welfare funds were left to their sole control").  Ordinance 300 does nothing to encourage or allow prohibited bribery, nor does Ordinance 300 do anything to undermine the limited exceptions provided by Section 302(c) for the payment of union dues by those who expressly authorize their deduction.   In fact, the LMRA seeks to make sure that employees are not permanently bound to a dues check off authorization, and Ordinance 300 furthers this goal rather than interferes with it.

In short, because there is no direct conflict between the federal law's "ceiling" and the Ordinance's "floor," and because there is no conflict between the intent of the federal law and the Ordinance, there can be no implied preemption.[7]

---

[6] The fact that Ordinance 300 adds an additional requirement that employees must "giv[e] written notice of such revocation to the employer" does not make it inconsistent with the LMRA, which is silent on the issue of how revocation is to be accomplished.  *See, e g., Foster v. Love,* 522 U.S. 67, 69 (1997) (only direct conflicts create issues of preemption).

[7] As explained previously, cases from other Circuits find that the NLRA and the LMRA preempt State or local regulation of dues check off agreements.  *See, e.g., SeaPAK v. Industrial Technical and Professional Employees*, 300 F.Supp. 1197 (S.D. Ga. 1969), *aff'd* 423 F.2d 1229 (5th Cir. 1970), *aff'd* 400 U.S. 985 (1971).  *SeaPAK* was

2.     **"Hiring Hall" Provision.**

Ordinance 300 prohibits **mandatory** union referrals.   Under Section 4, the Ordinance provides:

> "Section 4.    Freedom of Choice Guaranteed, Discrimination Prohibited.  No person covered by the National Labor Relations Act shall be required as a condition of employment or continued employment to:
>
> . . .
>
> (e) To be recommended, approved, referred, or cleared by or through a labor organization."

Ordinance 300 must be read as a whole, and its overall intent is to preclude compulsory union membership.  This is the same intent reflected in Section 158(a)(3) of the Act.  In fact, by forcing individuals to present themselves to a union and be referred through a union hall, it is inherently coercive and debilitating to employees' freedom of choice.

Mandatory union referrals, known as "hiring hall" agreements, are limited to the construction industry.  This is due to both the practice of the industry, and Section 8(f) of the NLRA (29 U.S.C. § 158(a)(f) and Section 8(a)(3).   Section 8(f) of the NLRA permits construction unions to enter into contracts with employers even though the union, then, does not represent a majority of the employer's workers, or even any of the employer's workers.  It is unlawful for an employer to enter into such an agreement with a union that does not represent a majority of its employees except in the construction industry.

Since a job referral, first, occurs before employment begins, some courts have found that "hiring hall" agreements are separated from the employment relationship and do not condition

---

affirmed by U.S. Supreme Court, but without opinion.   Accordingly, the grounds for the Court's finding of preemption and the application of those grounds to Ordinance 300 are not known, and the district court decision did not address the novel arguments at issue in this case.  For the reasons set out above, Defendants ask this Court to recognize the inherent connection between compulsory unionism and an employee's inability to revoke his or her authorization to deduct money from the employee's paycheck and send it to the union for union dues.

employment on union membership.  Legally, unions are not supposed to base their referrals upon whether an applicant is or is not a union member, or pays union dues.  *See, Breininger v. Sheet Metal Workers*, 493 U.S. 69, 73-84 (1984) (Describes how the "hiring hall" system is supposed to work).  Based on this pre-employment status and assumed lack of connection between referrals and union membership, some courts have held that the NLRA preempts regulation of "hiring hall" agreements.  *Local 514, Transport Workers v. Keating*, 212 F.Supp.2d 1319, 1327 (E.D. Okla. 2002) (Section 14(b) of the NLRA does not allow State regulation because hiring halls relate to the hiring process not the "post-hiring employer-employee-union relationship").

Cases that find the NLRA preempts regulation of "hiring hall" agreements ignore the realities of both the construction industry and hiring hall referrals.  Union referrals in the construction business are made for the day, the week, the month, the construction season, etc.  Construction employment is often a "revolving door."  The line between the "hiring process" and "post-hiring" is a continuum.  As a practical matter, required union referrals lead to pressure to join and pay union dues.  Mandatory union referrals are inherently inconsistent with truly voluntary union membership.

In light of these realities, Hardin County asks that this Court depart from the rulings of some Circuits that have found regulation of "hiring hall" agreements to be preempted by the NLRA or LMRA.  *See, Laborers Int'l Union Local 107 v. Kunco, Inc.*, 472 F.2d 456 (8th Cir. 1973); *NLRB v. Tom Joyce Floors, Inc.,* 353 F.2d 768 (9th Cir. 1965); *NLRB v. Houston Chapter Ass'd Gen'l Contractors,* 349 F.2d 449, 451 (5th Cir. 1965), *cert. denied*, 382 U.S. 1026 (1966); *Local 514, Transport Workers v. Keating,* 212 F. Supp.2d 1319 (E.D. Okla. 2002).

Rules of statutory construction dictate that, where two laws can coexist, the Court should adopt a construction of the Ordinance which will uphold its validity as opposed to one which will

render it void by reason of federal preemption.  *See, e.g., Ruckelhaus v. Monsanto Co.,* 467 U.S. 986, 1018 (1984).  Plaintiffs have relied on non-binding caselaw from other federal courts, all suggesting that hiring hall regulations are preempted by federal law.  *See, e.g., Local 514, Tranport Workers v. Keating,* 212 F.Supp.2d 1319 (E.D. Okla. 2002) (citing cases).  However, Defendants are aware of no authority in the Sixth Circuit or the U.S. Supreme Court (and Plaintiffs have cited none) that directly holds that the right to prohibit exclusive hiring hall arrangements is preempted by federal labor law.  Accordingly, this is a matter of first impression in the Sixth Circuit, and the Court is encouraged to consider the issue from a new perspective.  As stated previously, should any aspect of Ordinance 300 be determined to be preempted, the remainder of the Ordinance should remain in full force and effect pursuant to the Ordinance's Severability clause.  Ordinance 300, Section 13.

## CONCLUSION

This case presents no genuine issues of material fact.  A careful reading of the decisions of the United State Supreme Court, as well as other authorities, demonstrate that federal labor law does ***not*** preempt Hardin County's Ordinance 300.  Certainly, Hardin County has the right to adopt a "right to work" ordinance forbidding compulsory unionism.  The NLRA nowhere preempts "right to work" laws.  Hardin County is a political subdivision of the Commonwealth of Kentucky and, therefore, its "right to work" Ordinance is entitled to protection as a "State law" under Section 14(b) of the NLRA.  Finally, Hardin County, Kentucky, has been charged and authorized to take action, like the adoption of a "right to work" ordinance in order to regulate commerce and promote economic development, pursuant to KRS 67.083.  Hardin County's regulation of "dues check off" and "hiring hall" agreements, although more controversial than the core provisions of Ordinance 300, are nevertheless necessary to achieve the full purposes of

"right to work."   Therefore, Hardin County's regulation of "dues check off" and "hiring hall"

agreements should also be free from federal preemption.

Hardin County respectfully requests that the Court grants its Motion for Summary

Judgment.

Respectfully submitted,

/s/  John T. Lovett
John T. Lovett
jlovett@fbtlaw.com
FROST BROWN TODD LLC
400 West Market Street, 32nd Floor
Louisville, KY 40202
Telephone: (502) 589-5400
Facsimile:  (502) 581-1087

Jason Michael Nemes
jnemes@fmhd.com
FULTZ MADDOX HOVIOUS & DICKENS
101 South Fifth Street, 27th Floor
Louisville, KY 40202
Telephone: (502) 992-5045
Facsimile:  (502) 588-2020

Jennifer B. Oldham
jennyo.hcao@hcky.org
Hardin County Attorney
109 E. Dixie Avenue
Elizabethtown, KY  42701-1408
Telephone:  (270) 765-6726
Facsimile:   (270) 737-0087

*Counsel for Defendants*

0130958.0624725   4829-3975-3762v1