UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| UNITED AUTOMOBILE, AEROSPACE | ) | |
| AND AGRICULTURAL IMPLEMENT | ) | |
| WORKERS OF AMERICA LOCAL 3047, | ) | |
| *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE No. 3:15-cv-66 (DJH) |
| | ) | *Electronically filed* |
| HARDIN COUNTY, KENTUCKY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## BRIEF OF THE NATIONAL LABOR RELATIONS BOARD
## AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS

### STATEMENT OF *AMICUS*

The National Labor Relations Board (NLRB or Board) is an independent federal agency

created by Congress to enforce and administer the National Labor Relations Act (NLRA or the

Act), 29 U.S.C. § 151 *et seq.*, which regulates labor relations between most private-sector

employers in the United States, their employees, and the authorized representatives of their

employees. Among other things, the NLRA proscribes certain conduct by employers and by

labor organizations as unfair labor practices, and empowers the NLRB with exclusive

jurisdiction to prevent and remedy the commission of such unfair labor practices. *See*

*Amalgamated Util. Workers v. Consolidated Edison Co.*, 309 U.S. 261, 264-65 (1940).

This *amicus* brief is intended to provide the Court with the NLRB's experience and

historical perspective on the use of union security clauses in collective bargaining agreements

under the NLRA, the scope of authority delegated to states and territories under Section 14(b) of

the Act (29 U.S.C. § 164(b)), and the relevant statutory meaning and usage of certain terms

raised by this case. The NLRB has a significant interest in the Court's disposition of this case because permitting counties and other local political subdivisions to prohibit union security clauses in collective bargaining agreements displaces the Board's primary authority to regulate such clauses as well as its authority to regulate unfair labor practices falling outside of the authority delegated to states under Section 14(b).

For the reasons set forth *infra*, it is the NLRB's position that Ordinance 300 is pre-empted by the NLRA and that it should be struck down in its entirety.

## INTRODUCTION

The primary issue in this case is whether the provisions of NLRA Section 14(b) authorize counties and other local political subdivisions to prohibit the use of union-security provisions in collective bargaining agreements. Union-security provisions are agreements between employers and labor organizations under which bargaining unit members are required as a condition of employment to maintain membership and pay dues to a labor organization. As we will explain below, under the NLRA, the terms "State or Territory," found in Section 14(b) of the Act, do not and were never intended to include political subdivisions.  Nor are County ordinances state laws, and the regulations at issue in Ordinance 300 are not supported by the authority delegated to County Fiscal Courts by the Kentucky General Assembly to regulate trade or commerce, as outlined in Kentucky Statute 67.083(3)(m). As a result, all county ordinances relating to the regulation of union security clauses are preempted by virtue of the National Labor Relations Act, the Labor Management Relations Act, and the Supremacy Clause of the Constitution of the United States. Additionally, certain provisions of Ordinance 300, particularly hiring hall, dues check-off, and anti-coercion and discrimination provisions, as well as those imposing additional penalties for actions proscribed under Section 8 of the NLRA –remedies beyond those Congress

2

provided in the NLRA – do not fall within the regulatory authority delegated to states through the Section 14(b) exception to preemption.

## FACTUAL BACKGROUND

The stated purpose of Ordinance 300 is to ensure that "no employee within Hardin County covered by the National Labor Relations Act need join or pay dues to a union, or refrain from joining a union, as a condition of employment." County of Hardin, Ky., Ordinance No. 300, Series 2014 (January 13, 2015). Ordinance 300 outlaws union security (*id.* at §§ 4, 6) and hiring halls (*id.* at §§ 4, 6); regulates the permissible scope of union dues check-off agreements (*id.* at §§ 4, 5, 6) [1]; and outlaws coercion by unions and employers regarding an individual's choice to become or refrain from becoming a member or providing financial support to a labor organization, as well as discharge of employees or refusal to hire based on support or nonsupport of a labor organization (*id.* at § 7). Violations are deemed either Class A or Class B misdemeanors (*id.* at § 8), which subject violators to both civil (*id.* at § 9) and criminal penalties (*Id.* at § 8).

## ARGUMENT

I.    **STATE AND LOCAL LEGISLATION REGULATING ACTIONS COVERED BY SECTIONS 7 AND 8 OF THE NLRA ARE PREEMPTED UNDER *GARMON***

It is settled that the National Labor Relations Act establishes a comprehensive and preemptive national labor policy favoring collective bargaining.  Section 1 of the NLRA, 29 U.S.C. § 151, declares that in order to eliminate obstruction to the free flow of commerce, it is

---

[1] While not outlawing check-off agreements outright, Section 5 of the Ordinance provides that authorizations of voluntary deductions must be revocable at any time, which revocation directly conflicts with Section 302(c)(4) of the Labor Management Relations Act, 29 USC § 186(c)(4). That section permits voluntary deduction agreements irrevocable for up to one year. *See infra* n.13.

"the policy of the United States" to encourage "the practice and procedure of collective

bargaining" and to protect "the exercise by workers of full freedom of association, self-

organization, and designation of representatives of their own choosing, for the purpose of

negotiating the terms and conditions of their employment . . . ." To effectuate this policy,

Congress specified in Section 8 of the NLRA, 29 U.S.C. § 158, conduct that would be

prohibited, and conduct that would be permitted.  The Supreme Court has recognized that there

is a "national policy . . . expressed in the National Labor Relations Act . . . ."  *Barrentine v.*

*Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 735 (1981).[2]

As explained in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 243

(1959), "when it is clear or may fairly be assumed that the activities which a State purports to

regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor

practice under § 8, due regard for the federal enactment requires that state jurisdiction must

yield*."* In so holding, the Court reasoned that "to leave the States free to regulate conduct so

plainly within the central aim of federal regulation involves too great a danger of conflict

between power asserted by Congress and requirements imposed by state law," and that allowing

"the States to control conduct which is the subject of national regulation would create potential

frustration of national purposes." *Id.* at 244. In other words, Congress intended for uniform labor

---

[2]In order to obtain uniform application of the NLRA, Congress "confide[d] primary interpretation and application of its rules" to the National Labor Relations Board. *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 242, 245 (1959). "*Garmon* preemption" precludes interference "with the NLRB's interpretation and active enforcement of the 'integrated scheme of regulation' established by the NLRA." *Golden State Transit Corp. v. Los Angeles*, 475 U.S. 608, 613 (1986) (quoting *Wisconsin Dep't of Industry v. Gould, Inc.*, 475 U.S. 282, 289 (1986)). A second preemption principle, announced in *Machinists v. Wisconsin Employment Relations Commission*, 427 U.S. 132, 140 (1976), precludes regulation "concerning conduct that Congress intended to be unregulated." *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 749 (1985).

policy regarding issues protected by Section 7 and prohibited under Section 8 of the Act, such that federal regulation supersedes all state laws pertaining to those subjects.

 "Although the labor-management relationship is structured by the NLRA, certain areas intentionally have been left 'to be controlled by the free play of economic forces.'" *Golden State*, 475 U.S. at 614 (quoting *Machinists*, 427 U.S. at 140).  Indeed, Congress desired employers and unions generally to be free from regulation as to the particular terms and conditions of employment to be included in their collective-bargaining agreements. *See H.K. Porter Co. v. NLRB*, 397 U.S. 99, 108 (1970). Accordingly, even silence in the NLRA is meaningful and can preempt state and local regulation.

Congress included specific provisions in the NLRA to permit employers and unions to negotiate union-security agreements requiring employees to maintain membership in or pay dues to a union: "nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization…to require as a condition of employment membership therein."  29 U.S.C. § 158(a)(3). Congress's reason for permitting such agreements was described by the Second Circuit in *Buckley v. Television & Radio Artists*, 496 F.2d 305, 311 (2d Cir.), *cert. denied*, 419 U.S. 1093 (1974):

> Congress was understandably concerned with minimizing industrial strife . . . . It was the legislative judgment that these goals are most easily realized if a suitable collective bargaining apparatus exists . . . , and so the national labor laws provide for an exclusive bargaining agent to represent each discrete employee bargaining unit. . . .
>
> To enable these agents to fulfill their statutory responsibility to represent all the employees while collectively bargaining with the employer, the statutes permit the levying of mandatory dues on all employees who will reap the benefits . . . . A required tolerance of "free-riders," i.e., those who enjoy the benefit of the union's negotiating efforts without assuming a corresponding portion of the union's financial burden, would result not only in flagrant inequity . . . but might also eventually seriously undermine the union's ability to perform its bargaining function. It is thus manifest that the statutory treatment of mandatory union dues serves a substantial public interest.

While choosing to permit union-security agreements, Congress has carefully circumscribed their permissible boundaries. As originally enacted, Section 8(3) of the Wagner Act of 1935 (National Labor Relations Act) permitted unions and employers to negotiate "closed shop" agreements requiring employers to hire only persons who were already union members. *See Oil, Chemical and Atomic Workers v. Mobil Oil Corp.*, 426 U.S. 407, 414 (1976).

In 1947, Congress chose to ban closed shops, reacting to widespread abuses associated with them, but to permit "union shops," which allow employers and unions to require as a condition of continued employment membership in the labor organization "on or after the thirtieth day following the beginning of such employment . . . ." 29 U.S.C. § 158(a)(3). Thus, the 1947 Taft-Hartley Act

> intended to accomplish twin purposes. On the one hand, the most serious abuses of compulsory unionism were eliminated by abolishing the closed shop. On the other hand, Congress recognized that in the absence of a union-security provision 'many employees sharing the benefits of what unions are able to accomplish by collective bargaining will refuse to pay their share of the cost.'

*NLRB v. General Motors Corp.,* 373 U.S. 734, 740 (1963) (quoting S. Rep. No. 105, 80th Cong., 1st Sess., p.6).

In Section 8(a)(3) of the NLRA, Congress provided further safeguards, prohibiting an employer from discriminating against an employee for non-membership in a labor organization if "membership was not available to the employee on the same terms and conditions generally applicable to other members," or if "membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues . . . ." 29 U.S.C. § 158(a)(3). Section 8(b)(2), 29 U.S.C. § 158(b)(2), similarly prohibits unions from causing an employer to discharge an employee for non-membership if membership "has been denied or terminated on some ground

other than his failure to tender the periodic dues . . . ."[3] As the Supreme Court has stated, "'[m]embership' as a condition of employment is whittled down to its financial core." *General Motors Corp.,* 373 U.S. at 742.[4]

The NLRA thus extensively regulates union security. Union security is "a matter as to which . . . federal concern is pervasive and its regulation complex." *Amalgamated Ass'n of Street, Elec. Ry. and Motor Coach Employees v. Lockridge,* 403 U.S. 274, 276 (1971). Section 8(a)(3) "permits employers as a matter of federal law to enter into agreements with unions to establish union or agency shops" and "articulates a national policy that certain union-security agreements are valid as a matter of federal law." *Mobil Oil Corp.,* 426 U.S. at 409, 416. Indeed, under the NLRA, parties are required to bargain over union security where raised in negotiations for a collective bargaining agreement, as it is a mandatory subject of bargaining.[5] *See Pleasantview Nursing Home, Inc. v. NLRB*, 351 F.3d 747, 759 (6th Cir. 2003). A refusal to so bargain is an unfair labor practice under the Act. *Id.*

Accordingly, because Ordinance 300 regulates union security, it plainly falls within the area of conduct governed by Sections 7 and 8 of the NLRA, and is invalid. *See Lockridge*, 403 U.S. at 292-93 (state court lawsuit against union for causing employee's discharge under union-

---

[3] In addition, Section 8(b)(5), 29 U.S.C. § 158(b)(5), prohibits unions from requiring employees covered by union-security clauses to pay "excessive or discriminatory" initiation fees.

[4] The Supreme Court has held that employees may be required to pay only those fees necessary to cover the labor organization's actual costs for collective bargaining, contract administration, and grievance adjustment. *Communications Workers of America v. Beck*, 487 U.S. 735 (1988). Employees may opt out of paying for any union expenditures beyond those made to accomplish these core duties.

[5] Under the NLRA, parties may be required to bargain only over such mandatory subjects which are considered to fall within the phrase "wages, hours, and other terms and conditions of employment," found in Section 8(d) of the NLRA, 29 U.S.C. § 158(d). *See NLRB v. Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342, 348-49 (1958).

security provision is preempted since union's conduct arguably violated the NLRA). As shown

below, Section 14(b) of the Act does not save the ordinance from preemption.

## II.    THE 14(b) EXCEPTION TO PREEMPTION DOES NOT INCLUDE POLITICAL SUBDIVISIONS

Congress enacted Section 14(b) as part of the Taft-Hartley Act in 1947. This section

provides:  "Nothing in this Act . . . shall be construed as authorizing the execution or application

of agreements requiring membership in a labor organization as a condition of employment in any

State or Territory in which such execution or application is prohibited by State or Territorial

law." Section 14(b) is recognized as a clearly-worded and limited exception to the nationwide

application of the NLRA, empowering only States and Territories to prohibit union security. *See*

*Mobil Oil Corp.*, 426 U.S. at 416. Additional exceptions are not specifically articulated by

Congress, and they cannot be implied. *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17

(1980); *see also In re Robinson,* 764 F.3d 554, 562 (6th Cir. 2014).

The language of Section 14(b) is clear and unambiguous, and a narrow construction of

Section 14(b) – limited to States and Territories – is consistent with its legislative history.  At the

time that this section was enacted, Congress was aware that there existed some twelve States

with laws prohibiting union security, and the legislative history indicates that it was these State

laws which Congress intended to preserve.[6] Thus, "§ 14(b) was designed to make clear that

---

[6] The legislative history repeatedly refers to State laws and only State laws prohibiting union security:

> Since by the Labor Act Congress preempts the field . . . the committee has provided expressly in section 13 [now 14(b)] that laws and constitutional provisions of any <u>State</u> that restrict the right of employers to require employees to become or remain members of labor organizations are valid, notwithstanding any provision of the National Labor Relations Act. . . .

> [Union security] [a]greements . . . are valid only if they are valid under the laws of any <u>State</u> in which they are to be performed, and by section

§ 8(a)(3) left the States free to pursue 'their own more restrictive policies in the matter of union-security agreements.'" *Mobil Oil*, 426 U.S. at 417 (quoting *Algoma Plywood Co. v. Wisconsin Board*, 336 U.S. 301, 314 (1949)).

The Supreme Court in *Mobil Oil* narrowly construed Section 14(b), rejecting an expansive application of a Texas law to a collective-bargaining agreement of a corporation headquartered in Texas, where the employees' principal job situs was not in Texas, but on the high seas: "[t]here is nothing in either § 14(b)'s language or legislative history to suggest that there may be applications of right-to-work laws which are not encompassed under § 14(b) but which are nonetheless permissible." 426 U.S. at 413 n.7 (emphasis added). Having found that Section 14(b) did not permit the application of the Texas state law, the Court upheld the validity of a union-security clause negotiated between the union and employer. Thus, where there was no valid application of a state or territorial right-to-work law by virtue of Section 14(b), the federal law permits parties to negotiate and enforce union-security agreements.  It bears repeating, "Section 8(a)(3) articulates a national policy that certain union-security agreements are valid as a matter of federal law." *Mobil Oil*, 426 U.S. at 416.

---

13 the United States expressly declares the subject of compulsory unionism one that the <u>States</u> may regulate concurrently with the United States, . . .  At least <u>12 States (Alabama, Arizona, Arkansas, Florida, Georgia, Idaho, Louisiana, Minnesota, Nebraska, North Dakota, South Dakota, and Tennessee)</u> have laws forbidding compulsory unionism. Four others (Colorado, Kansas, Utah, and Wisconsin) allow agreements compelling union membership only after the employees authorize such agreements by large majorities.

H.R. No. 245, 80th Cong., 1st Sess. at 44, 34 (1947)(emphases added).

Hardin County is neither a "State" nor a "Territory," but rather, a political subdivision of a state.[7] Certainly if the terms "State or Territory" were intended to include their respective political subdivisions Congress would have included language referencing political subdivisions in Section 14(b). Indeed, Congress knew how to specify its intent to exclude local governments from provisions of the Act. Section 2(2) of the Act, 29 U.S.C. § 152(2), defines "employer" as excluding "any State *or political subdivision thereof*." (Emphasis added.) In Section 14(b), however, Congress merely used the terms "states or territories," but *not* "political subdivisions." Such a difference supports the conclusion that Congress had no intention of permitting any governments other than states or territories to prohibit union security. If it had, at the very least, Congress would have discussed political subdivisions during Section 14(b)'s drafting.[8]

Courts that have analyzed this issue have long agreed that political subdivisions are excluded from the scope of power delegated by Section 14(b) of the Act. In *Kentucky State AFL-*

---

[7] Defendants have not contended, nor could they, that the ordinance constitutes territorial law. The Supreme Court has generally described territories as lands "acquired by the United States by war with a foreign state." *Binns v. United States*, 194 U.S. 486, 490 (1904).

[8] Defendants' reliance on *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 605 (1991), and *City of Columbus v. Ours Garage and Wrecker Service, Inc*., 536 U.S. 424, 429 (2002), is misplaced (Def. MSJ at 5-7). Both cases involved statutes where only "states" were expressly referenced in the federal statute at issue. In *Mortier*, the Court's decision was largely influenced by the Court's rejecting the idea that the federal statute in question constituted a comprehensive statute occupying the field. *Mortier*, 501 U.S.at 612. Likewise, *City of Columbus* involved local authority over motor safety regulations, which the Court repeatedly noted was an area traditionally left to state authority (536 U.S. at 437-39), indeed, "in a field where States have traditionally allowed localities to address local concerns." *Id*. at 439. Here, *Garmon* and its progeny clearly demonstrate that the NLRA preempts regulations within the compass of § 7 or § 8 of the Act. *See Golden State,* 475 U.S. at 614 ("The *Garmon* rule is intended to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of the 'integrated scheme of regulation' established by the NLRA).

*CIO et al. v. Puckett*, 391 S.W.2d 360 (Ky. Ct. App. 1965),[9] the court found preempted a similar ordinance prohibiting union security that was enacted by a city, reasoning that "the [14(b)] exception should be strictly and narrowly construed because it represents a departure from the overall spirit and purpose of the Act." *Puckett*, 391 S.W.2d at 363; *see also Thomas E. Basham Co. v. Lucas,* 21 F.2d 550, 551 (W.D. Ky. 1927). The court further explained that the terms "State or Territory" were meant to exclude local subdivisions because "it is not reasonable to believe that Congress could have intended to waive other than to major-policy making units such as states and territories, the determination of policy in such a controversial area as that of union-security agreements." *Id*. at 362. The court thus invalidated the ordinance because it believed "Congress was willing to permit varying policies at the state level, but could not have intended to allow as many local policies as there are local political subdivisions in the nation." *Id.*

A similar case was decided in New Mexico. In *New Mexico Federation of Labor v. City of Clovis*, 735 F. Supp. 999 (D.N.M. 1990), the District Court for the District of New Mexico invalidated a city ordinance that prohibited employers within the municipality from requiring the payments of dues, assessments, or other charges to labor organizations as a condition of employment. Much like in *Puckett*, the court reiterated that "Congress intended an exclusive regulatory system and . . . 8(a)(3) so thoroughly regulates the subject of union security agreements so as to preempt the matter from state legislation except to the extent specifically permitted under § 14(b) of the Act." *Id.* at 1002. The court noted that "[a] myriad of local regulations would create obstacles to Congress' objectives under the NLRA." *Id*. at 1002.

---

[9] The Kentucky Court of Appeals, which decided *Puckett*, was the highest court in Kentucky until the Supreme Court was created on November 4, 1975, by a Kentucky Judicial Branch Restructuring Referendum.

> If the Ordinance is allowed to stand, other local governmental entities in New Mexico and presumably elsewhere could enact such ordinances, or different ordinances, concerning the same subject matter. The result would be a crazy-quilt of regulations within the various states. . . .  [T]he diversity that arises from different regulations among various of the 50 states and the federal enclaves within the 21 right-to-work states is qualitatively different from the diversity that would arise if cities, counties, and other local governmental entities throughout the country were free to enact their own regulations. A consequence of such diversity for both employers and unions would be to subject a single collective bargaining relationship to numerous regulatory schemes thereby creating an administrative burden and an incentive to abandon union security agreements.

*Id.* at 1002-03.

To illustrate the courts' concerns in both cases, permitting all local political subdivisions to enact their own right-to-work ordinances could create a "crazy-quilt" – in Kentucky alone – of at least 545 Kentucky regulations, spread across 120 counties and 425 cities, not to mention the local governments of 50 states across the country. Businesses with locations across county lines would be subject to varying regulations, with union-security provisions permissible in some of its locations, and prohibited in others. Such a scheme would make it virtually impossible to administer national "industry agreements," applicable to certain transient workers across the country. A national scheme of hundreds of potentially conflicting local regulations would discourage the bargaining of such agreements, which is already complicated by conflicting state laws. Certainly, Congress could not have intended to subject a single collective bargaining agreement covering multiple business locations to such a regulatory scheme.[10]

---

[10] While the Tenth Circuit Court of Appeals found no preemption of a tribal right-to-work ordinance in *NLRB v. Pueblo of San Juan*, 276 F.3d 1186 (10th Cir. 2002), the court there relied upon the unique sovereign nature of the San Juan Tribe and the fact that in such a federal enclave, the reach of the regulations in question would be truly limited to the lands controlled by the Tribe. The court thus ruled that Section 14(b)'s silence regarding Native American lands was not indicative of Congress's intent to exclude them from the scope of Section 14(b)'s exception. Of course, Native American lands and federal enclaves are not at issue here.

Finally, there is little doubt that Ordinance 300 lacks state judicial authorization. *See John P. King Mfg. Co. v. City Council of August*, 277 U.S. 100, 111 (1928) ("[t]he decision of the state court of last resort is conclusive upon the point that the ordinance under consideration is within the scope of the powers conferred by the state legislature."). While the issue of <u>county</u> right-to-work ordinances has not been reviewed by the Kentucky Supreme Court, there is reason to believe that on the basis of similar precedent related to municipal ordinances, namely *Kentucky State AFL-CIO v. Puckett,* decided by Kentucky's then highest court, the Kentucky court would find such county ordinances to be preempted. After all, as noted above, whether subjecting Kentucky businesses operating at multiple locations to 545 local or just 120 county ordinances, the court would likely find such a scheme to run counter to the authority granted to the Fiscal Court of Hardin County to regulate commerce for the "convenience of the public." *See* KRS 67.083(3)(m).

## III.   THE ORDINANCE REGULATES ACTIVITY OUTSIDE THE SCOPE OF AUTHORITY DELEGATED TO STATES BY THE 14(B) EXCEPTION

Ordinance 300 contains additional provisions that are beyond the scope of authority conferred upon states by Section 14(b), and is therefore invalid for this reason as well. Specifically, as set forth above, the ordinance regulates dues check-off, hiring halls, coercion, intimidation, and discharge or refusal to hire based on support or nonsupport of a labor organization; it further provides penalties for violations of any of these prohibitions. The Supreme Court has recognized that "for the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws." *Hillsborough Cnty., Fla. v. Automated Medical Labs., Inc*., 471 U.S. 707, 713 (1985). Not even states and territories are permitted to regulate in the manner prescribed above, and accordingly, the ordinance is preempted for this reason as well.

13

A.   Dues Check-off and Hiring Hall Provisions Are Regulated Under the NLRA and Are Not Within the Scope of Section 14(b)

The area of dues check-off is already federally regulated by Section 302(c)(4) of the Labor Management Relations Act (LMRA), which sets forth the requirements for a valid dues check-off provision.[11] As a mandatory subject of bargaining related to wages, the Board regulates such employee payroll deductions. *See Tribune Publishing Co.*, 351 NLRB 196, 197 (2007), enf'd, 563 F.3d 1330 (D.C. Cir. 2009). Likewise, hiring halls are regulated through Section 8's prohibition of discrimination based on union activity. *See, e.g.*, *Local 357, Int'l Bhd. of Teamsters v. NLRB*, 365 U.S. 667, 673-75 (1961) (noting that hiring halls are permissible under the Act, so long as they are operated in a nondiscriminatory manner).

Neither of these contractual provisions is within the scope of Section 14(b)'s permission of state regulation. As stated above (n.6), the purpose of Section 14(b) was to permit state laws "that restrict the right of employers to require employees to become or remain members of labor organizations."  H.R. No. 245, 80th Cong., 1st Sess. at 44, 34 (1947). Accordingly, the purpose of Section 14(b) is to permit the prohibition of *union-security* only – not additional laws that invade the field otherwise regulated by the Act. The courts that have addressed this issue are in agreement that provisions regulating dues check-off and hiring halls do not fall within Section 14(b)'s grant of state authority.

---

[11] The LMRA, which amended the NLRA, was enacted in 1959. This dues deduction section of the statute permits wage deductions for payment of union membership dues, "provided, that the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner." 29 U.S.C. § 186(c)(4). Notably, the ordinance conflicts with this provision, as Section 5 provides that to be valid, dues deduction provisions must be revocable "at any time."

In *SeaPAK v. Industrial Technical and Professional Employees*, 423 F.2d 1229 (5th Cir. 1970), aff'd, 400 U.S. 985 (1971), the Fifth Circuit adopted the opinion of the district court holding that state laws regulating check-off do not come within Section 14(b). *See* 300 F. Supp. 1197, 1200-01 (S.D. Ga. 1969). In analyzing the provisions of Section 302(c)(4), the district court expressed its disagreement "that the one year irrevocability provision in the Act can be varied by a state legislature under the reservation to the states of the power to prohibit 'agreements requiring membership in a labor organization as a condition of employment.'" *Id.* at 1201. The court reasoned that "preemption of the field of checkoff regulation by [Section 302(c)(4)] . . . leaves unimpaired the right of any state to prohibit union or closed shops. Section 14(b) contemplates state regulation only as to forms of union security which are 'the practical equivalent of compulsory unionism.'" *Id.* at 1201 (citing *NLRB v. Houston Chap. Associated Gen. Contractors of America, Inc.*, 349 F.2d 449 (5th Cir. 1966)). As the court further explained, "[c]heckoff authorizations irrevocable for one year after date do not amount to compulsory unionism as to employees who wish to withdraw from membership prior to that time." 300 F. Supp. at 1201. *See also NLRB v. Shen-Mar Food Prods.*, 557 F.2d 396, 399 (4th Cir. 1977).[12]

Similarly, the Eighth Circuit found in *Laborers' International Union, Local 107 v. Kunco, Inc.*, 472 F.2d 456 (8th Cir. 1973), that "[a] hiring hall which, though exclusive, does not require union membership does not violate the closed shop prohibition of § 8(a)(3), *Local 357, Int'l. Bhd. Teamsters v. NLRB*, 365 U.S. 667, . . . and thus, *a fortiori,* it is not within the ambit of § 14(b). *Cf., Retail Clerks Intl. v. NLRB*, 373 U.S. 746, 751-752, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963). This is the view of two circuits which have squarely held that § 14(b) does not empower

---

[12] If not found to be preempted under *Garmon*, Section 5's elimination of the one-year irrevocable dues deduction period outlined in the LMRA should be preempted under a theory of conflict preemption. *See Altria Group, Inc. v. Good*, 555 U.S. 70, 76 (2008) ("we have long recognized that state laws that conflict with federal law are 'without effect.'").

states to prohibit nondiscriminatory exclusive hiring halls." 472 F.2d at 458-59 (citing to *NLRB v. Tom Joyce Floors, Inc.*, 353 F.2d 768 (9th Cir. 1965); *NLRB v. Houston Chapter, AGC*, 349 F.2d 449 (5th Cir. 1965)). *See also Local 514, Transport Workers Union of America v. Keating*, 212 F. Supp.2d 1319, 1326-27 (E.D. Ok. 2002).

Consequently, neither states nor political subdivisions have power to regulate hiring hall or check-off agreements, and accordingly, these provisions of the ordinance are preempted.

B.    Regulation of Conduct Protected by Section 7 of the Act, As Well As Coercion, Intimidation, and Discharge or Refusal to Hire Based On Union Activity, Is Preempted and Beyond the Scope of Section 14(b)

The ordinance's prohibitions against coercion and intimidation (Ordinance § 7) also purport to regulate conduct governed by Sections 8(a)(1) and 8(b)(1) of the Act. Thus, Section 8(a)(1) makes it unlawful for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7" of the Act. 29 U.S.C. § 158(a)(1). And Section 8(b)(1) outlaws restraint or coercion by a labor organization regarding the exercise of those same rights. 29 U.S.C. § 158(b)(1).

Section 4 of the ordinance further regulates the same rights provided by Section 7 of the Act, which guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. §157. Section 7 of the Act further guarantees "the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a)(3)." *Id*. Again, the ordinance (§ 4) seeks to regulate the right to refrain from such activities, as well as the right become or remain a member of a labor organization.

16

Furthermore, the ordinance's provision which makes it unlawful to refuse to hire or discharge an employee for the exercise of the above rights (Ordinance § 7) regulates labor relations in a manner already found in Section 8(a)(3) of the Act. That section prohibits "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 USC § 158(a)(3).

Clearly, the provisions enumerated above regulate conduct covered by Sections 7 and 8 of the Act, and are therefore preempted under the principles outlined in *Garmon*. As with dues check-off and hiring halls, none of this activity falls within the confines of union-security that states are permitted to prohibit.

C.      The Ordinance's Imposition of Penalties Is Preempted

Section 8 of the ordinance classifies coercion and intimidation (Ordinance §7) as a Class A Misdemeanor, and the violation of any other section of the ordinance as a Class B Misdemeanor. Section 9 provides those harmed by violations or threatened violations with a civil cause of action, in addition to the penalties and remedies prescribed in the ordinance's other provisions.

It is well settled that such additional remedies, even if for violations that are consistent with the Act, are preempted. The Supreme Court held in *Wisconsin Department of Industry, Labor and Human Relations v. Gould*, 475 U.S. 282, 286 (1986), that "the *Garmon* rule prevents States . . . from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the Act." *See also Garmon*, 359 U.S. at 247. Here, not only does the ordinance provide additional remedies which are prohibited under *Gould*, but those remedies are actually inconsistent with the NLRA, which prohibits penalties. As explained in *Republic Steel*

17

*Corp. v. NLRB*, 311 U.S. 7, 11-12 (1940), the Board's "authority to order affirmative action does not go so far as to confer a punitive jurisdiction enabling the Board to inflict upon the employer any penalty it may choose because he is engaged in unfair labor practices even though the Board be of the opinion that the policies of the Act might be effectuated by such an order." If the Board, which has exclusive power to regulate and impose penalties for unfair labor practices, does not have the power to impose punitive penalties upon those charged with unfair labor practices, it stands to reason that neither states nor their political subdivisions may impose such penalties.

## CONCLUSION

For the reasons stated above, Kentucky county fiscal courts do not have the power to promulgate right-to-work ordinances banning union security, hiring hall, and dues check-off agreements. Additionally, such courts may not invade the jurisdiction of the Board by regulating activities covered under Sections 7 and 8 of the NLRA, or impose additional penalties for the activities proscribed by those sections. To find that Kentucky counties and other local political subdivisions have such power contradicts the plain meaning of Section 14(b) of the Act, contradicts Supreme Court and Kentucky precedent, and expands county authority to regulate labor in a manner that even the state has not been authorized to regulate by the Kentucky Supreme Court. Consequently, the court should find in favor of Plaintiffs and invalid the ordinance in its entirety.[13]

---

[13] Despite the inclusion of a severability clause in Section 13 of the ordinance, the entire ordinance should be invalidated. The test for severability involves a two-step analysis of whether the drafters intended legislation to be severable, and whether absent the offending portions, the remaining pieces may function sensibly on their own. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987). If the offending portions of Ordinance 300 were severed from the remaining sections, only a declaration of public policy, a definitions section, a description of the county sheriff's duty to investigate violations of the ordinance, and two sections outlining the

Respectfully submitted,

BARBARA A. O'NEILL
*Assistant General Counsel*
barbara.oneill@nlrb.gov
(202) 273-2958
National Labor Relations Board
Contempt, Compliance, and Special Litigation
Branch
1099 14th St. NW, Ste. 10700
Washington, D.C. 20570

/s/Nancy E. Kessler Platt
NANCY E. KESSLER PLATT
*Deputy Assistant General Counsel*
nancy.platt@nlrb.gov
(202) 273-2937

KEVIN J. HOBSON
*Attorney*
kevin.hobson@nlrb.gov
Phone: (202) 273-0102
April 17, 2015                                    Fax: (202) 273-4244

**CERTIFICATE OF SERVICE AND NOTICE OF ELECTRONIC FILING**

It is hereby certified that a true copy of the foregoing Motion was filed on this the 17th day of April, 2015 via the CM/ECF system.

/s/ Nancy E. Kessler Platt
Nancy E. Kessler Platt

---

ordinance's timing and application would remain (Sections 2, 3, 10, and 11). Without the ordinance's more substantive provisions, such as the underlying prohibitions of union-security agreements, these sections would be meaningless if severed from the ordinance's other parts. Consequently, there is no reason to believe the Fiscal Court of Hardin County, which enacted the ordinance, intended such a result.