UNITED AUTOMOBILE, AEROSPACE AND )
AGRICULTURAL IMPLEMENT WORKERS )
OF AMERICA LOCAL 3047, et al., )
                                  )
          Plaintiffs, )
                                  )
      v. )
                                    )
HARDIN COUNTY, KENTUCKY, et al., )
                                  )
          Defendants. )
                                  )

**Electronically Filed**

CASE NO. 3:15-cv-00066-DJH

---

### ***AMICUS CURIAE* BRIEF IN SUPPORT OF DEFENDANTS BY COUNTIES WHO HAVE PASSED SIMILAR ORDINANCES: WARREN, SIMPSON, FULTON, ROCKCASTLE, BUTLER, LOGAN, MONROE, AND BOONE COUNTIES IN KENTUCKY.**

Respectfully Submitted,

Jason M. Nemes (on behalf of Brent W. Yessin)
Brent W. Yessin, Esq
Yessin & Associates, LLC
One Tampa City Center
Suite 2880
Tampa, FL 33602
(813) 248-1818
*Co-counsel for Amicus Curiae*

Brett P. Scott, Esq.
Protect My. Check, Inc
10200 Forest Green Blvd
Suite 112
Louisville, KY 40223
(270) 331-4352
*Co-counsel for Amicus Curiae*

**STATEMENT OF POINTS AND AUTHORITIES**

**INTERESTS OF *AMICUS CURIAE* COUNTIES** ..........................................................1-2

         KRS 067.083 ...........................................................................................1

**ARGUMENT** ...............................................................................................2

    1.    <u>Twelve Counties in Kentucky Have Now Responded to Unique Local Needs to Enact Right to Work Ordinances Identical to Ordinance 300 In Order to Regulate Commerce for the Protection and Convenience of the Public, and to Promote Economic Development</u> ............................2-6

         KRS 067.83.......................................................................2, 3, 5, 6
         National Labor Relations Act ...........................................................2
         Labor Management Reporting Act, Section 8(a) and/or Section 14(b).....................................................................................................3
         *C & H Entertainment, Inc. v. Jefferson Co. Fiscal Court*, 169 F. 3d 1023, 1026 (6th Cir. 1999)................................................................5

    2.    <u>If Kentucky never gave up the power to regulate union security clauses, as the Supreme Court has said, then Congress *cannot* proscribe the delegation of the Sovereign's powers to its political subdivisions in Hardin County, or the *Amicus Counties*</u> .......................6-10

         National Labor Relations Act (the "Wagner Act")................................6, 7, 8
         Labor Management Reporting Act ("Taft Hartley Act") .........6, 7, 8, 9, 10
         *Retain Clerks International Ass'n v. Schermerhorn*, 375 U.S. 96 (1936) ....................................................................................... 6, 8
         *Gregory Ashcroft*, 501 U.S. 452, 461 (1991) ....................................7
         *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 607 (1991)...........7
         *Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board,* 336 U.S. 301 (1948).......................................................7, 8, 9
         *NLRB v. Pueblo of San Juan*, 276 F.3d 1186 (10th Cir. 2002) ......................9

    3.    <u>If in Section 14(b) Congress did "re-delegate" to Kentucky the power to regulate union security, it did not clearly and intentionally proscribe the state's delegation of those powers to its political subdivisions, Hardin County and the *Amicus Counties*</u> .......................10-12

         *Gregory Ashcroft*, 501 U.S. 452, 461 (1991) ...........................................10, 11
         U.S. CONST., Article VI........................................................................ 10
         *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 242 (1985)............. 10
         *Nixon v. Missouri Municipal League*, 541 U.S. 125, 140 (2004)............. 11
         *City of Columbus*, 536 U.S. at 437 ....................................................... 11
         *Holt Civic Club v. Tuscaloosa*, 439 U.S. 60, 71 (1978) ................................. 11

i

*Lockhart v. United States,* 460 U.S. 125, 127 (1983) ............................11,12

Labor Management Reporting Act ("Taft Hartley Act") ....................11, 12

4.   The Plaintiffs lack standing to sue, let alone assert damages, because the only clauses they include in the record are "maintenance of membership" clauses which the Supreme Court has long held are constitutionally infirm and unenforceable, *with or without a Right to Work ordinance,* and which the 6th Circuit has found to be facially invalid .............................................................................................................. 12-14

*Wegcsheid v Local 2291*, 117 F3d 986 (7th Cir. 1997) ............................... 12

*Bloom v NLRB,* 30F3d 101 (8th Cir) 1001, at 1004-1005.......................... 12

*International Union of Electrical Salaried, Machine and Furniture Workers v NLRB*, 41 F3d, 1532, 1537 (DC Cir. 1994) ................................ 12

*Buzenius v. NLRB*, 124 F3d, 788, 792 (6th Cir. 1997) ................................ 13

*Monson Trucking v. General Drivers Union Local 160*, 324 NLRB 933, 938 (1997) ......................................................................................................... 13

National Labor Relations Act (the "Wagner Act")...................................... 13

5.   The Union's Claim That "A Patchwork of Local Laws" would be difficult to administer is belied by the fact the Plaintiffs are parties to at least 36 contracts covering Right to Work and non Right to Work jurisdictions, and the burden of administration falls principally on the employer in each of the clauses in the record ......................... 14-15

6.   The Dues Check-Off and Hiring Hall Provisions in the Ordinance, as applied to the record before the Court, are entirely consistent with federal policy.................................................................................................. 15-19

Labor Management Reporting Act (LMRA)........................................... 15, 16

**CONCLUSION** ........................................................................................................ 19

**LIST OF EXHIBITS**

Exhibits 1-4    Affidavits and Exhibits attached thereto of County Judge Executives
Exhibit 5       Map of Kentucky Counties with RTW
Exhibit 6       News Article With Map
Exhibit 7       Washington Policy Group Report on RTW and Jobs
Exhibit 8       Heritage Foundation Report
Exhibit 9       "Right to Work is working"
Exhibit 10      Multi State CBA Exhibit

## INTERESTS OF *AMICUS CURIAE* COUNTIES

The Amicus Counties have passed ordinances substantively identical to Ordinance 300, in furtherance of their authority under KRS 067.083 to promote economic development and regulate commerce. On their behalf, we respectfully submit that these counties are uniquely situated to shed light on several of the issues raised in this case, and that perspective will aid the Court in deciding this case.

This Brief is submitted in accordance with the Proposed Order of the parties regarding submission of *Amicus Curiae* briefs.

The Counties contend: (1) that they have the authority granted them by the legislature under KRS 067.083 ("Home Rule"); (2) that they have properly executed their authority, as did Hardin County, in furtherance of their objectives to expand the tax base and the employment base of their counties; and (3) that the enactment of these ordinances took into consideration the unique circumstances of their counties – some in competition with neighboring counties to the South who have Right to Work protections and some in competition with other states for jobs – and that they in good faith believe this protection will provide them an advantage in securing economic development for their citizens.

In fact, the Counties contend that there have already been positive benefits from local enactment of the Right to Work Ordinances, consistent with the experiences of neighboring states who recently enacted Right to Work protections for employees, and that they have an interest in maintaining and not losing that advantage. (See Attached Exhibit 1 – 4, Affidavits and Exhibits of County Judge Executives.)

The decision of this Court will certainly have an impact upon the Amicus Counties, and this Brief is submitted with awareness of that interest, as well as in support of Defendant, Hardin County.

## ARGUMENT

1. **Twelve Counties in Kentucky Have Now Responded to Unique Local Needs to Enact Right to Work Ordinances Identical to Ordinance 300 In Order to Regulate Commerce for the Protection and Convenience of the Public, and to Promote Economic Development.**

Since December 19, 2014, when Warren County became the first County in Kentucky to use its power under KRS 067.083 ("Home Rule"), eleven other counties have followed, including Hardin County, the Defendant in the instant lawsuit. Each has enacted a substantively identical ordinance. Four additional counties conducted first readings on identical ordinances, and dozens more await the ruling of this Court. (See attached "Map of Kentucky Counties with RTW", Exhibit 5)

The Kentucky General Assembly enacted the current "Home Rule" law in 1978, which granted to counties, in pertinent part, the following powers:

> KRS 067.083 (m) Regulation of commerce for the protection and convenience of the public;
>
>           \*     \*     \*
>
> (x) Promotion of economic development of the county, directly or in cooperation with public or private agencies, including the provision of access roads, land and buildings, and promotion of tourism and conventions[.]

Plaintiffs have not challenged the power of Hardin County to enact such an ordinance under Home Rule; rather, their challenge here asserts that the Ordinance, and by analogy those of the *Amicus Counties,* was pre-empted by the National Labor Relations Act,

Section 8(a) and/or Section 14(b) of the Labor Management Reporting Act. That topic will be addressed in Sections 2 and 3 of this brief.

The needs of Kentucky counties vary with geography, demographics, proximity to highways and urban centers, transportation hubs, and neighboring states and cities. The Fiscal Courts of the Counties are tasked with their governance and are empowered by Home Rule to take such actions as may be necessary for the "protection and convenience of the public" or "promotion of economic development of the county." (KRS 067.083 (m)(x))

Some compete for jobs and economic growth with neighboring states – Indiana or Ohio to the north, Virginia or West Virginia to the east, Tennessee to the south, or Missouri or Illinois to the west. Indiana, Virginia and Tennessee are Right to Work states. Missouri and West Virginia may soon join them… Illinois, like Kentucky, is pursuing Right to Work "zones." (Exhibit 6, News Article With Map)

Some industries with broader markets choose sites from amongst lists that may span whole regions, or the country as a whole: Boeing moved from non Right to Work Washington to Right to Work South Carolina, thousands of miles away… Mercedes, BMW, Hyundai and Kia moved to Right to Work states Alabama, South Carolina and Georgia. (Exhibit 7, Washington Policy Group Report on RTW and Jobs)

Examples abound, and opinions vary as to what motivates the moves, and influences site selectors. One thing is certain, site selectors tell economic development officials and elected officials that Kentucky cities and counties are often passed over for Right to Work jurisdictions. (Exhibit 1 -4, Affidavits of County Judge Executives)

Judge Executives from Warren County (the first) to Boone County (the biggest) and ten others in between have been moved by those stories and by their own experiences to

enact Right to Work laws in their own counties in order to provide economic development opportunities and to expand employment rights and opportunities for their citizens.  (*Id*).

Warren County Judge/Executive Judge Buchanon cites his own experience in losing major manufacturers as a motivating factor for passing the ordinance last year (*Id*.)  Judge White and Judge Moore in Whitley County and Boone County compete, too, from the Tennessee line to the Ohio River, along I-75, and for their counties, the ordinance provides a competitive edge, as site selectors and economic development officials attest.

Fiscal Courts may be moved by the need to compete for jobs in distressed areas looking for any edge to locate a new employer or by a desire to expand employment rights for their citizens, but there is ample evidence to suggest that both are reasonable and attainable goals with the passage of Right to Work protections.  Job growth in Right to Work jurisdictions has been twice as fast in Right to Work states over the past decade (Exhibit 8, Heritage Foundation Report), and wage growth, too, has favored Right to Work areas (Bureau of Labor Statistics 1980 – 2011).  Young people move to Right to Work states by a 4:1 margin over the past decade (BLS 2001 -2012), leaving home and families and creating a brain drain for local leaders to try and fill… without the tools to do so.

Judge Buchanon in Warren County reports seeing an immediate impact of Right to Work on Warren County: over 30 new projects in the pipeline, worth more than $300 million with a potential for 3,000 new jobs just since the ordinance passed in December. (See Exhibit 1, Affidavit of Judge Executives, and 9 "Right to Work is working") Unprecedented economic growth – and with it, an expanding tax base and increasing opportunities for Warren County, the surrounding region, and the Commonwealth as a whole – that was the objective of the Fiscal Court in enacting this ordinance.

Counties have Home Rule in part to fill these local needs, and in part to provide that broader benefit to the Commonwealth. When Warren County – or Whitley or Fulton or Rockcastle - is awarded a project, its neighbors benefit as well, the tax base of the Commonwealth expands, and families who lost jobs when the last union mines closed don't have to go to Nashville or Birmingham or Atlanta or Charlotte; rather, they can go to Bowling Green, or Erlanger, or Elizabethtown, or Corbin. This is the fundamental purpose of Home Rule – to offer the Counties the freedom and authority to take action to promote economic development and to protect their citizens with more employment rights as part of their regulation of commerce.

The 6th Circuit Court of Appeals has addressed the Counties' power to regulate commerce under Home Rule, and rejected any notion that it need be more specific:

> KRS § 67.083 addresses "commerce" broadly, without enumerating specific types of businesses for regulation by the fiscal courts, or withholding power to regulate other types of businesses.

*C & H Entertainment, Inc. v. Jefferson Co. Fiscal Court*, 169 F.3d 1023, 1026 (6th Cir. 1999).

*C&H* had asserted that the home rule powers exercised by Jefferson County were too broad, because the statute did not specify "adult entertainment." Rejecting the notion that authority delegated by the legislature to the counties must be a "rifle shot", and upholding the broad grant of authority in Home Rule, the 6th Circuit noted:

> The current version of KRS § 67.083, enacted in response to *City of Louisville,* enumerates various police, planning, and regulatory powers that fiscal courts may undertake in order to govern effectively. Unlike the old version of KRS § 67.083, the current statute sets forth specific regulatory goals for fiscal courts, including planning, abatement of nuisances, and regulation to encourage economic development. We thus conclude that the concerns expressed in *City of Louisville* are not applicable under KRS § 67.083 as subsequently revised. *Id.* at 1026-1027.

The Counties have acted within their Home Rule powers, and there has been no assertion to the contrary by Plaintiffs. If the legislature wishes to pre-empt the field and to repeal local action, it has the constitutional authority to do so.

The Plaintiffs want the Court to force the unwilling and the disquieted objectors to pay to keep their jobs, regardless of the number of jobs that it costs the citizens of the *Amicus Counties* and regardless of the local deliberative legislative process in which they participated, simply because *they lost* the votes in the Fiscal Courts. There will be counties in which the unions' political views will prevail – and those like the *Amicus Counties* where they do not -- but that is the proper role of the legislative body, the Fiscal Court, to decide. It is a political decision made by the County, for the people of the County, because that is where the State has delegated that authority.

2. **If Kentucky never gave up the power to regulate union security clauses, as the Supreme Court has said, then Congress *cannot* proscribe the delegation of the Sovereign's powers to its political subdivisions in Hardin County, or the *Amicus Counties.***

The National Labor Relations Act, passed in 1934, is often referred to as "the *Wagner Act"*, after its sponsor, Senator Robert Wagner; the Labor Management Reporting Act, passed in 1947, is referred to as "the *Taft Hartley Act"* after its sponsors, Senator Robert Taft and Representative Fred Hartley. The legislative history of the two, contentious as they were at the time, is instructive, as the Supreme Court noted in the case both parties cite, *Retail Clerks International Ass'n v. Schermerhorn*, 375 U.S. 96 (1963).

The law seems clear, and the conclusion, as Chief Justice Lambert (ret'd) assured the Fiscal Courts in his opinion, is "inescapable", that our counties have the power to enact

Right to Work ordinances because: 1) the General Assembly has empowered them to do so (discussed above), and 2) Congress has not pre-empted them from doing so.

The first part of that construct is uncontested by the Plaintiffs, the latter is addressed in the next two sections.

The real question before the Court is whether the States have the power to delegate their authority to their chosen political subdivisions because: a) they never lost that power with the passage of the *Wagner Act's* Section 8(a) in 1934, or b) because Congress granted the authority to the States in 14(b) of *Taft Hartley* in 1947, but did not limit such authority by a "plain statement of intent" to do so, as the Supreme Court has repeatedly required. *See*, *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991), cited in *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 607 (1991), (holding that where preemption exception was "silent with reference to local governments . . . [m]ere silence . . . cannot suffice to establish a clear and manifest purpose to preempt local authority").

The Counties contend that the *former* construct is the more persuasive, but offer that either yields the same result.  For their authority, they cite first to the Constitution itself:

> "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." US Constitution, Tenth Amendment.

Next, we point to the extensive legislative history of the NLRA and LMRA.  The Supreme Court in both *Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board*, 336 U.S. 301, (1948) and *Schermerhorn*, 375 U.S. 96 (1963), addressed the legislative history and the meaning of the two Acts.  The Court in the latter case viewed

Section 14(b)'s legislative history "as making clear and unambiguous the purpose of Congress *not* to preempt the field." *Schermerhorn*, 375 U.S. at 102 (emphasis added*).*

However, even before Justice Douglass analyzed the legislative history of the two bills and wrote for a unanimous Court in *Schermerhorn*, Justice Frankfurter had explored the legislative record in *Algoma* and had reached the same conclusion. *Algoma* arose before the *Taft Hartley Act* was passed (though it was decided just afterward, which explains why Section 14(b) did not obviate the need to hear it). It provides thorough analysis of section 8(a) and the more recently enacted 14(b) – an analysis upon which the Counties rely today.

The issue in *Algoma* was whether Wisconsin's restrictions on union security clauses (they were restricted, though not entirely banned at that time) could prevent the firing of one Victor Moreau, who declared to his employer "he would rather quit than pay dues to the union." *Algoma Plywood,* 336 U.S. at 303. The Supreme Court ruled that the state *could* prevent Mr. Moreau's firing, holding:

> "The short answer is that § 8 (3) merely disclaims a *national* policy hostile to the closed shop or other forms of union-security agreement. This is the obvious inference to be drawn from the choice of the words "nothing in this Act . .. or in any other statute of the United States," and it is confirmed by the legislative history. *Id.* at 307. (Emphasis added)

The Court continued:

> The Senate Report on the bill which was to become the National Labor Relations Act has this to say about § 8 (3):  [T]he bill does nothing to facilitate closed-shop agreements or to make them legal in any State where they may be illegal; it does not interfere with the *status quo* on this debatable subject but leaves the way open to such agreements as might now legally be consummated. . .." S. Rep. No. 573, 74th Cong., 1st Sess. 11-12.

> * * *

> The House Report contains similar language: ... The bill does nothing to legalize the closed-shop agreement in the States where it may be illegal. *Id.,* at 308. 309.

The *Algoma* Court, which offered the Court's first review of the newly passed Taft Hartley Act,  specifically recognized Congress' continued commitment to preserve the states' broad authority in regulating union security agreements:

> "Other provisions of the Taft-Hartley Act make it even clearer than the National Labor Relations Act that the States are left free to pursue their own more restrictive policies in the matter of union-security agreements. Because § 8 (3) of the new Act forbids the closed shop and strictly regulates the conditions under which a union-shop agreement may be entered, § 14 (b) was *included to forestall the inference that federal policy was to be exclusive.*" (Emphasis added) *Id.* at 314.

Taking authority from *Algoma*, the 10th Circuit (the **only** U.S. Circuit Court to date that has analyzed the issue before this Court) addressed the issue of when, if ever, Congress pre-empted the regulation of union security clauses. *NLRB v. Pueblo of San Juan,* 276 F.3d 1186 (10th Cir. 2002). The *Pueblo* Court held that because Congress *never* pre-empted the field: "What Congress has not taken away by § 8(a)(3) it need not give back (by § 14(b)) in order for the tribe to continue to have authority to pass a right-to-work law."  *Id.* at 1197.

The *Pueblo* Court continued: "When Congress enacted Section 14(b), *it did not grant new authority* to states and territories, but merely recognized and affirmed their *existing authority.*"  (Emphasis added) *Id.*

Thus, whether the legislative body enacting a restriction upon union security agreements is a State, a County or an Indian Tribe, the principle remains: if the field was *never* pre-empted, the inquiry need go no further, and the sovereign can delegate its power in any manner that is consistent with its *own* Constitution.

Thus, because Plaintiffs' claim that Congress "preempted the field" by enacting Section 14(b) is contrary to the U.S. Supreme Court's position in *Algoma*, the complaint

must fail as a matter of law; therefore, this Court should grant Defendant's Motion for Summary Judgment.

3. **If in Section 14(b) Congress did "re-delegate" to Kentucky the power to regulate union security, it did not clearly and intentionally proscribe the state's delegation of those powers to its political subdivisions, Hardin County and the *Amicus Counties*.**

The U. S. Supreme Court has consistently recognized the fundamental principle of dual sovereignty between the states and the federal government. *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). While this balance favors the federal government through operation of the Supremacy Clause of Article VI of the U.S. Constitution, "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST., amend. X.

*Gregory* established that when Congress seeks to interfere with this balance between federal and state powers, "it must make its intention to do so '**unmistakably clear** in the language of the statute.'" 501 U.S. at 460–61 (emphasis added) (quoting *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 242 (1985)).

Therefore, the Supreme Court requires Congress to provide a "plain statement" of intent if it means to interfere with a state's delegation of its powers. *Gregory*, 501 U.S. at 461. As to the relationship between states and their political subdivisions, the Supreme Court stated, in *Mortier*:

> The principle is well settled that local governmental units are created
> as convenient agencies for exercising such of the governmental

10

powers of the State as may be entrusted to them in its absolute discretion. *The exclusion of political subdivisions cannot be inferred* from the express authorization to the States because political subdivisions are components of the very entity the statute empowers. *Mortier*, 501 U.S. at 607–08 (internal citations omitted, emphasis added).

This led to a "working assumption that federal legislation threatening to trench on the States' arrangements for conducting their own governments should be treated with great skepticism, and read in a way that preserves a State's chosen disposition of its own power, in the absence of the plain statement *Gregory* requires." *Nixon v. Missouri Municipal League*, 541 U.S. 125, 140 (2004). Thus, absent a clear indication that Congress specifically intended to interfere with a State's delegation of its powers, "[w]hether and how to use that discretion is a question [left] to state self-government." *City of Columbus*, 536 U.S. at 437; *Holt Civic Club v. Tuscaloosa*, 439 U.S. 60, 71 (1978) (noting states have "extraordinarily wide latitude . . . in creating various types of political subdivisions and conferring authority upon them").

"Home rule" statutes allow state legislatures to delegate their lawmaking powers to political subdivisions. *See Lockhart v. United States*, 460 U.S. 125, 127 (1983) ("In contrast to a general-law city, a home-rule city has authority to do whatever is not specifically prohibited by the State."). Section 14(b) of the Taft-Hartley Act unquestionably allows states to pass right-to-work laws. Congress, in granting states this authority, gave no sign that it intended to limit this power or prevent states from delegating such power to political subdivisions. As a result, absent such a "**plain statement" of Congressional intent**, home rule political subdivisions possess the authority to pass Right to Work laws.

Since "exclusion of political subdivisions cannot be inferred," (*Mortier, Supra at 607)* the Plaintiff's "inference" that the exception in 14(b) is for the "highest lawmaking authority in the State or Territory" (Plaintiff's Memorandum in Support, page 6) is without legal merit, and they cite not a scintilla of legislative history for the proposition because the legislative history is quite to the contrary, as noted above.

In the present case, there is no issue of material fact surrounding the validity of the Kentucky Legislature's enactment of its "Home Rule" statute. Consequently, because the State of Kentucky possessed the authority under Section 14(b) to enact right-to-work legislation, and because the State's delegation of this authority to its County Fiscal Courts was authorized under *Lockhart* and *Mortimer*, this Court should find as a matter of law that Defendant's enactment of the ordinance at issue was authorized under Section 14(b); therefore, the Court should grant Defendant's Motion for Summary Judgment.

4. **The Plaintiffs lack standing to sue, let alone assert damages, because the only clauses they include in the record are "maintenance of membership" clauses which the Supreme Court has long held are constitutionally infirm, *with or without a Right to Work ordinance*, and which the 6th Circuit has found to be facially invalid.**

Each of the "union security" clauses attached to the Plaintiff's complaint, ostensibly underlying its claim, are "maintenance of membership" clauses, requiring for example as with the Teamster Local 89 (Complaint, Exh 4) that "all bargaining unit employees must become and remain members in good standing… as a condition of employment with the company," and UFCW: "all employees covered by this agreement… remain members in good standing in the union." (Complaint, Exh 2).

As the Seventh Circuit correctly noted:

All that the collective bargaining agreement can require is the payment of the agency fee. This has been settled law for some time, and the only realistic explanation for the retention of the [maintenance of membership language] is to mislead employees about their right not to join the union." *Wegcsheid v Local 2291*, 117 F3d 986 (7th Cir. 1997), *citing*, *Bloom v NLRB,* 30F3d 101 (8th Cir) 1001, at 1004-1005; International Union of Electrical Salaried, Machine and Furniture Workers v NLRB, 41 F3d, 1532, 1537 (DC Cir. 1994);

The Sixth Circuit has specifically held that such clauses are facially invalid.

[T]he issue is whether, in light of the language of § 8(a)(3) and the subsequent Supreme Court decisions interpreting that language, a union-security clause that requires "membership in good standing," without concurrent definition of that term in the collective bargaining agreement, is valid**. We hold that it is not**. (*Emphasis added*) *Buzenius v NLRB*, 124 F3d, 788, 792 (6th Cir. 1997).

It is a view shared by then Chairman Gould of the National Labor Relations Board, *Monson Trucking v General Drivers Union Local 160*, 324 **NLRB** 933, 938 (1997). "[A] collective bargaining agreement containing a union-security clause which compels "membership" or "membership in good standing" as a condition of employment is facially invalid under the National Labor Relations Act. In order for such a clause to be valid, the collective bargaining agreement must define membership as *only* the obligation to pay periodic dues and initiation fees related to representational costs." *Id.,* at 938.

The reasons for the continued inclusion of facially invalid clauses in collective bargaining agreements is not an issue before the Court at this time. It is anyone's guess as to why the union would tell its members they were required to pay more than the law required them to pay, or obligate them to adhere to duties to the labor organization that the law does not require. What is clear, however is that the Plaintiffs are precluded from claiming a (future, speculative) "harm" by being unable to enforce a "facially invalid" contract provision.

In the absence of a "savings clause" in the record, the Plaintiffs are left to complain only of the future non-enforceability of unenforceable – or facially invalid – clauses.  The speculative nature of the continued existence of the clauses has been addressed in the Defendant's briefs, as they have correctly pointed out that union security clauses are not guaranteed, they are negotiated anew each and every time the parties go to the bargaining table.  Ordinance 300, like all the *Amicus Counties* ordinances avoided interfering with existing contract rights and only apply the Right to Work protections to future contracts.

The affidavits submitted by the union to establish that it "intends" to negotiate "identical" clauses in the future, undermine its case, since they express an intention to continue negotiating for facially invalid clauses, making it difficult for the Court to fashion a remedy to the Plaintiff's liking without also re-writing their contracts.

5. **The Union's Claim That "A Patchwork of Local Laws" would be difficult to administer is belied by the fact the Plaintiffs are parties to at least 36 contracts covering Right to Work and non Right to Work jurisdictions, and the burden of administration falls principally on the employer in each of the clauses in the record.**

The union asserts that "applying a patchwork of local Right to Work laws would make it difficult for parties to administer union security agreements."  That is belied by the fact that the union already does just that.  There are 36 collective bargaining agreements on file with the Department of Labor in which one of the Plaintiffs is a party covering both Right to Work and non-Right to Work jurisdictions.  (See attached Exhibit 10 "Counties Brief – Multi-state CBA Exhibit".  For the convenience of the Court, the file is in excel format, and if the Court chooses, by clicking "Column B" you *could* access the Department of Labor

website and electronic file containing the contract but need not do so, as Column "N" contains the wording covering compulsory dues states and Right to Work states.)

The language in Plaintiff's Exhibit 6, for example, Teamsters Local 89 simply states "In states where applicable…" as a preamble to the union security clause… "hardship" thus solved. A review of each of the Plaintiff's exhibits undermines their contention further: the "administration" of deducting the dues and forwarding them to the union falls on the (non party) employer, not the union under *any* of these clauses.

Furthermore, the Union's assertion of administrative burdens rings hollow, since most of the UAW's members now work in such Right to Work states Michigan and Indiana… as well as Warren County, and if administrative burdens were the real concern, they would simply embrace "open shops" rather than the "patchwork" required to collect dues in non Right to Work states while administering open shops in and around Detroit, or Kalamazoo, or Bowling Green.

6. **The Dues Check-Off and Hiring Hall Provisions in the Ordinance, as applied to the record before the Court, are entirely consistent with federal policy.**

**Dues Check-Off.** This is the administrative task of removing from an employee's paycheck, and sending to the union, such amounts as the employee voluntarily agrees to withhold. In Right to Work jurisdictions, this would apply only to union members. In non-Right to Work jurisdictions, employees cannot be required to sign dues check-off cards, but most do so for convenience. Dues paying non members, or "*Beck*" members, so called because they pay less than the full amount of membership, may choose not to agree to dues check-off, but members are generally required by terms of the union membership to agree to dues check-off in the same way that some employers require direct deposit.

Ordinance 300 does not prohibit dues check-off in any way, nor does it infringe on the membership compact between members and their union. Under Ordinance 300, and the Counties' ordinances, if members wish to continue paying via dues check-off, they have every right to do so and they remain subject to the membership rules to which they agree.

Section 302 of the Labor Management Reporting Act (LMRA) prohibits payments by an employer to a labor union with some exceptions, found in 302 (c), including (4) "with respect to money deducted from the wages of employees in payment of membership dues in a labor organization: *Provided*, That the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner."

Section 302 provides a ceiling - not more than a year – during which the employer and union *may* agree to make dues checkoff irrevocable. They are not required to do so. Indeed, a review of the exhibits to the Complaint, reveals that of the dues check-off provisions in the record,all but one is revocable at any time, as provided in the Ordinance:

      a.   Dow and the UFCW (Complaint Exh 2) dues checkoff can be revoked at any time currently;

      b.   Kroger and the UFCW (Complaint Exh 3) dues check off can be revoked at any time currently;

      c.   Bimbo Brands and Local 89 (Complaint Exh 4) Dues checkoff can be revoked at any time currently, and it recognizes that no authorizations are permitted "which are in violation of federal or state law", which would be unnecessary were the entire field pre-empted.

16

d.   Irving Materials and Local 89 (Complaint Exh 5), dues check-off is
     irrevocable for a year or at the conclusion of the contract, whichever is
     earlier, *BUT* the *employer can stop deductions at any time they receive notice*
     from the employee;

e.   E & B Paving and Local 89, (Complaint Exh 6) dues check-off is revocable at
     any time currently;

f.   NEC and IBEW (Complaint Exh 7) dues check-off is revocable at any time
     currently;

g.   IUE and CWA (Complaint Exh 9) dues check-off clause itself is silent as to
     revocation, but the dues check-off "card" presented to employees sets the
     term that is irrevocable for a period of one year and is automatically renewed
     every year thereafter.  That appears to be a "members only" agreement, by
     the reference to initiation fees and membership dues, and thus that
     arrangement would be between the member and union in a Right to Work
     jurisdiction, and not governed by Ordinance 300 or the other ordinances,
     since they protect those employees who choose *not to be members, and not to*
     *pay dues.*

Notably, the NLRB has evaluated this issue, and Ordinance 300 is entirely consistent with

its reading:

> [T]he policy of "voluntary unionism" that informs the Supreme Court's decision in
> *Pattern Makers* with regard to remaining in, or declining to remain, a union member
> also logically relates to other forms of union activity.  The policy warrants the
> application of a test that will assure that the extraction of moneys from an

employees' wages to assist a union, if not authorized by a lawful union security clause, is in accord with the employee's voluntary agreement... **Explicit language within the check-off authorization clearly setting forth an obligation to pay dues *even in the absence of union membership* will be required to establish that the employee has bound himself or herself to pay the dues even after a resignation of membership**." (*Emphasis added*) *IBEW Local 2088 (Lockheed Space Operations Company),* 302 NLRB 322, 328, 329 (1991)

*None* of the clauses in the record before the Court explicitly *set forth an obligation to pay in the absence of union membership*, including the only dues check-off card that references irrevocability at all.  Because each of the clauses lack the required language "even in the absence of union membership" they would be revocable at will *with or without Ordinance 300* even if they stated "irrevocable for up to a year" – which they do not.

Accordingly, there is nothing in the record that would permit the finding of pre-emption that the Plaintiffs seek.  Accordingly, Ordinance 300's allowance of voluntary dues check-off is *entirely* consistent with the Act, and it's protection of voluntary unionism by revocation of dues check-off at any time is consistent with the LMRA and the NLRA.  If the Counties wish to conform the language of their ordinances to the specific test set forth by the NLRB in *Lockheed*, they have adequate time to do so, but there is nothing in the record that would require doing so as relates to these Plaintiffs, and these clauses, and this Ordinance.

**Hiring Hall Provisions.**  Similar to the infirmity in the Plaintiff's case on dues check-off, there are no lawful hiring hall provisions in the record that would be prohibited by Ordinance 300.

    a.  Dow and UFCW (Complaint, EXH 2) No Hiring Hall Provision
    b.  Kroger and IFCW 227 (Complaint, EXH 3) Article 3, "The Employer may secure new employees from any source whatsoever."
    c.  Bimbo Brands/Local 89 (Complaint, EXH 4) No Hiring Hall Provision
    d.  Irving Materials/ Local 89 -(Complaint, EXH 5) No Hiring Hall Provision

e. Local 89 and E& B Paving (Complaint, EXH 6) The referral provision is part of an unenforceable maintenance of membership clause, and merely provides that the union will refer qualified personnel within 24 hours and if not, "the employer shall have the right to employ other available personnel…" Ordinance 300 would not conflict with this: you *can* be referred by the union but the clause do*es n*ot exclude "other available personnel."

f. IBEW Local 369 (Complaint, EXH 7) There are no Hardin County employers listed anywhere in the record, and the Ordinance would not prevent work from being done by Louisville Contractors, for example, who have lawful hiring hall arrangements.

g. IUE/CWA - (Complaint, EXH 9) No Hiring Hall Provision

In summary, there are no employers in Hardin County listed in the record before the Court who are parties to a hiring hall agreement that is prohibited by Ordinance 300. Again, if the Counties wish to amend their ordinances they have time to do so, but there is nothing in the record that would afford these plaintiffs a remedy under this ordinance based on this record.

## CONCLUSION

For the reasons set forth above, and those set forth in the Defendant's Brief, and Motion for Summary Judgment, this Court should find that the State's delegation of such Home Rule powers to the County as were necessary to enact Ordinance 300 were not preempted by the National Labor Relations Act, or the Labor Management Reporting Act.

**CERTIFICATE OF SERVICE AND NOTICE OF ELECTRONIC FILING**

It is hereby certified that a true copy of the foregoing motion was filed on this 17th day of April, 2015 via the CM/ECF system.

s/Jason M. Nemes (on behalf of Brent W. Yessin)
Brent W. Yessin, Esq.