UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3-15-CV-66-DJH

Electronically filed

**UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF
AMERICA LOCAL 3047, et al**.                                                     PLAINTIFFS

v.

**HARDIN COUNTY, KENTUCKY**, et al.                                               DEFENDANTS

\* \* \* \* \* \* \*

**PLAINTIFFS' JOINT REPLY / RESPONSE
TO DEFENDANTS' SUMMARY JUDGMENT ARGUMENTS**

TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ........................................................................................................................ 1

   I.  RIGHT TO WORK LAWS THAT ARE NOT ENCOMPASSED UNDER NATIONAL LABOR RELATIONS ACT § 14(b) ARE PREEMPTED BY THE ACT. ............................... 1

   II.  NLRA § 14(b) STATES A CAREFULLY DELINEATED EXCEPTION TO THE NLRA'S PREEMPTIVE REGULATION IN THE FIELD OF LABOR RELATIONS. .......... 4

   III.  THE SUPREME COURT HAS NOT ADOPTED ANY PRE SE RULE REQUIRING THAT ALL STATUTORY REFERENCES TO "STATE" OR "STATE LAW" ENCOMPASS LOCAL GOVERNMENTS AND LOCAL LAWS.......................................... 11

CONCLUSION .................................................................................................................... 16

**INTRODUCTION**

The Plaintiffs, by Counsel, hereby reply to the Defendants' Response to Plaintiffs' Motion for Summary Judgment, and respond in opposition to Defendants' Motion for Summary Judgment.

This memorandum addresses Hardin County's argument that local right to work laws, like County Ordinance No. 300, are not preempted by the National Labor Relations Act. Def. Mem. in Supp. SJ 5-24; Def. Mem. in Opp. SJ 2-10. With respect to the County's arguments in defense of the particular dues check-off and hiring hall provisions in the ordinance, we stand on our opening brief, which fully addresses the points the County has made in these two regards. Pltffs. Mem. in Supp. SJ 11-15.

**ARGUMENT**

**I. RIGHT TO WORK LAWS THAT ARE NOT ENCOMPASSED UNDER NATIONAL LABOR RELATIONS ACT § 14(b) ARE PREEMPTED BY THE ACT.**

Hardin County's principal argument is that § 14(b) is irrelevant to whether County Ordinance No. 300 is preempted by the National Labor Relations Act, on the supposition that the NLRA, as amended in 1947, would not have preempted right to work laws even if § 14(b) had never been enacted. Def. Mem. in Supp. SJ 5-13; Def. Mem. in Opp. SJ 2-3. The County's position is that "Section 14(b) did not create an exception to federal preemption," because no exception was needed. Def. Mem. in Supp. SJ 11. Indeed, the County goes so far as to assert that "Section 14" in its entirety "does not affect any positive law." *Id*. at 11 n. 3. *But see* **Beasley v. Food Fair of North Carolina**, 416 U.S. 653, 662 (1974) (applying NLRA § 14(a) to preempt the application of a state right to work law protecting supervisors). The County completely misunderstands the preemptive effect of the 1947 amendments to NLRA § 8(a)(3)

and thus misunderstands the role of § 14(b) as a narrow exception to that federal preemption.

"When it amended the Federal Act in 1947, . . . Congress knew full well that its labor legislation '*preempts the field that the act covers* insofar as commerce within the meaning of the act is concerned' and demonstrated its ability to *spell out with particularity those areas in which it desired state regulation to be operative*." **Bus Employees v. Wisconsin Board**, 340 U.S. 383, 397-98 (1951) (emphasis added; footnotes omitted). The statement to the effect that labor legislation "preempts the field that the act covers," quoted in **Bus Employees**, comes from the portion of H.R. Rep. No. 245, 80th Cong., 1st Sess. 44 (1947) explaining the need for a legislative proposal that was eventually enacted as § 14(b). *Id*. at 398 n. 24. And, § 14(b) itself is cited by **Bus Employees** as an example of the 1947 Congress "spell[ing] out with particularity those areas in which it desired state regulation to be operative." *Id*. at 398 n. 25. See **Algoma Plywood Co. v. Wisconsin Board**, 336 U.S. 301, 314 (1949) ("Because § 8(a)(3) of the new Act forbids the closed shop and strictly regulates the conditions under which a union-shop agreement may be entered, § 14(b) was included to forestall the inference that federal policy was to be exclusive.").

As we have noted, the 1947 amendments to various sections of the NLRA affirmatively authorized union security agreements and comprehensively regulated the negotiation and application of such agreements. Pltffs. Mem. in Supp. SJ 7-8. Against that background, "§ 14(b) was designed to prevent [those] other sections of the Act from completely extinguishing state power over certain union-security arrangements." **Retail Clerks v. Schermerhorn**, 373 U.S. 746, 751 (1963). Therefore, "it is § 14(b) which gives the States power to outlaw even a union security agreement that passes muster by federal standards." **Oil, Chemical & Atomic Workers v. Mobil Oil Corp.**, 426 U.S. 407, 413 n. 7 (1976) (quotation marks, brackets and citations

00625005

2

omitted). For precisely that reason, there are no "applications of right-to-work laws which are not encompassed under § 14(b) but which are nonetheless permissible." *Id*.

Hardin County dismisses as "*dicta*," Def. Resp.in Opp. SJ 7, **Mobil Oil**'s characterization of § 14(b) as the source of state authority to prohibit union security agreements. To the contrary, **Mobil Oil**'s statements about § 14(b) are part of the Court's holding. "[T]he holding of a case includes, besides the facts and the outcome, the reasoning essential to that outcome." **Tate v. Showboat Marina Casino P'ship**, 431 F.3d 580, 582 (7th Cir. 2005). Thus, "a court's stated and, on its view, necessary basis for deciding does not become dictum because a critic would have decided on another basis." *Id.*, quoting Friendly, "In Praise of Erie--and of the New Federal Common Law," 39 N.Y.U.L. Rev. 383, 385-86 (1964). The **Mobil Oil** Court's conclusion that § 14(b) is the exclusive source of state power to apply right-to-work laws was essential to the Court's reasoning and thus is part of the holding of that decision.

The issue addressed in **Mobil Oil** was "whether, under § 14(b), Texas' right-to-work laws can void an agency shop agreement covering unlicensed seamen who, while hired in Texas and having a number of other contacts with the State, spend the vast majority of their working hours on the high seas." 426 U.S. at 410. "[T]he central inquiry in th[e] case [wa]s whether § 14(b) permits the application of Texas' right-to-work laws to the agency-shop provision," because "[o]nly if [§14(b)] is to be so read is the agency-shop provision unenforceable." *Id*. at 412-13. The Court "h[e]ld that under § 14(b), right-to-work laws cannot void agreements permitted by § 8(a)(3) when the situs at which all the employees covered by the agreement perform most of their work is located outside of a State having such laws." *Id*. at 414. Contrary to Hardin County, the **Mobil Oil** decision did *not* rest on a determination that "Texas law did not apply." Def. Resp.in Opp. SJ 7, Rather, the Court held "that § 14(b) *does not allow enforcement* of

right-to-work laws with regard to an employment relationship whose principal job situs is outside of a State having such laws." 426 U.S. at 418 (emphasis added).

In sum, the Supreme Court correctly *held* in **Mobil Oil** that "it is '§ 14(b) [which] gives the States power to outlaw even a union security agreement that passes muster by federal standards.'" 426 U.S. at 413 n. 7, quoting **Retail Clerks v. Schermerhorn**, 375 U.S. 96, 103 (1963). It follows "that there [are no] applications of right-to-work laws which are not encompassed under § 14(b) but which are nonetheless permissible." *Id*. Accordingly, as Hardin County tacitly admits by attempting to render § 14(b) a nullity, if Ordinance No. 300 is not encompassed by § 14(b) – and we show in the next section that it is not – that right-to-work law is preempted by the NLRA.

## II. NLRA § 14(b) STATES A CAREFULLY DELINEATED EXCEPTION TO THE NLRA'S PREEMPTIVE REGULATION IN THE FIELD OF LABOR RELATIONS.

"As is immediately apparent from its language, § 14(b) was designed to prevent other sections of the Act from completely extinguishing state power over certain union-security agreements. And it was the proviso to § 8(a)(3), expressly permitting agreements conditioning employment upon membership in a labor union, which Congress feared might have this result." **Schermerhorn**, 373 U.S. at 751 (footnote omitted). Since "[t]he connection between the § 8(a)(3) proviso and § 14(b) is clear," any effort to determine "the scope and effect of § 14(b)" must begin with the 1947 amendments to the § 8(a)(3) proviso. *Id*. at 750-51.

The Supreme Court has explained that "[b]oth the structure and purpose of § 8(a)(3) are best understood in light of the statute's historical origins." **Communications Workers v. Beck**, 487 U.S. 735, 747 (1988). The Court outlined the pertinent history as follows:

> Prior to the enactment of the Taft-Hartley Act of 1947, § 8(3) of the Wagner Act of 1935 (NLRA) permitted majority unions to negotiate 'closed shop' agreements requiring

00625005　　　　　　　　　　　　　　　　4

> employers to hire only persons who were already union members. By 1947, such agreements had come under increasing attack, and after extensive hearings Congress determined that the closed shop and the abuses associated with it created too great a barrier to free employment to be longer tolerated. The 1947 Congress was *equally concerned*, however, that without such agreements, many employees would reap the benefits that unions negotiated on their behalf with in any way contributing financial support to those efforts.

*Id*. at 747-48 (emphasis added; quotation marks, brackets and citations omitted).

"The legislative solution embodied in § 8(a)(3) allows employers to enter into agreements requiring all the employees in a given bargaining unit to become members 30 days after being hired as long as such membership is available to all workers on a nondiscriminatory basis, but it prohibits the mandatory discharge of an employee who is expelled from the union for any reason other than his or her failure to pay initiation fees or dues." **Beck**, 487 U.S. at 749. By both expressly authorizing union security agreements, while regulating their terms and application, "the Taft-Hartley Act was intended to accomplish twin purposes":

> On the one hand, the most serious abuses of compulsory unionism were eliminated by abolishing the closed shop. On the other hand, Congress recognized that in the absence of a union-security provision many employees sharing the benefits of what unions are able to accomplish by collective bargaining will refuse to pay their share of the cost.

*Id*. at 748-49 (quotation marks and citation omitted). "Thus, Congress recognized the validity of unions' concerns about 'free riders,' i.e., employees who receive the benefits of union representation but are unwilling to contribute their fair share of financial support to such union, and gave unions the power to contract to meet that problem while withholding from unions the power to cause the discharge of employees for any other reason." *Id*. at 749 (emphasis, quotation marks and citation omitted).

"Congress' decision to allow union-security agreements at all reflects its concern that the

parties to a collective bargaining agreement be allowed to provide that there be no employees who are getting the benefits of union representation without paying for them." **Beck**, 487 U.S. at 750 (ellipses, quotation marks and citation omitted). Accordingly, "§ 8(a)(3) articulates a national policy that certain union-security agreements are valid as a matter of federal law" and to that extent "[f]ederal policy favors permitting such agreements." **Mobil Oil**, 426 U.S. at 416 & 420.

If the 1947 Congress had stopped at amending § 8(a)(3) and not included § 14(b) in the statute, there is no doubt that state laws prohibiting the union security agreements that "[f]ederal policy favors permitting," **Mobil Oil**, 426 U.S. at 420, would be preempted. In the first place, the 1947 amendments to § 8(a)(3) bring the negotiation and application of union security agreements well within the range of "conduct arguably protected or prohibited by the NLRA" as to which "state jurisdiction . . . is preempted" under "the rule of **San Diego Building Trades Council v. Garmon**, 359 U.S. 236 (1959)." **Golden State Transit Corp. v. Los Angeles**, 493 U.S. 103, 110 (1989). Another well-established rule of NLRA "pre-emption doctrine . . . pre-empt[s] state law and state causes of action concerning conduct that Congress intended to be unregulated." **Metropolitan Life Inc. Co. v. Massachusetts**, 471 U.S. 724, 749 (1985). See **Machinists v. Wisconsin Employment Relations Comm'n**, 427 U.S. 132 (1976). And, it is difficult to imagine a more deliberate decision *not* to regulate certain conduct than the 1947 Congress' decision to allow the negotiation and application of union security agreements that meet the requirements of the provisos to § 8(a)(3).

"While § 8(a)(3) articulates a national policy that certain union-security agreements are valid as a matter of federal law, § 14(b) reflects Congress' decision that any State or Territory that wishes to may exempt itself from that policy." **Mobil Oil**, 426 U.S. at 416-17. Thus, "with

respect to those state laws which § 14(b) permits to be exempted from § 8(a)(3)'s national policy '[t]here is . . . conflict between state and federal law; but it is a conflict sanctioned by Congress with directions to give the right of way to state laws.'" *Id*. at 417, quoting **Schermerhorn**, 375 U.S. at 103.

"By the time § 14(b) was written into the Act, twelve States had statutes or constitutional provisions outlawing or restricting the closed shop and related devices . . . ." **Schermerhorn**, 375 U.S. at 100. And, "the wording of § 14(b)" ensured that "Congress did not deprive States of any and all power to enforce their laws restricting the execution and enforcement of union-security agreements." *Id*. at 102.

It is very much to the point here that "the wording of § 14(b)" also indicates that Congress did not intend to exacerbate the "conflict between state and federal law," **Schermerhorn**, 375 U.S. at 102 & 103, by extending the authority to enact right to work laws below the level of the existing state laws. Section 14(b) provides that "[n]othing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment *in any State* or Territory *in which such execution or application is prohibited by State* or Territorial *law*." 29 U.S.C. § 164(b) (emphasis added). By stating that the federal authorization of union security agreements does not apply "in any State or Territory" where "State or Territorial law" prohibits the negotiation or application of such agreements, the language of § 14(b) makes clear that the "State or Territorial law" in question must be a law of the sort that would have authority throughout the "State or Territory." "[Section] 14(b) reflects Congress' decision that any State or Territory that wishes to may exempt itself from [the national] policy" regarding union security agreements, **Mobil Oil**, 426 U.S. at 416-17, but the words of that provision make clear that it is the state itself, and not a

political subdivision, that has authority to make that decision.

By its terms, § 14(b) preserves the sort of state "statutes or constitutional provisions outlawing or restricting the closed shop and related devices" about which the 1947 Congress was "well-informed." **Schermerhorn**, 375 U.S. at 100. But it does not go beyond that to authorize local governments to enactment a wholly new, local form of right to work ordinances. While "Congress was willing to permit varying polices at the state level," it "could not have intended to allow as many local policies as there are local political subdivisions in the nation." **Kentucky State AFL-CIO v. Puckett**, 391 S.W.2d 360, 362 (Ky. 1965). There are a number of reasons why Congress did not intend such a vast expansion in the number and type of right to work laws.

First, application of local right to work laws would defeat "[t]he legislative solution embodied in § 8(a)(3) [that] allows employers to enter into agreements requiring *all employees in a given bargaining unit* to . . . pay initiation fees and dues." **Beck**, 487 U.S. at 749 (emphasis added). As we demonstrated in our opening brief, Pltffs. Mem. in Supp. SJ 9-10, the existence of local right to work laws would subject many multi-facility bargaining units to inconsistent laws governing the legality of union security agreements. Such units were not uncommon by 1947. *See, e.g.,* **Sixth Annual Report of the NLRB** 65-66 (1941) ("Multiple-Plant and System Units") **Fifth Annual Report of the NLRB** 66-67 (1940) (same); **Fourth Annual Report of the NLRB** 89-91 (1939)(same). Congress refused to include a provision similar to § 14(b) in the 1950 amendments to the Railway Labor Act authorizing union security agreements precisely because "it would be wholly impracticable and unworkable for the various States to regulate such [union security] agreements," because the "agreements are uniformly negotiated for an entire railroad system and regulate the rates of pay, rules of working conditions of employees in many States." H.Rep. No. 2811, 81st Cong., 2d Sess., p. 5 (1950). The Supreme Court has

treated the 1950 RLA amendments as highly informative with regard to the intent of the 1947 NLRA amendments. **Beck**, 487 U.S. at 750-52. It is inconceivable that the 1950 Congress would have refused to allow the application of *existing* state right to work laws to RLA union security agreements on the grounds that applying multiple laws to a single collective bargaining agreement "would be wholly impracticable," H.Rep. No. 2811 at 5, if three years earlier it had voted to allow every village, township, city and county in the nation to apply their own myriad local right to work laws to NLRA union security agreements.

Allowing local governments to apply local right to work laws would also defeat the goal that "parties entering [into] a collective bargaining agreement will easily be able to determine in virtually all situations whether a union- or agency-shop provision is valid." **Mobil Oil**, 426 U.S. at 419. "[T]he diversity that would arise if cities, counties, and other local governmental entities were free to enact their own regulations" is "qualitatively different" from "the diversity that arises from different regulations among various of the 50 states." **New Mexico Federation of Labor v. City of Clovis**, 735 F.Supp. 999, 1002-03 (D.N.M. 1990). Not only would local regulation vastly increase the number of possibly applicable right to work laws, but "[t]he result would be a crazy quilt of [overlapping and possibly inconsistent] regulations" by the various levels of state, county and municipal government. *Id*. at 1002. *See* Pltffs. Mem. in Supp. SJ 9-10 (describing what that would mean in Kentucky). Those problems would be immensely amplified by the often ephemeral nature of local legislation, which can be enacted and repealed with a minimum of effort. As the Supreme Court said in rejecting a reading of § 14(b) that would have made the applicability of a state's right to work law depend on a weighing of various employment-related contracts, "[t]he unpredictability that such a [state of affairs] would inject into the bargaining relationship, as well as the burdens of litigation that would result from it,

[should] make [one] unwilling to impute to Congress any intent to adopt such a [system]." ***Mobil Oil***, 426 U.S. at 419.

Hardin County does not deny that allowing local right to work laws would result in a confusing patchwork of overlapping regulation. The County discounts this problem on the ground that the inclusion of a union security clause in any particular collective bargaining agreement depends on the "'give and take' process" of negotiations. Def. Mem. in Supp. SJ 23. But that is exactly the problem. Negotiations over whether to include a union security clause in an agreement will be made much more difficult and contentious if the proposed clause cannot apply throughout the bargaining unit or if the parties are unable to determine with any certainty whether the proposal is lawful. *See, e.g.*, ***NLRB v. General Motors Corp.***, 373 U.S. 734 (1963) (refusal to bargain case generated by a legal dispute over the legality of a proposed union security clause).

Given the statutory language of § 14(b) and the legislative background to that provision, it is hardly surprising that the only courts to have addressed the question have concluded that § 14(b) does not authorize local right-to-work laws. ***Kentucky State AFL-CIO v. Puckett***, 391 S.W.2d at 362 (Ky. 1965); ***New Mexico Federation of Labor v. City of Clovis***, 735 F.Supp. 999, 1004 (D.N.M. 1990). These decisions have never been called into question by any other court. To the contrary, the Kentucky Court of Appeals decision in ***Puckett*** was cited with approval in ***Mobil Oil Corp.***, 426 U.S. at 413 n. 7. And, ***City of Clovis*** was relied upon in ***NLRB v. Pueblo of San Juan***, 276 F.3d 1186, 1197 (10th Cir. 2002), for the proposition that NLRA § 14(b) "embraces diversity of legal regimes respecting union security agreements" only "at the level of 'major policy-making units.'"

Against the foregoing, Hardin County places great weight on the Tenth Circuit's ruling in

***NLRB v. Pueblo of San Juan*** that an Indian "tribe is not preempted by § 8(a)(3) from enacting a right-to-work law for business conducted in its reservation." 276 F.3d at 1197. Def. Mem. in Supp. SJ 12-13; Def. Resp.in Opp. SJ 9-10. The County acknowledges that "***NLRB v. Pueblo of San Juan*** utilizes some legal principles unique to Indian tribes," Def. Mem. in Supp. SJ 13, but that is a gross understatement. The Tenth Circuit's decision rests entirely on "canons of statutory construction peculiar to Indian law." 276 F.3d at 1196. These canons flow from the basic principle that "Indian tribes are neither states, nor part of the federal government, nor subdivisions of either" but rather "are sovereign political entities possessed of sovereign authority not derived from the United States, which they predate." 276 F.3d at 1192 (footnote omitted). Given their sovereign nature, "Indian tribes . . . have a status higher than that of states" as "subordinate and dependent nations possessed of all powers [except] to the extent that they have been *expressly required to surrender them* by the superior sovereign, the United States." *Id*. at 1192 n. 6 (emphasis added; quotation marks and citation omitted). Thus, the determination of whether the United States has expressly required Indian tribes to surrender their sovereign powers is completely unlike the determination of whether federal law has impliedly preempted state law.

In sum, local right to work laws like Hardin County Ordinance No. 300 "are not encompassed under § 14(b)" and thus are not "permissible" as a result of NLRA preemption. *Mobil Oil*, 426 U.S. at 413 n. 7.

### III. THE SUPREME COURT HAS NOT ADOPTED ANY PER SE RULE REQUIRING THAT ALL STATUTORY REFERENCES TO "STATE" OR "STATE LAW" ENCOMPASS LOCAL GOVERNMENTS AND LOCAL LAWS.

When Hardin County finally turns to the words of § 14(b), it makes no effort to analyze the particular statutory language or to consider the particular statutory context. Rather, the

County relies on two Supreme Court decisions interpreting two completely different statutes, which the County asserts establish a per se rule that, no matter what the statutory context, "[w]here a federal statute authorizes a State to act, this federal statute authorizes its political subdivisions to act." Def. Mem. in Opp. SJ 5, citing **Wisconsin Public Intervenor v. Mortier**, 501 U.S. 597, 607 (1991), and **City of Columbus v. Ours Garage & Wrecker Service, Inc.**, 536 U.S. 424, 434 (2002). Neither **Mortier** nor **Ours Garage** stand for that sweeping proposition. "[T]he purpose of Congress is the ultimate touch-stone in every pre-emption case," and "Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it." **Medtronic, Inc. v. Lohr**, 518 U.S. 470, 485-86 (1996) (quotation marks and citations omitted). **Mortier** and **Ours Garage** faithfully follow that approach, each carefully attends to the statutory language and the statutory framework at issue.

**Mortier** considered whether the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) preempts the regulation of pesticides by local government. 501 U.S. at 600. The question arose because of a provision stating that "[a] State may regulate the sale or use of any federally registered pesticide or device," so long as it did not authorize any sale or use prohibited by federal law or impose any labeling or packaging requirements different from the federal requirements. 7 U.S.C. § 136v(a). In determining whether this affirmative authorization of state regulation implicitly preempted local regulation, the court "start[ed] with the assumption that the historic police powers of the State were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." 501 U.S. at 605 (quotation marks and citation omitted). The court then noted that, aside from the affirmative authorization of state regulation, "[t]here was no suggestion that . . . FIFRA was a sufficiently comprehensive statute to justify an

inference that Congress had occupied the field to the exclusion of the States." *Id.* at 607. Thus, the court concluded, that "field pre-emption cannot be inferred." *Id.* at 611. Rejecting the argument that local regulation was implicitly preempted by a provision that "plainly authorizes the 'States' to regulate pesticides and just as plainly is silent with reference to local government," the court explained that "[m]ere silence, in this context, cannot suffice to establish a 'clear and manifest purpose' to pre-empt local authority." *Id.* Against that background, the court concluded that "the more plausible reading of FIFRA's authorization to the States leaves the allocation of regulatory authority to the 'absolute discretion' of the States themselves, including the option of leaving local regulation of pesticides in the hands of local authorities." *Id.* at 608.

*Ours Garage* also began its preemption analysis "with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." 536 U.S. at 432, quoting *Mortier*, 501 U.S. at 605. That case concerned a provision of the Interstate Commerce Act that stated the Act's preemption of state and local regulation "related to a price, route, or service of any motor carrier" would "not restrict the safety regulatory authority of a State with respect to motor vehicles." 49 U.S.C. § 14501(c)(1) & (2)(A). As in *Mortier*, the Court concluded that this express recognition of state authority did not implicitly preempt local regulation:

> This case . . . deals . . . with preemption stemming from Congress' power to regulate commerce, in a field where States have traditionally allowed localities to address local concerns. Congress' clear purpose in § 14501(c)(2)(A) is to ensure that its preemption of States' economic authority over motor carriers of property, § 14501(c)(1), 'not restrict' the preexisting and traditional state police power over safety. That power typically includes the choice to delegate the State's 'safety regulatory authority' to localities. Forcing a State to refrain from doing so would effectively 'restrict' that very authority.

*Id.* at 439.

The statutory language and surrounding statutory framework analyzed in *Mortier* and *Ours Garage* are at the furthest remove from the language and statutory framework of § 14(b). Section 14(b) provides that the affirmative federal authorization of union security agreements will not apply "in any State or Territory in which such [agreements are] prohibited by State or Territorial law," 29 U.S.C. § 164(b), and thus sanctions a "conflict between state and federal law." *Schermerhorn*, 375 U.S. at 103. The statutes at issue in *Mortier* and *Ours Garage* did not involve any conflict between state and federal law. *See Ours Garage*, 536 U.S. at 440 (noting that the Interstate Commerce Act's "preemption rule and [the] safety exception to it do not necessarily conflict"). What is more, both cases concern "the regulation of health and safety matters [which] is primarily, and historically, a matter of local concern." *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 719 (1985).

By contrast with the statutes at issue in *Mortier* and *Ours Garage*, "the NLRA . . . comprehensively deals with labor-management relations from the inception of organizational activity through the negotiation of a collective-bargaining agreement" because of "Congress' perception that . . . state legislatures and courts were unable to provide an informed and coherent labor policy." *English v. General Electric Co.*, 496 U.S. 72, 86 n. 8 (1990). The salient point of difference between this case and *Mortier* and *Ours Garage* is this: because of the NLRA "field pre-emption" in the area of industrial relations, § 14(b) is properly "understood . . . as *authorizing* certain types of state regulation (for which purpose it makes eminent sense to authorize States but not their subdivisions)," rather than simply assuring that the states' historic authority to act is not disturbed by a federal enactment. *Mortier*, 501 U.S. at 616 (Scalia, J., concurring) (emphasis in original). *See also id*. at 607 & 612-13 (emphasizing the absence of "field pre-emption" under FIFRA).

00625005 14

Finally, in relying on *Mortier* and *Ours Garage*, Hardin County does not come to terms with the full text of § 14(b). The County reads § 14(b) as if it only used the word "state" once – in the phrase "state law." But § 14(b) does not merely provide that union security agreements are not permitted by federal law when "such execution or application is prohibited by State or Territorial law." It also says "*in any State or Territory where* such execution or application is prohibited by State or Territorial law." The italicized phrase uses the word "state" as a noun to describe a specific geographic area. The words "in any State" simply cannot be read to mean "in any state, county, city or other political subdivision." Thus, accepting Hardin County's construction of the words "State . . . law" in § 14(b) would require this Court to hold that Congress used the word "State" twice in the same sentence, but to mean different things. The words state in the phrase "in any State" clearly refer only to states and not to political subdivisions. And, just as clearly, when Congress again used the word "State" 12 words later in the same sentence, it meant the same thing – states and not political subdivisions of states.

By stating that the federal authorization of union security agreements will not apply in "any State or Territory" where such agreements are prohibited by "State or Territorial law," 29 U.S.C. § 164(b), the terms of "§ 14(b) reflect[] Congress' decision that any State or Territory that wishes to may exempt itself from [the national] policy," *Mobil Oil*, 426 U.S. at 416-17. However, "the more restrictive policies [regarding union security agreements] that § 14(b) allows the States to enact," *id*. at 417, are state policies and not the policies of the myriad local political subdivisions of a state. There is nothing in *Mortier* or *Ours Garage* that would support a different understanding of § 14(b).

## CONCLUSION

As shown above, right-to-work laws not covered by § 14(b) of the NLRA are preempted by the NLRA, because § 14(b) is a defined and limited exception to the NLRA's broad preemption of the field of labor relations. Further, contrary to the Defendants' arguments, there exists no interpretive assumption that the terms "state" or "state law" invariably encompass local entities and local laws, and there was no Congressional intent to that effect in § 14(b).

And Defendants have failed to offer any credible response to the Plaintiffs' showing, in their Memorandum in Support of Motion for Summary Judgment, that Hardin County's attempt to regulate collective bargaining agreements regarding dues check-off and hiring halls is preempted.

We therefore respectfully request the Court to deny the Defendants' cross Motion for Summary Judgment, and to grant the Plaintiff's Motion for Summary Judgment.

/s/ Irwin H. Cutler, Jr.
Irwin H. Cutler, Jr.
David Leightty
Benjamin S. Basil
Priddy, Cutler, Naake & Meade, PLLC
800 Republic Building
429 West Muhammad Ali
Louisville, Kentucky 40202
Phone: (502) 587-8600
Fax: (502) 632-5271 E-mail: cutler@pcnmlaw.com
COUNSEL FOR PLAINTIFFS EXCEPT TEAMSTERS LOCAL 89

/s/ Robert M. Colone *(with permission)*
Robert M. Colone
General Counsel
IBT Local 89
3813 Taylor Blvd.
Louisville, KY 40215
Phone: (502) 368-5885
Fax: (502) 366-2009
rmcolone@teamsers89.com
COUNSEL FOR PLAINTIFF TEAMSTERS LOCAL 89

CERTIFICATE OF SERVICE

    It is hereby certified that a copy of the foregoing will this 24th day of April, 2015, be served through this Court's CM/ECF system on counsel of record.

*s/* Irwin H. Cutler, Jr.
Counsel for Plaintiffs
