UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA LOCAL 3047, et al., | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | **Electronically Filed** |
| v. | ) ) ) | CASE NO. 3:15-cv-00066-DJH |
| HARDIN COUNTY, KENTUCKY, et al., | ) ) ) | |
| Defendants. | ) | |

**DEFENDANT HARDIN COUNTY'S RESPONSE TO THE BRIEF OF THE NATIONAL LABOR RELATIONS BOARD AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS**

Defendants, by counsel, respectfully respond to the Brief of the National Labor Relations Board as Amicus Curiae in support of Plaintiffs.

**INTRODUCTION**

Defendants, Hardin County, Kentucky, and its elected officials named in their official capacity, appreciate the Court's extension of an opportunity to respond to Amicus Curiae. The arguments and authorities advanced by the Amicus Curiae in support of Plaintiffs parallel the arguments and authorities already advanced by the Plaintiffs. Accordingly, Defendants will not burden the Court with redundant Responses to each of the Amicus Curiae.

Nevertheless, Defendants believe a response to the National Labor Relations Board (NLRB) is warranted. A Response to the NLRB's amicus curiae brief is needed to confirm that the NLRB speaks with no special knowledge or authority on the subject of "right to work." The NLRB speaks with authority on many subjects related to collective bargaining, but the U.S. Supreme Court has ruled that "right to work" is not one of them.

The relationship of the NLRB to "right to work" laws is addressed in *Retail Clerks International Ass'n. v. Schermerhorn,* 375 U.S. 96 (1963).  Both sides have frequently cited *Schermerhorn* because the *Schermerhorn* opinion carefully analyzes the history and character of "right to work" ("RTW") legislation.  The primary issue before the Court in *Schermerhorn* was whether the NLRB has **any** jurisdiction over, or authority to interpret, "right to work" laws.  *Id.* at 97-98.  The *Schermerhorn* Court ruled that the NLRB has no authority to interpret or apply RTW laws.  *Id.* at 103.

The NLRB is entitled to its opinion.  Yet, the NLRB offers no special expertise or authority binding upon this Court.  The Tenth Circuit Court of Appeals has already rejected the NLRB's understanding of whether the National Labor Relations Act (NLRA) preempts local RTW laws. *NLRB v. Pueblo of San Juan*, 276 F.3d 1196 (10th Cir. 2002).  There is no reason why this Court should accept the NLRB's reasoning here. In rejecting NLRB involvement in "right to work," the Supreme Court held that courts, not the NLRB, possess the power and authority to interpret and enforce RTW laws.  *Id.* at 105.

Later, the U.S. Supreme Court announced that authority granted to the States is exercisable by their political subdivisions, like Hardin County, "in the absence of 'clear and manifest indication that Congress sought to supplant local authority.'"  *City of Columbus v. Ours Garage & Wrecker Service, Inc.*, 536 U.S. 424, 434 (2002); *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 611 (1991).  The NLRB's brief articulates no argument and cites no authority that demonstrates a "clear and manifest indication that Congress sought to supplant local authority" to adopt a "right to work" ordinance.  Therefore, nothing within the NLRB's brief defeats Ordinance 300. The NLRB's appropriate role in regulating *other aspects* of union

relationships with employers and employees should not mislead this Court into concluding that the NLRB speaks with authority or accuracy on the subject of "right to work."

## ARGUMENT

### I.    *Garmon* **Preemption Does Not Apply to "Right to Work."**

The NLRB relies first and foremost upon *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959).  By asserting *Garmon* preemption applies to "right to work" laws, the NLRB is basically asking this Court to overrule the U.S. Supreme Court's decision in *Retail Clerks Intern. Assn. v. Schermerhorn*, 375 U.S. 96 (1963). *Schermerhorn* held that *Garmon* preemption has no application to "right to work" laws.  *Schermerhorn*, 375 U.S. at 103.

The United States Supreme Court established the principles of what is now called *Garmon* preemption in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959). *Garmon* involved union picketing of an employer in an effort to force the employer to recognize the union as the bargaining agent for the employer's workers.  The National Labor Relations Act grants the NLRB exclusive authority to govern and regulate the union recognition process.  I the *Garmon* case, however, the NLRB had declined to accept jurisdiction over this particular employer, because the employer was not sufficiently engaged in interstate commerce activity. *Id.* at 237.

The union offered no proof that a majority of the employer's workers wanted to be represented by the union.  Accordingly, California state law, as well as the NLRA, forbid the employer to recognize the union as the workers' bargaining agent.  The employer filed suit in California state court asking that the union's picketing be enjoined, and for an award of money damages, resulting from the "unlawful" picketing.

The U.S. Supreme Court addressed the issue of whether the NLRA preempted the authority of California courts to address this labor dispute.  The Supreme Court held that only the

3

National Labor Relations Board (NLRB) had authority over such disputes, even if the NLRB chose not to exercise its authority.  The Court reasoned:

> "When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by Section 7 of the National Labor Relations Act, or constitute an unfair labor practice under Section 8, due regard for the federal enactment requires that state regulation must yield."  *Id.* at 244.

Thus, *Garmon* preemption applies whenever union activity is "protected by Section 7," or would "constitute an unfair labor practice under Section 8" of the NLRA.  *Id.*

*Garmon* made clear, however, that the principle of preemption it establishes does ***not*** deprive the States of all power to address all aspects of labor relations.  The Supreme Court explained, "due regard for the presuppositions of our embracing federal system" require that State power be maintained over some aspects of labor relations.  *Id.* at 244.  These areas include "where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress has deprived the States of the power to act."  *Id.* at 244.[1]  *Garmon* did not involve "right to work" laws.  Nevertheless, shortly thereafter, the U.S. Supreme Court made clear in *Schermerhorn* that RTW laws are an example of "where the regulated conduct touched interest so deeply rooted in local feeling and responsibility that . . .  we could not infer that Congress has deprived the States of the power to act."

Matters within the scope of *Garmon* preemption fall within the exclusive jurisdiction of the National Labor Relations Board, even if the NLRB declines to exercise this jurisdiction.  This is the holding in *Garmon*.  *Id.* at 246.  Therefore, the issue of whether *Garmon* preemption has any application to "right to work" laws controlled the outcome of the Supreme Court's

---

[1] In support of this conclusion, the Court cited a variety of cases upholding the power of States to exercise its traditional police powers over workplace issues.  *Id.* at 244, fn 2 (citing U.S. Supreme Court cases approving exercise of State police powers in labor relations).

4

decision in *Schermerhorn*.  If *Garmon* applied to "right to work" laws, the NLRB possessed exclusive jurisdiction over "right to work" laws.  In *Schermerhorn,* however, the U.S. Supreme Court ruled *Garmon* preemption has no application to "right to work" laws.  *Schermerhorn*, 375 U.S. at 103-104.

In ruling that the NLRB had ***no*** jurisdiction to interpret or apply "right to work" laws, the *Schermerhorn* decision directly addressed *San Diego Building Trades Council v. Garmon.*

> "This result on its face may seem to be at war with *San Diego Building Trades Council v. Garmon* (cite omitted), decided in 1959, and holding that where action is 'arguably subject to s 7 or s 8 of the Act, the States, as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board' (cite omitted) . . . Garmon, however, does not state a constitutional principle; *Id.* at 103.

The Court, then, explained that "right to work" laws are among those State powers that have always fallen outside the scope of federal preemption.  The Court explained:

> "State power, however, was held to coexist along side of federal power because of the special legislative history of the union-security provisions of the Act (NLRA)."  *Id.* at104.

The *Schermerhorn* decision explained that protecting this "State power" was the reason Congress added Section 14(b) to the NLRA:

> ". . . . 14(b) was included to forestall the inference that federal policy was to be exclusive on this matter of union-security agreements."  *Id.*

The *Schermerhorn* Court drew a helpful "line" between matters preempted by *Garmon*, and "right to work" laws.  The Court found that the State's power to regulate compulsory unionism begins "with actual negotiation and execution of the type of agreement described by Section 14(b)." *Id.* at 105.  *Garmon* preemption assigns to the NLRB matters relating to union recognition, and an employer's obligation to negotiate with a union.  But, *Garmon* preemption

stops at the point of "actual negotiation and execution" of "union shop" clauses.  *Id.*  Contrary to the NLRB's assertion to this Court, *Garmon* has no application to "right to work" laws.

## II.     Section 14(b) of the NLRA Does Not Create A "Narrow Exception" to Federal RTW Preemption.

The NLRB repeats Plaintiffs argument that the NLRA preempts all "right to work" laws not saved by Section 14(b) of the NLRA. Amicus Br. p. 8. As pointed out in Defendants' Reply Brief, Ordinance 300 is valid even if Section 14(b) creates the only exception to federal preemption of RTW laws. Def. Reply p. 1-4. Nevertheless, the NLRB's argument misunderstands the role of Section 14(b). As the Ten Circuit Court of Appeals explained to the NLRB in *NLRB v. Pueblo of San Juan*, 276 F.3d 1186, 1197 (10th Cir. 2002):

> "What Congress has not taken away by Section 8(a)(3) it need not give back (by Section 14(b)) in order for the tribe to continue to have authority to pass a right-to-work law. Although the Supreme Court has characterized Section 8(a)(3) as 'articulat[ing] a national policy that certain union-security agreements are valid as a matter of federal law,' the Court has also made it clear that . . . Section 8(a)(3) left the States free to pursue their own more restrictive policies in the matter of union-security agreements."

*Id.* at 1197-8 (internal quotations omitted).

Section 8(a)(3) is the statutory authority for any union security agreement. It does not preempt State or local RTW laws. The inclusion of Section 14(b) only made "clear and unambiguous the purpose of Congress not to preempt the field."  *Schermerhorn,* 375 U.S. at 102.

Section 14(b) states:

> Nothing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law."

29 U.S.C. § 164(b).

6

Contrary to the impression the NLRB tries to create, the legislative history of Section 14(b) shows that Section 14(b) was never intended to carve out a "limited exception" to preemption of RTW laws. Section 14(b)'s purpose is to protect a preexisting right to ensure that preemption does not occur. As the NLRB admits in their brief, at the time Section 14(b) was enacted, multiple States already had laws forbidding compulsory unionism. Amicus Br. p. 8. This fact was understood when debating the inclusion of 14(b) in the Wagner Act.

As Senator Taft indicated, the Wagner act "did not in any way prohibit the enforcement of State laws which already prohibited closed shops." 93 Cong.Rec. 6520, 2 Leg.Hist. of the Labor Management Relations Act, 1947, 1597. Instead, he stated, "[t]hat has been the law ever since that time. It was the law of the Senate bill; and in putting in this express provision from the House bill, (§14(b)) we in no way change the bill as passed by the Senate of the United States." *Id.* Therefore, 14(b) did not provide an exception to Section 8(a)(3), but merely set forth the already existing law so that it could never be infringed upon. *See Retail Clerks International Association, Local 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96, 100-01 (1963)("… a section, which later became § 14(b), appeared . . . as making clear and unambiguous the purpose of Congress not to preempt the field.").

Even in the face of the Tenth Circuit's rejection the NLRB's argument in *NLRB v. Pueblo of San Juan*, and the clear teaching about Section 14(b)'s history set out in *Schermerhorn,* the NLRB still argues that Section 14(b) of the NLRA is "a clearly-worded and limited exception to the nationwide application of the NLRA, empowering only States and Territories to prohibit union security." P. 8. It cites to *Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO v. Mobil Oil Corp.*, 426 U.S. 407, 418 (1976) in support of this assertion. This citation is seriously misplaced, as *Mobil Oil* holds no such proposition.

7

*Mobil Oil* addressed whether Texas' RTW law could apply to unlicensed seamen who worked not in Texas, but on oil tankers on the high seas. The Court found that the law did not apply, as "the employees' predominant job situs should determine the applicability of a State's right-to-work laws." *Mobil Oil Corp.*, 426 U.S. at 418. Because the seamen worked outside of Texas, that state could not apply its RTW law as it related to those seamen. Nowhere in the case does the Court indicate that Section 14(b) is "a limited exception to the . . . NLRA, empowering only States and Territories to prohibit union security," as asserted in the NLRB's brief.  Nor does it limit § 14(b) in any way, other than to prohibit states from attempting to enforce a RTW law on a jurisdiction outside of the state.[2]

This is not a "narrowly construed" application of 14(b), as the NLRB suggests. Instead, this case only reiterates the proposition the Supreme Court espoused in *Algoma Plywood Co. v. Wisconsin Board,* that  "§14(b) was designed to make clear that § 8(a)(3) left the States free to pursue 'their own more restrictive policies in the matter of union-security agreements.'" *Mobil Oil* at 417 (quoting *Algoma Plywood Co. v. Wisconsin Board*, 336 U.S. 301, 314 (1949)).

## III.   Relationship Between the Historical "Police Power" of States to Enact Right to Work Laws and NLRA Section 14(b)

The right to forbid compulsory unionism is among the historic "police powers" of the States.  As the Supreme Court explains:  "(t)here can be no doubt that it is within the police power of a State to prohibit the union or closed shop." *Railroad Emp. Dept. v. Hanson,* 351 U.S. 225, 233 (1956).  Every State in the Union has laws governing issues that impact the paychecks of its citizens.  These include the circumstances under which mandatory or voluntary deductions may be taken from the wages of their citizens.[3]  "Right to work" states usually include their

---

[2] In this case, because the workers worked on the high seas, they were not subject to Texas state law.
[3] ALA. CODE §§ 36-1-4-36-1-4.4 (2015); ALASKA STAT. § 8.15.160 (2015); ARIZ. REV. STAT. ANN. § 23-352 (2015); ARK. CODE ANN. § 19-4-1602 (2015); CAL. LAB. CODE § 224 (West 2015); COLO. REV. STAT. § 8-

prohibition against mandatory payments to unions among their other wage deduction laws.[4]

Most of the laws governing an employee's pay check are state or federal laws. When State "police powers," like the power to regulate commerce, are delegated to the State's political subdivisions, however, nothing prevents the political subdivision (cities and counties) from exercising these delegated "police powers" to protect its citizen's paycheck in the manner it deems best and necessary. The recent movement of some localities to adopt their own minimum wage laws is a recent example.[5] Such local minimum wage laws have already come to Kentucky.

---

4-101 (2015); CONN. GEN. STAT. § 31-71e (2015); DEL. CODE ANN. tit. 19, § 1104 (2015); D.C. CODE § 1-617.07 (2015); FLA. STAT. ANN. § 110.114 (2015); GA. CODE ANN. § 34-6-25 (2015); HAW. REV. STAT. § 388-6 (2015); IDAHO CODE ANN. § 45-609 (2015); ILL. COMP. STAT. ANN. 820.115/9 (2015); IND. CODE ANN. § 22-2-6-2 (2015); IOWA CODE § 701-204.1 (2015); KAN. STAT. ANN. § 44-319 (2015); KRS § 337.060 (2015); LA. REV. STAT. ANN. § 23:635 (2015); ME. REV. STAT. ANN. tit. 26, § 635 (2015); MD. CODE ANN., LAB. & EMPL. § 3-503 (2015); MASS. GEN. LAWS ch 154, § 8 (2015); MICH. COMP. LAWS § 423.210 (2015) MINN. STAT. § 181.06 (2015); MO. REV. STAT. § 33.103 (2015); MONT. CODE ANN. § 39-3-204 (2015); NEB. REV. STAT. § 48-1230 (2015); NEV. REV. STAT. § 608.110 (2015); N.H. REV. STAT. ANN. § 275:48 (2015); N.J. STAT. ANN. § 34:11-4.4 (2015); N.M. STAT. § 50-4-2 (2015); N.Y. LAB. LAW § 193 (2015); N.C. GEN. STAT. § 95-25.8 (2015); N.D. CENT. CODE § 34-14-04.1 (2015); OHIO REV. CODE ANN. § 4113.15 (2015); OKLA. ADMIN. CODE § 380:30-1-7 (2015); OR. REV. STAT. § 652.610 (2015); 34 PA. CODE § 9.1 (2015); R.I. GEN. LAWS § 28-14-10 (2015); S.C. CODE ANN. § 41-10-40 (2015); S.D. CODIFIED LAWS § 60-11-2 (2015); TENN. CODE ANN. § 8-23-204 (2015); TEX. LAB. CODE ANN. § 61.018 (2015); UTAH CODE ANN. § 34-28-3 (2015); VT. STAT. ANN. tit. 21, §302 (2015); VA. CODE ANN. § 40.1-29 (2015); WASH. REV. CODE § 49.48.010 (2015); W. VA. CODE § 21-5-19(g) (2015); WIS. STAT. § 111.06(1)(i) (2015); WYO. STAT. ANN. § 27-4-116 (2015).

[4] ALA. CODE § 25-7-34 (2015); ARIZ. REV. STAT. ANN. §§ 23-202-23.203 (2015); ARK. CONST. AMEND. XXXIV, § 1 (2015); FLA. CONST. art. I, § 6; GA. CODE ANN. § 45-7-54(e) (2015); IDAHO CODE ANN. § 44-2001 (2015); IND. CODE ANN. § 22-6-6-8 (2015); IOWA CODE § 731.1 (2015); KAN. CONST. art. 15, § 12 (2015); LA. REV. STAT. ANN. § 23:981 (2015); MICH. COMP. LAWS § 408.478 (2015); NEB. REV. STAT. § 48-217 (2015); NEV. REV. STAT. § 613.250 (2015); N.C. GEN. STAT. § 95-82 (2015); N.D. CENT. CODE § 34-01-14 (2015); OKLA. CONST. art. XXIII, § 1A; S.C. CODE ANN. § 41-7-70 (2015); S.D. CODIFIED LAWS § 60-8-3 (2015); TENN. CODE ANN. § 50-1-201 (2015); TEX. LAB. CODE ANN. § 101.052 (2015); UTAH CODE ANN. § 34-34-2 (2015); VA. CODE ANN. § 40.1-62 (2015); WIS. STAT. § 111.04 (2015); WYO. STAT. ANN. § 27-7-109 (2015).

[5] Emeryville, California Municipal Code § 3-1.141; Oakland, California Municipal Code § 5.92.020; Richmond, California Ordinance No. 11-14 N.S. (March, 2014); San Diego, California Ordinance No. 0-20390 (Aug. 18, 2014); San Francisco, California Admin. Code § 12R.1; San Jose, California Municipal Code § 4.100.010; Chicago, Illinois Ordinance No. 02014-9680 (Dec. 2, 2014); Louisville, Kentucky Ordinance No. 0-470-14 (Dec. 18, 2014); Seattle, Washington Municipal Code § 14.19.020

Louisville, Kentucky. Ordinance No. 0-470-14 (Dec. 18, 2014)(increasing minimum wage within city limits of Louisville, Kentucky)

Since States have the right to implement RTW laws, States are free to delegate power to counties and other political subdivisions of the States broad enough to empower these political subdivisions to adopt RTW laws within their borders. *City of Columbus v. Ours Garage and Wrecker Service, Inc.,* 536 U.S. 424, 429 ("Ordinarily, a political subdivision may exercise whatever portion of state power the State, under its own constitution and laws, chooses to delegate to the subdivision."); *Wisconsin, Public Intervenor v. Mortier,* 501 U.S. 597, 607-08 (1991).

In the case of Hardin County, Kentucky, this is exactly what has happened.  Here, Hardin County has authority to regulate commerce and promote economic development. KRS 67.083(3)(m)&(x).  Ordinance 300 is simply an exercise of this delegated State "police power."

In Section 14(b), Congress *explicitly* protected States' power to prohibit compulsory unionism. In *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 607-608 (1991), the Supreme Court found: "The *exclusion* of political subdivisions *canno*t be inferred from the *express authorization* to the States because political subdivisions are components of the very entity the statute empowers." (emphasis added). If federal law does not preempt State RTW laws, this "should be read to preserve, not preempt, the traditional prerogative of the States to delegate their authority to their constituent parts." *City of Columbus*, 536 U.S. at 429.

The only way the historic police powers of the States can be superseded by a federal act is if that was the "clear and manifest purpose of Congress." *Hillsborough County, Fla. v. Automated Medical Labs,* 471 U.S. 707, 715 (1985). Therefore, in order to separate a county's authority from that of a State's, the NLRB is required to show that it was Congress's "clear and

manifest purpose" to exclude counties and political subdivisions from the authority of the States to pass RTW laws.  This, the NLRB's brief fails to do.

    1.   <u>The NLRB Misunderstands the Legal Standard for Federal preemption of Local Laws.</u>

The mere omission of the terms "counties" and "political subdivisions" in Section 14(b) is not sufficient to show that Congress had a "clear and manifest purpose" to exclude the States' political subdivisions from the authority reserved to States.  The NLRB's argument, to the contrary, ignores clear U.S. Supreme Court instructions on how federal preemption applies to the States' political subdivisions.  Instead, the NLRB tries to substitute a U.S. Supreme Court decision on the subject of interpreting two conflicting federal statutes.

    The NLRB's relies on *Andrus v. Glover Const. Co.,* 446 U.S. 608 (1980).[6] Amicus Br.  p. 8. *Andrus* is a case about reconciling two <u>federal</u> statutes, the Federal Property and Administration Services Act (FPASA) and the Buy Indian Act (BIA).  No issue of federal preemption of State or local laws is raised in *Andrus*.

    In *Andrus,* the Department of the Interior's Bureau of Indian Affairs (BIA) entered into a road-building contract with a Native American-owned company on a stretch of road in BIA jurisdiction. *Andrus* 446 U.S. at 610.  A non-Native American-owned company sued, alleging that the contract award violated the Federal Property Administrative Services Act (FPASA) because the project was not advertised for bids. *Id.*  The BIA argued that the Buy Indian Act required them to preference Native American "products" and therefore were not required to advertise under the FPASA. *Id.* at 609.  Ultimately the Court found that the Buy Indian Act does not authorize the BIA to enter into road construction contracts with Indian-owned companies without first advertising bids pursuant to FPASA. *Id.* at 619.

---

[6] The Ten Circuit rejected an identical effort by the NLRB to apply *Andrus v. Glover Const. Co.,* 446 U.S. 608 (1980) to preempt a local RTW ordinance in *NLRB v. Pueblo of San Juan*, 276 F.3d 1186, 1196 (10th Cir. 2002)

The sole reason the NLRB cites this case is for its language indicating that "[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Id.* at 616-17. The NLRB uses this proposition to support its argument that States and Territories are exceptions to Section 8(a)(3). As noted, Andrus is not even a preemption case.  Even if it were, however, this argument fails at the onset because Congress did not generally prohibit States from regulating union security agreements under Section 8(a)(3). Section 14(b) does not carve out an exception only for "States and Territories," as narrowly defined. Instead, Section 14(b) merely protects a right traditionally held by the States to pass RTW laws.

Furthermore, as explained more fully below, in cases involving federal preemption of local laws, the Supreme Court has explicitly rejected the NLRB's premise. On the contrary, the Supreme Court holds that "[m]ere silence, in this context,[7] cannot suffice to establish a 'clear and manifest purpose' to pre-empt local authority." *Mortier* 501 U.S. at 407 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). The NLRB's argument that Section 14(b)'s silence on counties and political subdivisions signals their exclusion is simply erroneous.

2.  The Inclusion of the Term "Any State or political subdivision thereof" Fails to Show that Congress Meant to Exclude Counties and Political Subdivisions from 14(b)

Simply because Section 2(2) of the National Labor Relations Act, 29 U.S.C. § 152(2), defines "employer" as excluding "any State or political subdivision thereof", this is not a clear intention that Congress meant to exclude counties and political subdivisions from § 14(b). In *City of Columbus* the Supreme Court found that Congress' use of the phrase "State [or] political subdivision of a State," in one area of a statute, while only mentioning "States" in another area

---

[7] Here, a section of the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") expressly authorized "states" to regulate pesticides, but remained silent as to political subdivisions or counties.

was not a "clear and manifest" indication of congressional intent to preempt local safety laws, or

prohibit states from delegating their authority to municipalities:

> The federal legislation preempts provisions by "a State [or] political subdivision of a State . . . related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." § 14501(c)(1). As an exception to this general rule, Congress provided that the preemption directive "shall not restrict the safety regulatory authority of a State with respect to motor vehicles." § 14501(c)(2)(A). Section 14501(c)(1)'s statement of the general rule explicitly includes "State[s]" and their "political subdivision[s]." The exception for safety regulation, however, specifies only "State[s]" and does not mention "political subdivision[s]." § 14501(c)(2)(A).

> We hold that § 14501(c) does not bar a State from delegating to municipalities and other local units the State's authority to establish safety regulations governing motor carriers of property, including tow trucks. A locality, as § 14501(c) recognizes, is a "political *subdivision* " of the State. Ordinarily, a political subdivision may exercise whatever portion of state power the State, under its own constitution and laws, chooses to delegate to the subdivision. Absent a clear statement to the contrary, Congress' reference to the "regulatory authority of a State" should be read to preserve, not preempt, the traditional prerogative of the States to delegate their authority to their constituent parts.

536 U.S. at 428-29. *See, also, Mortier*, 501 U.S. at 607-8.  It follows, therefore, that the NLRB's

argument that including the words "political subdivision" in one area of the NLRA, but not in

section 14(b), is not sufficient to show "clear and manifest purpose" on behalf of Congress to

exclude counties and political subdivisions.

    3.  <u>NLRB's Argument Contradicts How Federal Agencies Are Required To Interpret Federal Preemption.</u>

    The logic advanced in the NLRB's brief runs counter to Executive Order 13132, which

President Clinton issued to all executive departments and federal agencies on the subject of

Federalism.  President Clinton issued Executive Order 13132 on August 4, 1999, and it remains

in effect today.[8]  Among the "Fundamental Federalism Principles" articulated in Section 2 of Executive 13132 are the following:  "(f) The nature of our constitutional system encourages a healthy diversity in the public policies adopted by the people of the several States according to their own conditions, needs, and desires. In the search for enlightened public policy, individual States **and communities** are free to experiment with a variety of approaches to public issues. One-size-fits-all approaches to public policy problems can inhibit the creation of effective solutions to those problems".[9]

In applying Executive Order 13132, federal agencies are to use the "definitions" set out in Section 1 of the Executive Order.  Among these definitions is the following:  "(b) 'State' or 'States' refer to the States of the United States of America, individually or collectively, and, where relevant, to State Governments, **including units of local government and other political subdivisions established by the States**."[10]

With this background, the Executive Order imposes "Special Requirements for Preemption," which include:

> "(a) Agency shall construe  . . . a federal statute to preempt State law only where the statute contains an express preemption provision or there is some other clear evidence that the Congress intended preemption of a State law, or where the exercise of State authority conflicts with the exercise of Federal authority under the Federal statute."[11]

This language must be considered in light of the Executive Order's definition of "State." "State" and "State Governments"  "includ(e) units of local government and other political subdivisions established by the States." This brings the NLRB's brief comes into direct conflict with the Executive Order mandate.

---

[8] Executive Order 13132, 64 FR 43255 (1999) (copy attached).
[9] Section 2 *Fundamental Federalism Principles*," 64 FR 43256 (emphasis added).
[10] Section 1(b), 64 FR 43255 (emphasis added).
[11] Section 4, "Special Requirements for Preemption," 64 FR 43257(a).

**IV.    The NLRB's Reliance on Kentucky State AFL-CIO et al. v Puckett, Thomas E. Basham Co. v. Lucas, and New Mexico Federation of Labor v City of Clovis is Misplaced and Does Not Support the Contention that Ordinance 300 is Preempted**

The NLRB's contention that Ordinance 300 is preempted ignores the Supreme Court cases of *Wisconsin Public Intervenor v. Mortier* (1991) and *City of Columbus v. Ours Garage and Wrecker Service* (2002). Instead, the NLRB mistakenly cites to the much earlier cases *Kentucky State AFL-CIO et al. v Puckett*, 391 S.W.2d 360 (1965), *Thomas E. Basham Co. v. Lucas,* 21 F.2d 550 (W.D. Ky. 1927), and *New Mexico Federation of Labor v. City of Clovis*, 735 F. Supp. 999 (D.N.M. 1990) to support its contention that Ordinance 300 should be invalidated. Each of these cases are addressed in turn.

*1.    Kentucky State AFL-CIO et al. v. Puckett*

In *Kentucky State AFL-CIO et al. v. Puckett,* the Kentucky Court of Appeals case,[12] the Court concluded that the NLRA preempted a RTW ordinance issued by the City of Shelbyville. Yet, the *Puckett* decision was issued long before the U.S. Supreme Court decided either *Wisconsin Public Intervenor v. Mortier* (1991) or *City of Columbus v. Ours Garage and Wrecker Service* (2002), which both indicate that "the 'regulatory authority of the State' should be read to *preserve, not preempt*, the traditional prerogative of the States to delegate their authority to their constituent parts." *City of Columbus,* 536 U.S. at 432; *Mortier,* 501 U.S. at 607-08. As a result, *Puckett* mistakenly concluded that the protection of State power to adopt RTW laws, protected by the NLRA's Section 14(b), excludes the right of localities to adopt RTW laws when the very opposite is true. *See, e.g., City of Columbus,* 536 U.S. at 429; *Mortier,* 501 U.S. at 607-08.

Ultimately, the *Puckett* Court's reasoning turned on its *belief* that Congress sought some level of uniformity in the enforcement of "union shop" agreements *Puckett* at 360-61. Yet

---

[12] The Court of Appeals was then the highest court in the state.

*Schermerhorn* indicates that Congress has long since rejected any intention or desire for uniformity in union security agreements:

> Congress, in other words, chose to abandon any search for uniformity in dealing with the problems of state laws barring the execution and application of agreements authorized by Section 14(b) and decided to suffer a medley of attitudes and philosophies on the subject.

*Schermerhorn* at 104-05.

Indeed, uniformity is rarely a reality when it comes to collective bargaining. The NLRB applies a presumption that single sites of employment are "appropriate units" for collective bargaining. *See, e.g., Gargill, Inc.* 336 NLRB 1114 (2001); *Dixie Bell Mills,* 139 NLRB 629, 631 (1962). Certainly, unions can be organized in units that include multiple geographic locations. Practical considerations, however, dictate that most union organizing occurs on a local level, where a majority of employees at a particular work site are convinced to vote for union representation. A collective bargaining agreement is, then, negotiated for that worksite. Just because the worksite is located in a jurisdiction without a RTW law does not mean that the employer will agree to a "union shop" agreement.

The NLRB also relies on *Puckett* to support its contention that Section 14(b) creates a "narrow exception" to the NLRA's authority over compulsory unions. Yet, the legislative history of §14(b), as discussed in *Schermerhorn*, demonstrates that this section was not an exception to Section 8(a)(3), but was merely an iteration of the right that states already had to institute RTW laws. As a result, the ruling in *Puckett* ignores the reasoning in *Schermerhorn*, and lacks the benefits of later Supreme Court holdings in *Wisconsin Public Intervenor v. Mortier* (1991), and *City of Columbus v. Ours Garage and Wrecker Service* (2002). These cases explicitly denote the rights of states to delegate areas of traditional authority to counties as its component parts.

2.  *New Mexico Federation of Labor v. City of Clovis*

In *New Mexico Federation of Labor v. City of Clovis*, 735 F. Supp. 999 (D.N.M. 1990)*,* the District Court for the District of New Mexico invalidated a city ordinance, reiterating the assumptions made by the *Puckett* Court, that "Congress intended an exclusive regulatory system…" and that "8(a)(3) so thoroughly regulates the subject of union security agreements so as to preempt the matter from state legislation except to the extent specifically permitted under § 14(b) of the Act. *City of Clovis* 735 F. Supp. 999, 1002.[13] As addressed above, the assumption that Congress intended a uniform regulatory system in union-security agreements is invalidated in *Schermerhorn.*

Finally, this case, too, was decided prior to the Supreme Court decisions in *Mortier* and *City of Columbus*, which hold, contrary to the proposition in *City of Clovis,* that "[t]he exclusion of political subdivisions cannot be inferred from the express authorization to the States because political subdivisions are components of the very entity the statute empowers." *City of Columbus,* 536 U.S. at 433 (quoting *Mortier*, 501 U.S. at 607-608 (1991)). As a result, this case further fails to offer support to the NLRB's contentions that Ordinance 300 is invalid.

3.  *Thomas E. Basham Co. v. Lucas*

Finally, the NLRB uses *Thomas E. Basham Co. v. Lucas,* 21 F.2d 550 (W.D. Ky. 1927), to support its contention that Section "14(b) is an exception that should be strictly and narrowly construed because it represents a departure from the overall spirit and purpose of the Act."[14] *Lucas* 21 F.2d at 551. Yet the NLRB misapplies the reasoning in *Lucas.* In that case*,* the Court was tasked to determine whether the plaintiff, a corporation engaged in the advertising agency business, was entitled to be classified as a personal service corporation under the provisions of

---

[13] Like *Puckett,* this case is not binding on this Court.

[14] Importantly, this case does not address Section 14(b) or the NLRA in any way.

section 200 of the Revenue Act of 1918. *Id.* at 550 (W.D. Ky. 1927) aff'd, 30 F.2d 97 (6th Cir. 1928).[15] The Court found that the corporation was not a personal service corporation, based on the principle of law that "where the enacting clause of a law is general in its language and objects (as is the Revenue Act of 1918), and a proviso or exception is introduced into the act, that proviso or exception must be strictly construed, and will not be permitted to take any case out of the enacting clause which does not clearly fall within its term." *Id.* at 551.

This reasoning cannot be applied to support the NLRB's reasoning.  Section 8(a)(3) never prohibited States from regulating union security agreements. States always had the power under the NLRA to prohibit compulsory unionism. Because they have always had this traditional power, it is within their authority to delegate it to local counties and other political subdivisions. Moreover, as the U.S. Supreme Court explained in *Railway Emp. Dept. v. Hanson,* 351 U.S. 225, 233 (1956), "(t)here can be no doubt that it is within the police power of a State to prohibit the union or closed shop." As a result, this case does nothing to support the NLRB's position that Ordinance 300 is unlawful.

## V.    The Authority Delegated to Hardin County Pursuant to Kentucky Statute KRS 67.083(3)(m) and (x) Affords It the Right to Adopt Ordinance 300

As the Supreme Court noted in *City of Columbus:* "Ordinarily, a political subdivision may exercise whatever portion of state power the State, under its own constitution and laws, chooses to delegate to the subdivision." 536 U.S. at 429.  Here, Hardin County has authority to regulate commerce and promote economic development, giving its Fiscal Court the authority to adopt Ordinance 300. KRS 67.083 specifically authorizes Kentucky counties to enact ordinances to fulfill the following "public functions":

18

> "(m) Regulation of commerce for the protection and convenience
> of the public; and
>
> (x) Promotion of economic development of the county. . . ."

Indeed, the Plaintiffs don't even challenge this. One of the primary purposes of Ordinance 300 is "to promote and encourage direct commerce for the protection and convenience of the public, by giving employees freedom to choose employment without restrain or coercion regarding payment of mandatory dues, fees or other payments to a labor organization as a condition of that employment."  Ordinance 300, p. 1. The regulation of compulsory union agreements falls within the scope of the regulation of commerce, which is a central purpose of the Hardin County Fiscal Court.

The NLRB argues that by allowing counties and political subdivisions to implement their own RTW laws, it would subject Kentucky businesses to multiple ordinances which would run counter to the authority granted to the Court to regulate commerce "for the convenience of the public" Amicus Br. p. 13 (quoting KRS 67.083(3)(m). This is a judgment to be made by Hardin County.

As discussed multiple times above, a quest for uniformity in regulating RTW laws was abandoned under Section 14(b). Uniformity is not the NLRA's goal. In Hardin County's judgment, an RTW ordinance will aid the County in attracting industry, jobs, and other economic opportunities for the citizens of Hardin County. It will enable Hardin County citizens to have more control over their paychecks.  These are lawful goals of Hardin County.

The General Assembly has not precluded counties from exercising the power it granted under KRS 67.083 to enacting RTW ordinances to regulate commerce and promote economic development. The NLRA does not preempt Hardin County from using the power delegated to it by the Kentucky to accomplish these goals through the enactment of a RTW ordinance.

**CONCLUSION**

Ordinance 300 is valid. *Garmon* preemption does not apply to Ordinance 300. States have always had the authority to enact RTW laws. Section 14(b) merely made clear that this State authority was not preempted by the NLRA.  As counties are merely components of the States, States can delegate this authority to counties and other political subdivisions. Because Ordinance 300 falls under the purview of Section 14(b), *Garmon* preemption does not apply.

Moreover, Section 14(b) merely articulated the fact that States have always held power to prohibit mandatory unionism. As a result, Section 14(b) it is not an exception to Section 8(a)(3), and need not be narrowly construed. The only way that the NLRB can show that the NLRA preempts State and county RTW laws is to show that Congress had a clear and manifest purpose to limit Section 14(b)'s application strictly to States and Territories. It has not done this.

The NLRB's reliance on the earlier cases *Puckett, Lucas,* and *City of Clovis* is misplaced. It ignores more recent Supreme Court authority. KRS 67.083(3)(m) and (x) delegates Hardin County the right to enact Ordinance 300. No federal preemption takes this right away.

Respectfully submitted,

/s/  John T. Lovett
John T. Lovett
jlovett@fbtlaw.com
FROST BROWN TODD LLC
400 West Market Street, 32nd Floor
Louisville, KY 40202
Telephone: (502) 589-5400
Facsimile:  (502) 581-1087

Jason Michael Nemes
jnemes@fmhd.com
FULTZ MADDOX HOVIOUS & DICKENS
101 South Fifth Street, 27th Floor
Louisville, KY 40202
Telephone: (502) 992-5045
Facsimile:  (502) 588-2020

Jennifer B. Oldham
jennyo.hcao@hcky.org
Hardin County Attorney
109 E. Dixie Avenue
Elizabethtown, KY  42701-1408
Telephone:  (270) 765-6726
Facsimile:   (270) 737-0087

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of May, 2015, I electronically filed the foregoing Response to the Brief of the National Labor Relations Board As *Amicus Curiae* in Support of Plaintiffs with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following: John T. Lovett (jlovett@fbtlaw.com); James Michael Nemes (jnemes@fmhd.com); Jennifer B. Oldham (jennyo.hcao@hcky.org); Irwin H. Cutler, Jr. (cutler@pcnmlaw.com); David Leightty (dleightty@earthlink.net); Benjamin S. Basil (basil@pcnmlaw.com); and Robert M. Colone (rmcolone@teamsters89.com).


/s/ John T. Lovett
*Counsel for Defendants*