UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED AUTOMOBILE, AEROSPACE
AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA, et al.,                                                            Plaintiffs,

v.                                                                                      Civil Action No. 3:15-cv-66-DJH

HARDIN COUNTY, KENTUCKY, et al.,                                                  Defendants.

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

The National Labor Relations Act is a broad federal law that regulates the relationships between employers and unions. The NLRA permits agreements between employers and unions that require employees to join or pay dues to the union, known as union-security agreements. But the NLRA also permits "State or Territorial" laws that prohibit such agreements, commonly referred to as right-to-work laws. The primary question presented by this lawsuit is whether a right-to-work law may be enacted solely by a state or territorial government, or whether a local government—in this case a county—may pass a law prohibiting union-security agreements. Because the Court finds that local regulation of union-security agreements is preempted by the NLRA, the right-to-work ordinance at issue here is invalid.

### I.  BACKGROUND

The Fiscal Court of Hardin County is the legislative body for Hardin County, a political subdivision of the Commonwealth of Kentucky. *See* Ky. Const. § 144; Ky. Rev. Stat. Ann. tit. IX (West 2015). In the absence of a Kentucky state law prohibiting union-security agreements, the Hardin Fiscal Court passed a county ordinance on January 13, 2015, Ordinance 300, which

purports to ensure that no employee is required to join or pay dues to a union.[1]  (Docket No. 5, PageID # 75)  The right-to-work provision is found in Section 4 of Ordinance 300, which states that

> no person covered by the National Labor Relations Act shall be required as a condition of employment or continuation of employment:
>
> . . .
>
> (B)    to become or remain a member of a labor organization;
>
> (C)    to pay any dues, fees, assessments, or other charges of any kind or amount to a labor organization; [or]
>
> (D)    to pay to any charity or other third party, in lieu of such payments, any amount equivalent to or a pro-rata portion of dues, fees, assessments, or other charges regularly required of members of a labor organization[.]

(D.N. 5-1, PageID # 96)  Section 6 of the ordinance declares any such agreements "unlawful, null and void, and of no legal effect."  (*Id*., PageID # 97)

The plaintiff labor organizations assert that Sections 4 and 6 of the ordinance violate the Supremacy Clause of the Constitution.  (*See* D.N. 1)  According to the plaintiffs, the NLRA preempts right-to-work laws not specifically authorized in § 14(b) of the Act, including the Hardin County ordinance.  (*See* D.N. 7-1, 31)  Also preempted, they argue, is Ordinance 300's regulation of "hiring-hall" agreements—which require prospective employees to be recommended, approved, referred, or cleared by or through a labor organization—and "dues-checkoff" provisions—which require employers to automatically deduct union dues, fees, assessments, or other charges from employees' paychecks and transfer them to the union.  (D.N. 7-1, PageID # 116-18)  The defendants, various Hardin County officials, contend that the

---

[1] Kentucky is one of twenty-five states without such a law.  *Right-to-Work States*, NATIONAL CONFERENCE OF STATE LEGISLATURES, http://www.ncsl.org/research/labor-and-employment/right-to-work-laws-and-bills.aspx (last visited Feb. 1, 2016).

ordinance constitutes state law within the meaning of § 14(b) and thus is not preempted by the NLRA. (*See* D.N. 14, 16-1, 34)

As the case presents exclusively legal issues, the parties have filed cross-motions for summary judgment on the validity of Ordinance 300.[2] (D.N. 7, 16) In deciding whether Ordinance 300 is preempted, the Court considers only the legal challenges to the ordinance and makes no finding as to the efficacy of right-to-work laws.

## II. DISCUSSION

In 1935, Congress enacted the National Labor Relations Act, which established federal labor relations standards and the National Labor Relations Board. *See* 29 U.S.C. § 151 *et seq*. In response to abuses of closed-shop agreements, which mandated that only union members be hired, Congress enacted the Taft-Hartley Act banning such agreements. *See Oil, Chemical & Atomic Workers Int'l Union, AFL-CIO v. Mobil Oil Corp.*, 426 U.S. 407, 414-17 (1976). Congress still allowed for union-shop agreements, which require employees to join the union soon after they are hired, and agency-shop agreements, which require employees to pay union dues whether or not they are members of the union. *Id.* at 409 & n.1. In § 14(b) of the NLRA, however, Congress gave any State or Territory the option to exempt itself from that policy. *Id*. at 409 & n.2.

Section 14(b), entitled "Construction of Provisions," provides:

Nothing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.

---

[2] The Court heard oral argument on the cross-motions (D.N. 42) and also reviewed several amicus briefs (D.N. 26 (brief of former Kentucky Attorney General Jack Conway), 27 (brief of Kentucky State Senate President Robert Stivers), 28 (brief of National Labor Relations Board), 29 (brief of AFL-CIO, Kentucky chapter), 30 (brief of nine counties supporting Hardin County)), as well as supplemental legal authorities submitted by the parties. (*See* D.N. 39, 40)

29 U.S.C. § 164(b). Union-security agreements are also addressed in § 8(a)(3). Pursuant to that section, it is an unfair labor practice for an employer

> by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this Act, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later[.]

29 U.S.C. § 158(a)(3). Thus, § 8(a)(3) provides that no federal statute shall preclude union-security agreements, while § 14(b) provides that state and territorial laws prohibiting such agreements shall take precedence over the NLRA. In other words, if Ordinance 300 constitutes state law within the meaning of § 14(b), it is valid and enforceable. If not, then the question is whether the NLRA preempts a regulation that falls outside of that section. The Court thus begins with the language of § 14(b).

### A. State Law Within the Meaning of § 14(b)

Section 14(b) provides that nothing in the NLRA shall be read to authorize the execution or application of union-security agreements "in any State or Territory in which such execution or application is prohibited by State or Territorial law." 29 U.S.C. § 164(b). As the plaintiffs observe, it makes little sense to read "State or Territorial law" as encompassing local law in light of the statute's previous reference to "any State or Territory"—if "State or Territorial law" includes the laws of political subdivisions, then the statute must be read "in any State or Territory [or political subdivision thereof]" to avoid assigning two different meanings to "State" in the same sentence. This is not a logical reading; "[a] standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning." *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232

(2007) (citing *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005)); *see also Day v. James Marine, Inc.*, 518 F.3d 411, 416 (6th Cir. 2008) ("It is not often that Congress gives the same term two different meanings in adjacent subsections of a statute, much less in the same sentence of one of those subsections. If words are known by the surrounding company they keep, they are surely known by how they are used in the surrounding sections of the same statute." (internal quotation marks and citations omitted)).

In their arguments, the defendants skip past the statute's reference to "any State or Territory." Instead, they rely on carefully selected quotations from two Supreme Court cases unrelated to the NLRA, *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597 (1991), and *City of Columbus v. Ours Garage & Wrecker Service, Inc.*, 536 U.S. 424 (2002). Each of those cases, however, turned on the specific language of the statute at issue.

In *Mortier*, the plaintiff challenged a local ordinance regulating the use of pesticides, arguing that it was preempted by the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA). The *Mortier* Court examined the relevant language of FIFRA in detail and ultimately concluded that the statute's express grant of regulatory authority to "a State" did not preempt local regulations. *See* 501 U.S. at 606-14. The Court found that "[t]he exclusion of political subdivisions cannot be inferred from the express authorization to the "State[s]" because political subdivisions are components of the very entity the statute empowers." *Id.* at 608 (alteration in original).

While the defendants quote this passage as black-letter law, the *Mortier* Court's conclusion was that "the express authorization to the "State[s]" *in FIFRA* could not be read to exclude political subdivisions. The paragraph begins, "Properly read, the statutory language tilts in favor of local regulation." 501 U.S. at 607. The next paragraph starts, "Certainly no other

5

textual basis for pre-emption exists." *Id.* at 608.  Taken in context, it is clear that the Court's conclusion was based on the specific statutory language at issue and thus was not a broad pronouncement regarding Congress' use of the term "State" in federal statutes.

The defendants also insist that the *Mortier* Court "addressed how political subdivisions of the States are to be treated for preemption purposes." (D.N. 34, PageID # 1164)  They quote the following passage from *Mortier*: "It is, finally, axiomatic that 'for the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws.'"  501 U.S. at 605 (quoting *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)).  If this quote means what the defendants say it means—that if a state's laws are not preempted, then the laws of the state's political subdivisions are not preempted, either—then the remainder of the *Mortier* opinion was superfluous, as the statute at issue in that case expressly granted regulatory authority to states.  *See id.* at 606 (quoting 7 U.S.C. § 136v); *see also id.* at 607 ("Section 137v plainly authorizes the "States" to regulate pesticides . . . .").  The Court's statement is more logically read to mean that courts apply the same rules and principles when determining whether a local ordinance is preempted as they do when deciding whether a state law is preempted.

Likewise, the quotes highlighted by the defendants from *Ours Garage* are statements based on an analysis of the statute at issue in that case, the Interstate Commerce Act (ICA). Citing *Ours Garage*, the defendants argue, "In the words of the Supreme Court, federal statutes protecting 'State' laws from federal preemption 'should be read to preserve, not preempt, the traditional prerogative of the States to delegate their authority to their constituent parts.'" (D.N. 14, PageID # 198 (quoting *Ours Garage*, 536 U.S. at 429))  Read in context, however, this statement obviously refers to the language of the ICA: "Absent a clear statement to the contrary,

6

Congress' reference to the 'regulatory authority of a State' should be read to preserve, not preempt, the traditional prerogative of the States to delegate their authority to their constituent parts." *Ours Garage*, 536 U.S. at 429 (quoting 49 U.S.C. § 14501(c)(2)(A)). Again, the Supreme Court based its conclusion on the specific statutory language at issue.

The defendants make no attempt to show that the NLRA sections at issue in this case are analogous to the FIFRA and ICA provisions discussed in *Mortier* and *Ours Garage*. This is likely because there are virtually no similarities that would justify similar treatment. Unlike the statutes analyzed in *Mortier* and *Ours Garage*, the term "State" in § 14(b) is not used in an express grant or acknowledgment of states' regulatory authority. Rather, it identifies the political entities whose right-to-work laws withstand the NLRA. 29 U.S.C. § 164(b); *cf. Ours Garage*, 536 U.S. at 428 ("As an exception to this general rule [of preemption], Congress provided that the preemption directive 'shall not restrict the safety regulatory authority of a State with respect to motor vehicles.'" (quoting 49 U.S.C. § 14501(c)(2)(A))); *Mortier*, 501 U.S. at 606 ("A State may regulate the sale or use of any federally registered pesticide or device . . . ." (quoting 7 U.S.C. § 136v)).

Because the term "State" was used in a different context in FIFRA and the ICA than in the NLRA, the Supreme Court's interpretation of that term in *Mortier* and *Ours Garage* is not dispositive. Instead, standard principles of statutory interpretation control. Those principles lead the Court to read the two uses of the word "State" in § 14(b) as referring to the same thing. *See Powerex*, 551 U.S. at 232 (citations omitted). Thus, "State" law does not include county or municipal law for purposes of § 14(b), and Ordinance 300 is not protected by § 14(b).

7

### B. Section 14(b) and NLRA Preemption

The next question, then, is whether § 14(b) is the only exception to NLRA preemption. The Supreme Court has observed that "[t]here is nothing in either § 14(b)'s language or legislative history to suggest that there may be applications of right-to-work laws which are not encompassed under § 14(b) but which are nonetheless permissible." *Mobil Oil Corp.*, 426 U.S. at 413 n.7. Although the defendants dismiss this statement as mere dictum (D.N. 14, PageID # 199), the Court's entire analysis in *Mobil Oil* was premised on the assumption that only a right-to-work law covered by § 14(b) can be valid.[3] *See* 426 U.S. at 412-13 ("[T]he central inquiry in this case is whether § 14(b) permits the application of Texas' right-to-work laws to the agency-shop provision in the collective-bargaining agreement between the Union and respondent. Only if it is to be so read is the agency-shop provision unenforceable."). In other words, the Court recognized that § 14(b) is the sole source of authority for right-to-work laws. *See id.* at 413 n.7 ("[I]t is '§ 14(b) [which] gives the States power to outlaw even a union-security agreement that passes muster by federal standards.'" (second alteration in original) (quoting *Retail Clerks Int'l Ass'n, Local 1625 v. Schermerhorn*, 375 U.S. 96, 103 (1963))). Notably, the Court cited *Kentucky State AFL-CIO v. Puckett*, 391 S.W.2d 360 (Ky. 1965), in which the Kentucky Court of Appeals (then Kentucky's highest court) found a city right-to-work ordinance to be preempted by the NLRA. *See id.* at 362; *Mobil Oil*, 426 U.S. at 413 n.7.

Notwithstanding the *Mobil Oil* Court's treatment of § 14(b), the defendants contend that in an earlier case, *Schermerhorn*, "the Supreme Court took pains to explain that the [NLRA] never preempted State power." (D.N. 16-1, PageID # 232) Like *Mobil Oil*, *Schermerhorn* deals with §§ 8(a)(3) and 14(b) of the NLRA but is not directly on point. The question in

---

[3] In *Mobil Oil*, the Court considered whether Texas' right-to-work laws applied to an agency-shop agreement covering employees who spent little work time in Texas. *See* 426 U.S. at 410.

8

*Schermerhorn* was whether state courts or the NLRB had jurisdiction to enforce a state's right-to-work law. *Schermerhorn*, 375 U.S. at 97-98. The *Schermerhorn* Court noted that in enacting § 8(a)(3),

> Congress undertook pervasive regulation of union-security agreements, raising in the minds of many whether it thereby preempted the field . . . , and put such agreements beyond state control. That is one reason why a section, which later became § 14(b), appeared in the House bill—a provision described in the House Report as making clear and unambiguous the purpose of Congress not to preempt the field. That purpose was restated by the House Conference Report in explaining § 14(b).

*Id.* at 100-01 (footnotes omitted). The defendants focus on this excerpt but quote it selectively, omitting any mention of the House Reports. (*See* D.N. 16-1, PageID # 232) They take more liberties with a later quotation from *Schermerhorn*, asserting that "[t]he Court went on to state unequivocally: 'It was never the intention of the National Labor Relations Act . . . to preempt the field in this regard so as to deprive the States of their powers to prevent compulsory unionism.'" (*Id.*, purportedly quoting *Schermerhorn*, 375 U.S. at 102) The passage quoted by the defendants was not a statement by the *Schermerhorn* Court, but rather a quote from the House Conference Report. *See* 375 U.S. at 101 n.9.

In any event, *Schermerhorn* is not damaging to the plaintiffs' position. The Court's statement that Congress did not intend to preempt the field of union-security agreements is based on the House Reports it cites. *See id.* at 101 & nn.8-9. Those reports do explain that the amendments were not meant to preclude states from enacting and enforcing right-to-work laws, but they do not suggest that a right-to-work provision could never be touched by preemption. Indeed, the House Report recognized the NLRA's broad preemptive effect, indicating that state right-to-work laws would be preempted in the absence of § 14(b):

> "Since by the Labor Act Congress preempts the field that the act covers insofar as commerce within the meaning of the act is concerned, and since when this report

9

> is written the courts have not finally ruled upon the effect upon employees of employers engaged in commerce of State laws dealing with compulsory unionism, the committee has provided expressly in section 13 [now § 14(b)] that laws and constitutional provisions of any State that restrict the right of employers to require employees to become or remain members of labor organizations are valid, notwithstanding any provision of the National Labor Relations Act."

*Id.* at 101 n.8 (quoting H.R. Rep. No. 510, 80th Cong., 1st Sess., p. 44). Likewise, the House Conference Report merely acknowledged that Congress did not intend to preempt right-to-work laws to the extent states had already been allowed to establish them:

> "Many states have enacted laws or adopted constitutional provisions to make all forms of compulsory unionism in those States illegal. It was never the intention of the National Labor Relations Act . . . to preempt the field in this regard so as to deprive the States of their powers to prevent compulsory unionism." [4]

*Id.* (omission in original) (quoting H.R. Rep. No. 510, 80th Cong., 1st Sess., p. 60).

NLRA preemption doctrine erases any lingering doubts about how to interpret *Schermerhorn*. In the context of the NLRA, there are two distinct preemption principles: *Garmon* preemption and *Machinists* preemption. *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 613 (1986); *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724 (1985). Only *Garmon* preemption is relevant here.

*Garmon* preemption forbids state and local regulation of "activity that the NLRA protects, prohibits, or arguably protects or prohibits." *Golden State*, 475 U.S. at 613; *see Bldg. & Constr. Trades Council of the Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 224-25 (1993). "This rule of pre-emption is designed to prevent conflict between, on the one hand, state and local regulation and, on the other, Congress' 'integrated scheme of regulation.'" *Bldg. & Constr. Trades Council*, 507 U.S. at 225 (quoting *San Diego*

---

[4] The *Schermerhorn* Court noted that "[b]y the time § 14(b) was written into the Act [in 1947], twelve states had statutes or constitutional provisions outlawing or restricting the closed shop and related devices" (i.e., right-to-work laws) and that "Congress seems to have been well informed" of such laws when it debated the 1947 amendments. 375 U.S. at 100.

10

*Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 247 (1959)). Section 8(a)(3) of the NLRA protects union-security agreements. 29 U.S.C. § 158(a)(3) ("*Provided*, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein . . . ."). Thus, barring any exceptions, state and local regulation of union-security agreements is preempted by the NLRA.

There is, however, an exception to this preemption: § 14(b), which allows states and territories to prohibit union-security agreements. 29 U.S.C. § 164(b). The only logical reading of § 14(b), in light of *Garmon* and *Schermerhorn*, is that it is the sole exception to NLRA preemption of right-to-work laws. Thus, any regulation that falls outside the confines of § 14(b) is preempted.[5] And because § 14(b) does not apply to counties, the NLRA preempts Ordinance 300's right-to-work provision.

**C. Hiring Halls**

Subsection (4)(E) of the ordinance provides that no employee shall be required "to be recommended, approved, referred, or cleared by or through a labor organization" as a condition of employment or continued employment. (D.N. 5-1, PageID # 96) The plaintiffs argue that this

---

[5] The defendants' citation of *NLRB v. Pueblo of San Juan*, 276 F.3d 1186 (10th Cir. 2002), does not alter the Court's conclusion. In that case, which the defendants offer as an example of a court finding no preemption of a "local" right-to-work law, the Tenth Circuit conducted its entire preemption analysis using principles specific to tribal law. *See, e.g.*, *id.* at 1190 ("The burden falls on the NLRB and the Union, as plaintiffs attacking the exercise of sovereign tribal power, 'to show that it has been modified, conditioned or divested by Congressional action.'" (quoting *Southland Royalty Co. v. Navajo Tribe*, 715 F.2d 486, 488 (10th Cir. 1983))). And the defendants quote selectively from the decision to make it appear more persuasive and pertinent than it actually is. In short, *Pueblo of San Juan* is of little value in analyzing the constitutionality of Ordinance 300—with one exception that favors the plaintiffs: the Tenth Circuit noted that the NLRA "embraces diversity of legal regimes respecting union security agreements at the level of 'major policy-making units.'" *Id.* at 1197 (quoting *N.M. Fed'n of Labor v. City of Clovis*, 735 F. Supp. 999, 1003 (D.N.M. 1990)).

provision—which prohibits what are known as hiring-hall agreements—is preempted regardless of whether Ordinance 300 is a state law under § 14(b). In support, they cite *Local 514, Transport Workers Union of America v. Keating*, 212 F. Supp. 2d 1319 (E.D. Okla. 2002), which they note "follows a unanimous line of circuit court precedent[] holding the state regulation of hiring hall agreements is preempted by the NLRA." (D.N. 7-1, PageID # 117) The *Local 514* court found an Oklahoma state law prohibiting hiring-hall agreements to be preempted because it fell "outside the grant of authority contained in section [14(b)]." 212 F. Supp. 2d at 1327.

The defendants offer little in response except to suggest that the Court depart from substantial precedent and find the hiring-hall provision valid as part of the ordinance's "overall intent . . . to preclude compulsory union membership." (D.N. 16-1, PageID # 250) Noting that previous decisions have invalidated such provisions on the ground that hiring-hall agreements are technically separate from the employment relationship, the defendants point out that hiring-hall agreements occur exclusively in the construction industry, where "employment is often a 'revolving door'" and "[t]he line between the 'hiring process' and 'post-hiring' is a continuum." (*Id.*, PageID # 251) They argue that "[a]s a practical matter, required union referrals lead to pressure to join and pay union dues" and that "[m]andatory union referrals are inherently inconsistent with truly voluntary membership." (*Id.*) They cite no authority in support of their position, however.

The Court declines to depart from the unanimous line of circuit court precedent finding that the NLRA preempts regulation of hiring-hall agreements. *See Laborers' Int'l Union Local 107 v. Kunco, Inc.*, 472 F.2d 456, 458-59 (8th Cir. 1973); *NLRB v. Tom Joyce Floors, Inc.*, 353 F.2d 768, 770-71 (9th Cir. 1965); *NLRB v. Houston Chapter Associated Gen. Contractors*, 349 F.2d 449, 451 (5th Cir. 1965). Those courts found that § 14(b) is the sole exception to "the

general rule that the federal government has preempted the field of labor relations." *Local 107*, 472 F.2d at 458. And § 14(b)—which, as explained above, is inapplicable to counties in any event—only provides a carve-out for "compulsory unionism." *Id.* Because hiring halls do not compel union membership, the power to regulate them does not fall within § 14(b). *Id.* at 459. The Court thus finds that the NLRA preempts Ordinance 300's hiring-hall provision.

### D. Dues Checkoff

Section 5 of Ordinance 300 provides:

> It shall be unlawful to deduct from the wages, earnings, or compensation of an employee any union dues, fees, assessments, or other charges to be held for, transferred to, or paid over to a labor organization, unless the employee has first presented, and the employer has received, a signed written authorization of such deductions, which authorization may be revoked by the employee at any time by giving written notice of such revocation to the employer.

(D.N. 5-1, PageID # 96) As with the hiring-hall provision, the plaintiffs argue that Section 5, the "dues-checkoff" provision, is not covered by § 14(b) of the NLRA because a dues-checkoff agreement is not an "agreement[] requiring membership in a labor organization as a condition of employment." 29 U.S.C. § 164(b). They cite several cases, most notably *SeaPAK v. Industrial Technical & Professional Employees*, 300 F. Supp. 1197 (S.D. Ga. 1969), in support of this position.[6] (*See* D.N. 7-1, PageID # 115-16)

The defendants maintain that dues checkoff is part and parcel of compulsory union membership. (D.N. 16-1, PageID # 248) They further contend that there is no conflict between Section 5 of the ordinance, which makes authorization revocable "at any time," and the Labor Management Relations Act, which provides that authorizations "shall not be irrevocable for a period of more than one year." (*Id.* (citing 29 U.S.C. § 186(c)(4)) The defendants again offer no

---

[6] *SeaPAK* was adopted by the Fifth Circuit and affirmed by the Supreme Court without opinion. *See* 400 U.S. 985 (1971); *SeaPAK v. Indus. Tech. & Prof'l Emps.*, 423 F.2d 1229 (5th Cir. 1970).

13

authority to support their position and instead ask the Court to depart from the precedent cited by the plaintiffs.

The Court again declines to depart from well-established precedent. The *SeaPAK* Court found that the field of labor relations is preempted, that § 14(b) permits state regulation "only as to forms of union security which are the practical equivalent of compulsory unionism," and that dues-checkoff provisions do not amount to compulsory unionism. *SeaPAK*, 300 F. Supp. at 1200-01. This Court agrees.

### III.   CONCLUSION

The NLRA preempts the right-to-work, hiring-hall, and dues-checkoff provisions of Hardin County Ordinance 300. Section 14(b) is the only exception to NLRA preemption of the field of labor relations, and it does not extend to counties or municipalities. Because Ordinance 300 does not fall under § 14(b)'s narrow exception, sections 4, 5, and 6 of the ordinance are preempted and thus invalid. Accordingly, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1)   The Plaintiffs' Motion for Summary Judgment (D.N. 7) is **GRANTED**.

(2)   The Defendants' Motion for Summary Judgment (D.N. 16) is **DENIED**.

(3)   The Defendants' Motion for Leave to File Supplemental Legal Authorities (D.N. 39) is **GRANTED**.

(4)   The Plaintiffs' Motion for Leave to File Supplemental Legal Authority (D.N. 40) is **GRANTED**.

(5)   A separate judgment will issue this date.

February 3, 2016

14

**David J. Hale, Judge**
**United States District Court**